Melissa Read
July 18, 2012

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

---------------------------------------------------------

OCEANS OF IMAGES
PHOTOGRAPHY, INC., a
Florida Corporation,

              Plaintiff,

   -vs-               Case No. 8:11-cv-1160-T-30AEP

FOSTER AND SMITH, INC., a
Wisconsin Corporation,

              Defendant.

---------------------------------------------------------


          Examination of MELISSA K. READ, taken at

the instance of the Plaintiff, under and pursuant to

Federal Rules of Civil Procedure, before ANDREA REICHLE,

a Registered Professional Reporter and Notary Public in

and for the State of Wisconsin, at Best Western Inn, 70


North Stevens Street, Rhinelander, Wisconsin, on


July 18, 2012, commencing at 1:44 p.m. and concluding at


3:24 p.m.

Melissa Read
July 18, 2012

1                       A P P E A R A N C E S

2       GRAY ROBINSON, P.A., by
        MR. WOODROW POLLACK,
3       201 North Franklin Street, Suite 2200,
        Tampa, Florida 33602,
4       appeared on behalf of the Plaintiff.

5       HINSHAW & CULBERTSON, LLP, by
        MR. CHARLES GEITNER,
6       100 South Ashley Drive, Suite 500,
        Tampa, Florida 33602,
7       appeared on behalf of the Defendant.

8                     A L S O   P R E S E N T

9       Mr. Richard M. Howard, Plaintiff.
        Ms. Laura Howard, telephonically, Plaintiff.
10

11                          * * * * *

12                          I N D E X

13      Examination By:                              Page

14      Mr. Pollack.....................................  3

15      Exhibit Identified:                          Page

16      No. 1 -Two Screen Shots Of Facebook Page...........  25
        No. 2 -Letter From Laura Howard To SueEllen Hopp,
17              November 4, 2002; Oceans of Images - Bird
                Spreadsheet; Oceans of Images - Fish
18              Spreadsheet; Oceans of Images -
                Reptile/Small Animal Spreadsheet............  31
19      No. 3 -Invoice No. FS1038; Check Stub For Check
                No. 2601; Letter From Laura Howard To
20              Melissa Read, Dated January 12, 2002........  38
        No. 4 -Drs. Foster & Smith Web Page Printouts......  44
21      No. 5 -Printouts From The Wayback Machine..........  45

22                          * * * * *

23      Disposition Of Original Exhibits:

24      Attached To Original Transcript.

25

Melissa Read
July 18, 2012

1                    TRANSCRIPT OF PROCEEDINGS

2                    MELISSA K. READ, called as a witness

3          herein, having been first duly sworn on oath, was

4          examined and testified as follows:

5                         EXAMINATION

6    BY MR. POLLACK:

7    Q    Good afternoon, Ms. Read.  How're you?

8    A    Good.

9    Q    Have you ever had your deposition taken before?

10   A    No.

11   Q    Okay.  Just a couple of ground rule type things.

12        I'm going to try my best to ask questions that you

13        understand, but if I ask you a question and you

14        don't understand it, please let me know, and I will

15        try and ask it a better way.  Please try and answer

16        with words and not head nods so she can write down

17        what you're saying.

18   A    Okay.

19   Q    Have you taken any medications or anything that

20        would impact your ability to testify truthfully

21        today?

22   A    No.

23   Q    Where do you work?

24   A    I work at Foster & Smith.

25   Q    And what do you do at Foster & Smith?

Melissa Read
July 18, 2012

1    A    I'm a graphic designer and project coordinator for

2         the Internet.

3    Q    What's a project coordinator?

4    A    I coordinate projects for the web site, and I make

5         sure they get implemented, and I work with various

6         people in the company to make sure everybody is

7         informed and kept on goal.

8    Q    What would be an example of a project?

9    A    Say, we're implementing some new service, I would

10        make sure that all of the elements on the web site

11        are created and approved, and I would work with the

12        people in my department to make sure they're able

13        to implement the new project or service, and I

14        would work with programmers to make sure what they

15        program for us works for us and works for

16        customers.

17   Q    Who's in your department?  Not necessarily the

18        names, the types of people in your department.

19   A    Production specialists.  We have copywriters and a

20        couple other graphic designers.

21   Q    And programmers?

22   A    They're in a separate department.

23   Q    So when a new project for the web sites would come

24        up that would require some programming, you would

25        coordinate the graphic elements and the desired

Melissa Read
July 18, 2012

Page 5

1      look and feel with the implementation done by the

2      programmers?

3   A  Yes.

4   Q  You said there are other graphic designers?

5   A  Yes.

6   Q  How many graphic designers?

7   A  Right now there are two, but they also work on

8      catalog designs as well.

9   Q  Who are the other two?

10  A  Beth Grasser and Benoit Meney.

11  Q  Can you spell his last name?

12  A  M-E-N-E-Y.

13  Q  And Ms. Grasser and Mr. Meney, they do Internet and

14     catalog?

15  A  Yes.

16  Q  And do you do both Internet and catalog?

17  A  No.  I just do Internet.

18  Q  Okay.  How long have you been at Foster & Smith?

19  A  12 years.

20  Q  Has your title been the same throughout that

21     12-year period?

22  A  No.  Started out just as a graphic designer.

23  Q  And then what did you become?

24  A  Then we added project coordinator.

25  Q  Okay.  How long ago did you become a project

Page 6

1       coordinator?

2    A  I'm not sure exactly, but it was probably three or

3       four years ago.

4    Q  So before you were a project coordinator, what were

5       your responsibilities as a graphic designer?

6    A  I'm still a graphic designer, so not to be confused

7       with -- I haven't -- I'm not not a graphic designer

8       anymore.  I also do that.

9    Q  Okay.

10   A  Okay.  I design our emails.  I help design a home

11      page, refreshes, division refreshes.  I approve and

12      review product pages and any other sort of general

13      informational page that goes on the web site that I

14      haven't designed that somebody else did.  I guess

15      that's about it.

16   Q  Okay.  That sounds like a lot.

17   A  Yep.

18   Q  What is a home page refresh?

19   A  That would be, like, our home page, say,

20      DRSFOSTERSMITH.COM, if you type that in, that's our

21      home page, and we refresh the content of that, and

22      I either do the design or I approve the design.

23   Q  Refresh the contents so that if I visited it today,

24      it might look different if I go there tomorrow?

25   A  Right.

Melissa Read
July 18, 2012

Page 7

1    Q    Or if I reload it right now, there might be a

2         couple different versions of the home page?

3    A    Sure.

4    Q    And then division refreshes?

5    A    That would be then if you go to our home page and

6         then, say, you move to our dog page, that's a dog

7         division page.  So we have dog, cat, fish, pond,

8         small pet, reptile, parrot, horse.  Each one of

9         those is a division.

10   Q    Okay.  And all of this is the DRSFOSTER&SMITH.COM

11        web site?

12   A    Yes.

13   Q    Are there other web sites?

14   A    Yes.  We also have our PETEDUCATION.COM web site

15        and our LIVEAQUARIA.COM web site.

16   Q    Any others?

17   A    Not right now.

18   Q    And do you have the same responsibilities for Pet

19        Education and LiveAquaria web sites?

20   A    I oversee things that happen on those pages.

21        LiveAquaria, I do the home page, and we don't have

22        divisions.  I do the emails.  I oversee product

23        pages.  Pet Education is a little bit different in

24        that it's sort of run on its own and has been set

25        up years ago, and we don't really add new content

Melissa Read
July 18, 2012

Page 8

1      very frequently.

2  Q   So is the bulk of the work on LiveAquaria and

3      DRSFOSTER&SMITH.COM adding new content, changing

4      design?

5  A   Both.

6  Q   Both.  And who do you oversee -- I'm sorry.  I

7      think LiveAquaria, you said you do that just like

8      you do DRSFOSTER&SMITH.COM?

9  A   Mm-hmm, mm-hmm.

10 Q   And then Pet Education, it's more of a management

11     then --

12 A   It sort of runs on its own.  We don't -- we don't

13     do a lot to maintain it.  We're not putting new

14     content on there.  We do update it occasionally,

15     like the home page and stuff like that, but it's

16     not frequently.

17 Q   Okay.  Where were you at before Foster & Smith?

18 A   I worked at a company called Thomas Register in

19     Grand Rapids, Michigan.

20 Q   Were you a graphic designer there?

21 A   Yep, yes.

22 Q   For Internet?

23 A   Yeah, that was Internet, print as well.

24 Q   And how long were you at Thomas Register?

25 A   A year.

Melissa Read
July 18, 2012

Page 9

1   Q    And before Thomas Register?

2   A    That was my first job out of college.  So --

3   Q    Okay.  Where did you go to college?

4   A    I went to Michigan State University.

5   Q    Did you get a degree?

6   A    Yes.

7   Q    Did you have a major?

8   A    I have a bachelor of fine arts.

9   Q    So what is the process for designing a home page

10       refresh?

11  A    Okay.  That's a lengthy answer.  Right now, the

12       process is -- I mean, you have to start from the

13       very beginning where we set up the schedule, and we

14       say we're going to update the home page on these

15       dates throughout the year.  And then merchandising

16       selects what products they may want on it.  And

17       then marketing tells us what else to market on

18       there.  And then when it gets to our time to design

19       it, we bring all those elements together and do the

20       work.

21  Q    And make it look nice?

22  A    Yeah.

23  Q    The schedule that you mentioned, is that kind of an

24       external release schedule or an internal project

25       management-type schedule that would manage the

Melissa Read
July 18, 2012

Page 10

1        resources that would be involved?

2    A   It's internal.

3    Q   To manage the resources how you're going to get

4        from A to B?

5    A   Mm-hmm.

6    Q   Who's going to need to do what?

7    A   Mm-hmm, yes.

8    Q   Are there documents that --

9    A   Yes, there is, right now.

10   Q   What's that mean?

11   A   Well, because we're talking about a long span of

12       time here and our processes have changed --

13   Q   Okay.

14   A   -- from the point that I started working at Foster

15       & Smith to now.  So I can tell you what we're doing

16       right now.

17   Q   Okay.  What are you doing right now?

18   A   What I just told you.

19   Q   Okay.  The schedules?

20   A   Yeah.

21   Q   What were you doing before?

22   A   I don't -- I don't remember.

23   Q   Okay.  You said the merchandising selects which

24       products that are going to want to be featured in

25       the new home page and the marketing selects how to

Melissa Read
July 18, 2012

1      market that.

2   A    Mm-hmm.

3   Q    How is that information communicated to you?

4   A    A spreadsheet.

5   Q    What types of things would be in that spreadsheet?

6   A    Product numbers, product IDs, maybe a little bit of

7      copy.

8   Q    And the product numbers and IDs, is that the

9      information coming from the merchandising people?

10   A    Yes.

11   Q    What information are the marketing people

12      providing?

13   A    A copy, which is just to tell us, you know, we may

14      want this promoted more than this or a certain

15      headline.  Like right now we're doing our summer

16      sale, so they would tell us to go that route.

17   Q    Would they provide you images to use on the web

18      site?

19   A    No.

20   Q    Okay.  Where do you get images for the web site?

21   A    A lot of places on the -- on our servers.

22   Q    What are those places?

23   A    That's another complicated answer.  So you have to

24      bear with me.

25   Q    Okay.

Melissa Read
July 18, 2012

Page 12

1   A   We have a set of images that come from the catalog.

2       Okay.  Because we have often been two different

3       departments, we've been the catalog department and

4       we've been the Internet department.  So although

5       we're right now the same creative department, we've

6       had two sets of --

7               So typically we get all of our images

8       from catalog.  And they have numerous folders on

9       their network of where all these images are, and we

10      just sort of look through them and pick what we

11      want to use.

12  Q   And, then, do you just use whatever you've picked?

13  A   Yeah.  Then we format it for the Internet and save

14      it to our network, the formatted low resolution

15      image, and then we load it to our server and put it

16      on a web site.

17  Q   And is there any kind of approval process before

18      you --

19  A   Yes, there's a proofing and routing process.  So it

20      goes to a proofreader, make sure there's no typos,

21      everything is correct.  And it goes to one of our

22      Internet production specialists so they can verify

23      that whatever we're saying is correct as well.

24              Usually a copywriter looks at things to

25      make sure we have appropriate copy.  Sometimes if

Melissa Read
July 18, 2012

1          it's healthcare related, a veterinarian reviews it,

2          and then they get routed to call center managers,

3          owners, marketing manager, merchandising manager.

4     Q    What do you mean it gets routed?

5     A    Oh, sorry.  It gets distributed with a due date and

6          the person they need to review it, mark any

7          changes, and then return it to us.  So that's what

8          routing is.

9     Q    So those people have to sign off?

10    A    Yes.

11    Q    And you said that would be owners?

12    A    It's a -- the group changes depending on what it

13         is.  So if it's a -- let's say it's a fish email,

14         that's going to get routed to the fish

15         merchandising manager.  It's going to get routed to

16         our marketing managers.  And I think everything

17         gets routed to some of the owners.  I don't know

18         who exactly.

19    Q    By "owners," do you mean owners of the business?

20    A    Yes.  I mean, like Race Foster or Marty Smith, John

21         Powers, but I don't know -- Mike Scrivner doesn't

22         get anything.  But I don't know of the owners who

23         gets them.  And then it goes to call center

24         managers and the LiveAquaria manager, if it's a

25         fish email.  So that sort of changes depending on

Melissa Read
July 18, 2012

Page 14

1         what topic it is.

2    Q    And do you know what the managers are looking for

3         in that approval process?

4    A    Well, each one is looking at a different element.

5         So merchandising is looking at the product to make

6         sure it's being represented the way they feel it

7         needs to be represented.  Marketing it, putting

8         their marketing spin on it.  Call center,

9         they're -- that's just a notification for them.

10        Owners, I don't know what they're looking for.

11   Q    Okay.  So going back to where the images are

12        stored, you said a number of places on the servers,

13        and we've talked about the images from the

14        catalogs.

15   A    Mm-hmm.

16   Q    What would be the another place you would get an

17        image from?

18   A    Sometimes we might get an image directly from our

19        photography, but in general it's probably going to

20        be stored on the catalog image servers.

21   Q    Foster & Smith has in-house photographers?

22   A    Yes.

23   Q    How many in-house photographers?

24   A    Right now we have three.

25   Q    Has -- how long has Foster & Smith had in-house

Melissa Read
July 18, 2012

1       photographers?

2    A    Since as long as I've worked there.

3    Q    Okay.  Have they always had three?

4    A    No.  It changes.

5    Q    Sometimes more; sometimes less?

6    A    Right, yep.

7    Q    What do the in-house photographers do?

8    A    They photograph products.  They do catalog cover

9         kind of glory shots, things like that.

10   Q    What is a -- what do you mean by that?

11   A    I mean, like, if you have a catalog cover and it's

12        a beautiful photograph of a dog running in a field

13        with a small kid, they've shot that.

14   Q    Okay.  So images can come from -- most of the

15        images, it sounds like, come from the catalog

16        people.  You might also get images from

17        photography?

18   A    Right, which is still the catalog.

19   Q    Probably come by way of the --

20   A    Yeah.

21   Q    Anywhere else?

22   A    We get images also from our coral farm.  We have a

23        section on our web site called "The Divers Den"

24        which is a what-you-see-is-what-you-get section.

25        So every day they photograph up to 150 fish coral

Melissa Read
July 18, 2012

1        inserts and load them on the web site, and we sell

2        them.  And so sometimes we use their photography.

3    Q   To help sell the coral or maybe it's --

4    A   Glory shots, articles, things like that.  It's not

5        for -- we don't use them to sell the coral.

6    Q   Okay.  But those are pictures taken by Foster &

7        Smith employees?

8    A   Yeah.

9    Q   Any other sources of images?

10   A   We have a few vendor-type images.  Some that we've

11       obtained from -- let's say, we have, for instance,

12       an author who has given us some articles and he's

13       provided images with it, and we use those images in

14       his article, and we have a few that we're using

15       online to sell, like, a product, but they say

16       copyright so-and-so.

17   Q   You have a few images that are associated with a

18       product that some vendor provided?

19   A   These ones are specifically fish and coral for our

20       LiveAquaria web site.  And we do use some vendor

21       images like from Instant Ocean salt mixes, United

22       Pet Group.  So they will provide us their image

23       because we haven't been able to shoot it

24       internally.

25   Q   Okay.  And is that an image of their product?

Melissa Read
July 18, 2012

1    A    Yes.

2    Q    Okay.  So some people who have products that you

3         sell --

4    A    Yes.

5    Q    -- provide images, marketing materials, including

6         images, to go with those products?

7    A    Yes.

8    Q    The author that has some articles or images, who is

9         that author?

10   A    Scott Michael.  There may be others, I'm not sure.

11        I just know that one because I did the article.

12   Q    How many -- if you know, how many vendors -- how

13        many product vendors also have marketing images

14        that they provided to you to use for marketing with

15        their product?

16   A    I don't know.  Yeah, that's not something I know.

17        I'm trying to think if --

18   Q    Is it a little, is it a lot, or you don't even have

19        a sense?

20                    MR. GEITNER:  Objection to form.

21                    MR. POLLACK:  You can still answer.

22                    THE WITNESS:  I just don't -- I really

23        don't know.  We have thousands and hundreds of

24        thousands of images.

25   BY MR. POLLACK:

Melissa Read
July 18, 2012

Page 18

1   Q   Would those images also be stored on the catalog?

2   A   Yes.

3   Q   Okay.  Would you know that those are vendor images

4       based on how they're stored on the catalog

5       departments?

6   A   Vendor images have a "V" on them, in general.

7       They're supposed to.

8   Q   In the name of the file?

9   A   Yes.  But -- some instances where that's not going

10      to happen, for instance, the Scott Michael article,

11      those images he provided us specifically for his

12      article, and they're in his article only, and we

13      don't have any further copy of that image.

14  Q   The image is embedded in the article and you

15      just --

16  A   Right.  We don't have a high resolution image on

17      our catalog server.

18  Q   Okay.  The catalog server, is that the hard drive

19      or the network directory that the catalog people

20      have the images on?

21  A   Mm-hmm.

22  Q   And so the vendor images, you think, should

23      generally have a "V" in them?

24  A   Yes, hope so.

25  Q   Are there other vendor images that are not

Melissa Read
July 18, 2012

1          associated with specific products?

2     A    I don't know.

3     Q    How do you know what product a vendor image is

4          associated with for the images with a "V"?

5     A    If I see an image that has a "V," I don't

6          really -- I use it because if it's available to me

7          to use, that means I can use it.

8     Q    What does it mean to be available for you to use?

9     A    It's on the server, on the network, the catalog

10         images server, and it's there and I can use it.  So

11         --

12    Q    So if it's on the -- if it's on the catalog server,

13         your understanding is you are free to use the

14         image?

15    A    Yes.

16    Q    On any web site?

17    A    Yes.

18    Q    Why do you have that understanding?

19    A    Because if I'm not supposed to use it, it shouldn't

20         be accessible.

21    Q    Whose responsibility is it to make sure only images

22         that you can use are on the catalog server?

23    A    I don't know.  I wish I knew, but I don't.

24    Q    Who would be the person to ask whose responsibility

25         that would be?

Melissa Read
July 18, 2012

Page 20

1    A    I guess I probably would go to Ryszard.

2    Q    Kotula?

3    A    Yes.

4    Q    Did I pronounce that correctly?

5    A    Yes.

6    Q    And his title is?

7    A    I don't know.  We don't really work together.

8    Q    You don't work together?

9    A    No.  Our jobs don't intertwine.

10   Q    Is Ryszard in the creative department?

11   A    Yes.

12   Q    And you're in the creative department?

13   A    Yes.

14   Q    But you're in different areas of the creative

15        department?

16   A    Yes.

17   Q    What area of the creative department is Mr. Kotula

18        in?

19   A    I don't know.  He deals with catalogs and paper.

20        So I don't have anything to do with that.

21   Q    Okay.  And you're all online?

22   A    Right.

23   Q    So when you design -- excuse me, a new home page

24        refresh or any web page?

25   A    Mm-hmm.

Melissa Read
July 18, 2012

Page 21

1    Q    Do you create mock-ups?

2    A    Yes.

3    Q    Are those mock-ups stored somewhere?

4    A    Yes.

5    Q    Where are they stored?

6    A    On one of our network folders.

7    Q    Does that network folder have a name?

8    A    It's like internal.  It depends on what the project

9         is.  So --

10   Q    If you were designing new FOSTER&SMITH.COM homepage

11        refreshes?

12   A    Homepage refreshes, you know, I don't -- I don't

13        know the path to the folder off the top of my head.

14   Q    What would you need to look at to know the name?

15   A    My computer.

16   Q    If you were going to tell one of your colleagues --

17   A    I would go to my computer and navigate to it, but I

18        don't --

19   Q    You don't know.  What are the names of the

20        mock-ups?  What do you call the mock-ups?

21   A    It varies.  It could be anything.  I could call it

22        homepage, you know, 71612 or it could be called DFS

23        home.  I don't know.  It changes.

24   Q    Let me ask the -- I don't think I asked a very good

25        question.  Do you call them mock-ups?

Melissa Read
July 18, 2012

Page 22

1    A    No.

2    Q    What do you call them?  Not the file name.  If you

3         say, "I'm going to go create a -- I'm going to

4         design a new homepage refresh."

5    A    That's what I call it.

6    Q    A new homepage refresh?

7    A    Yes.

8    Q    And how long are these homepage refreshes stored?

9    A    I don't know how to answer that.  Do you mean the

10        Photoshop document that is creating the file, or do

11        you mean the low resolution JPEG that's loaded on

12        to the web site, or do you mean how long has the

13        refresh been up?

14   Q    Before it goes live, when you're still designing

15        it.

16   A    Mm-hmm.

17   Q    What I called the mock-up before.

18   A    Mm-hmm.

19   Q    Is it fair to call that -- what I'm calling a

20        mock-up.  You understand what I mean by a mock-up?

21   A    Yes.

22   Q    Is that mock-up a document somewhere?

23   A    Yes.

24   Q    And you would call that document a homepage

25        refresh?

Melissa Read
July 18, 2012

Page 23

1    A    Yes.

2    Q    Even before it goes live.  It may be set to go live

3         in two months, but for now it's a homepage refresh

4         for August 2012?

5    A    Sure.

6              MR. GEITNER:  Objection to form.

7    BY MR. POLLACK:

8    Q    Okay.  And those homepage refreshes are stored on a

9         network folder somewhere.  Are they deleted at some

10        point in time?

11   A    I don't -- I don't know if they are.  They just

12        stay in that folder.  Where they go, I don't know.

13   Q    Do you delete them?

14   A    I don't, but I don't know if somebody else does

15        eventually.

16   Q    Okay.  Are all of the homepage refreshes in a

17        single folder?

18   A    Right now.

19   Q    Before they were not?

20   A    I just really don't know.

21   Q    Is there someone who would know?

22   A    No.  It's just that our process changes literally,

23        like, constantly.  So right now, we've got a

24        spreadsheet, and we're refreshing every two weeks

25        right now.  Before that -- and we have, you know,

Melissa Read
July 18, 2012

Page 24

1           Benoit, he's a new designer, he's doing the

2           homepages right now, so they're stored in a

3           different folder.  As opposed to when Beth was

4           doing them, which may have been a year ago or two

5           years ago, and we had a different schedule and

6           maybe we didn't have a spreadsheet.  I don't know.

7           And as opposed to when I was doing them way back

8           when, I can't remember.

9      Q    Okay.  And the spreadsheet you're referring to was

10          the same spreadsheet you were talking about before?

11     A    Yes.

12     Q    What I'm going to hand you is going to seem like a

13          weird exhibit.  Give me a second to find it.  And I

14          didn't mention before, at any time you need a

15          break, please say so.  I'm happy to do that.

16                (Exhibit No. 1 was marked.)

17     BY MR. POLLACK:

18     Q    So this is -- I'm handing you what's been marked as

19          Exhibit 1.

20                MR. POLLACK:  Chuck, for some reason your

21          copy is two copies.

22                MR. GEITNER:  Is it the same thing?  Do

23          you want to keep one?

24                MR. POLLACK:  No, it's not.  I'm sorry.

25          It's two pages.

Melissa Read
July 18, 2012

Page 25

1          MR. GEITNER:  Front and back.

2          MR. POLLACK:  The general way I do this

3     is the witness copy is single-sided.  To ease the

4     scanning process later on the lawyer copy, it's a

5     double-sided one.  For this one, it's okay.  We'll

6     get it all worked out.

7          MR. GEITNER:  Okay.  All right.

8  BY MR. POLLACK:

9  Q    It's two screen shots of a Facebook page.

10 A    Mm-hmm.

11 Q    And it's your cat?

12 A    It is.

13 Q    But what I'm looking at more is what's under the

14     cat -- what's your cat's name?

15 A    Cirrhi.

16 Q    Cirrhi.  What's under Cirrhi?  Are those four

17     documents?

18 A    Yeah.  Those are printouts of the divisions on our

19     web site which I used to print out every time we

20     updated.

21 Q    So every time a new refresh -- when you say

22     "updated," does that mean a new refresh?

23 A    Yes, mm-hmm.

24 Q    So every time you updated, you would print them

25     out?

Melissa Read
July 18, 2012

1    A    Yes.

2    Q    And where would those printouts go?

3    A    In a binder.

4    Q    And does that binder still exist?

5    A    Yes.

6    Q    Do you know if you produced that binder in this

7         litigation?

8    A    Yes.  I don't know if it was the binder or if it

9         was just the printouts of the Oceans of Images

10        usage on them.  Because I think I still have the

11        actual binder, but I know I had to go through it

12        and find the ones that had the images and mark

13        them.

14   Q    Okay.  How did you know they were Oceans of Images

15        images?

16   A    Because we were provided a sheet, a screen shot

17        with thumbnails.

18   Q    Okay.  So you went through your binder to find web

19        pages that had images that looked --

20   A    Yes.

21   Q    -- images that you thought were those images?

22   A    Yes.

23   Q    But there might be more web page printouts in your

24        binder than what you would have pulled out?

25   A    Right.

Melissa Read
July 18, 2012

Page 27

1   Q    Those not being ones that didn't have Oceans of

2        Images pictures on them?

3   A    Right.

4   Q    How far back does your binder go?

5   A    I don't know off the top of my head.

6   Q    Like, a year or two, or like ten years?

7   A    I just really don't know.

8   Q    How big is the binder?

9   A    Well, I have several because it's for every

10       division, which adds up to be a lot.  So --

11  Q    How many binders are we talking about?

12  A    I think there's three or four.

13  Q    Like three-inch binders?

14  A    They're the big binders.

15  Q    And that would be for Drs. Foster & Smith,

16       LiveAquaria, and Pet Education?

17  A    Not Pet Education.

18  Q    Because that's not changing?

19  A    Right.

20  Q    And so the four pictures under Cirrhi in the

21       Exhibit 1, those would be live -- these aren't

22       mock-up documents?

23  A    Those were -- I don't know if they were live at the

24       time.  At some point, I stopped printing them out

25       and just had those up just for quick reference if I

Melissa Read
July 18, 2012

1      needed to say to somebody, "I need a feature

2      updated or I need one of these thumbnails updated."

3      I don't know if at the time I took the picture, if

4      those were -- if I was still doing the live

5      printouts.  I could be.  I don't know.

6   Q   And you're not doing the live printouts anymore?

7   A   No.

8   Q   The three web sites we've talked about, Drs. Foster

9      & Smith, LiveAquaria, and Pet Education, are those

10      the only three web sites that you know of that

11      Foster & Smith has had since 2001?

12   A   No.  We've had our Foster & Smith Aquatics, which

13      was just our fish and pond hard goods.  Let me see

14      if we had anything else.  We had something called

15      Pet Books for a while, but I don't remember when

16      that was.  And if it was a separate web site, I

17      can't remember.  I think that's it.

18   Q   And do those two web sites no longer exist?

19   A   Correct.

20   Q   Okay.  Do you know when they both disappeared?

21   A   The Pet Books just is a vague memory.  Foster &

22      Smith Aquatics was -- we ended it last -- I am not

23      sure.  It may have been last October.  And it was

24      only live for a year or two.  It was basically just

25      -- we just took our fish and pond off of the Drs.

Melissa Read
July 18, 2012

Page 29

1          Foster & Smith.Com, and we moved it to Foster &

2          Smith Aquatics, and that didn't work out, so we

3          moved it back.

4     Q    You moved it back.  Do you know what kind of web

5          site traffic you get at the web sites?

6     A    No.

7     Q    That's a separate department?

8     A    Yes.

9     Q    Do you know who would know that?

10    A    Jason Coe.  Maybe Gordon Magee.  I'm not sure who's

11         the right person.

12    Q    Okay.

13    A    Anybody could retrieve that information and get it.

14    Q    But that's not something you look at --

15    A    Right.

16    Q    -- in your day-to-day job?  So when you're laying

17         out a page, you've got the merchandising

18         information, the marketing copy, and you want to

19         add some images to it, so you go to the catalog

20         server to find images.

21    A    Mm-hmm.

22    Q    How do you select images?

23    A    It depends.  If the particular homepage or email is

24         associated with a catalog drop, so we have -- let's

25         say we have a catalog dropping on Tuesday, we're

Melissa Read
July 18, 2012

Page 30

1          going to send an email out on Tuesday that has the

2          same image that's on the catalog cover.  So if it's

3          that image, I take the catalog cover image as the

4          main glory shot, whatever we're doing.

5                     Aside from that, it's really just a

6          design decision.  So I'm doing something that's

7          blue, so I'm looking for a blue bird, and I just

8          pick whatever blue bird looks best.

9     Q    One blue bird might look better than another blue

10         bird for the context?

11    A    Yeah.

12    Q    Do you know who SueEllen Hopp is?

13    A    Yes.

14    Q    Who is she?

15    A    She used to work in the catalog department.  I

16         don't remember when, but she's a distant memory.

17    Q    She's a distant memory?

18    A    Yes.

19    Q    Meaning she left sometime ago?

20    A    Yes.

21    Q    Left Foster & Smith or left the cataloging agency?

22    A    Left Foster & Smith.

23    Q    Okay.  Did you work with her when she was in the

24         cataloging department?

25    A    I don't really remember.

Melissa Read
July 18, 2012

1          MR. POLLACK:  I'm going to hand you

2     Exhibit 2.

3               (Exhibit No. 2 was marked.)

4  BY MR. POLLACK:

5  Q    I don't know if you've seen the letter on the first

6       page, but I'm more interested in --

7               MR. GEITNER:  Does this have a Bates?

8               MR. POLLACK:  This was never

9     Bates-stamped.  This was taken out of one of our

10    binders.  It's a letter from Laura Howard to

11    SueEllen Hopp, November 4th, 2002.

12  BY MR. POLLACK:

13  Q    The second and third pages are a -- what look like

14       two different spreadsheets, one called Oceans of

15       Images-Fish and one called Oceans of Images-Bird.

16       Have you ever seen these spreadsheets before?

17  A    They don't look familiar.

18  Q    Well, then you can put that exhibit to the side.

19       There's actually a third spreadsheet on the last

20       page.  Oceans of Images-reptile, small animal.

21  A    Yeah, I saw that.

22  Q    Had you seen that one before just now?

23  A    No.

24  Q    Okay.  Did you ever interact with the Howards?

25  A    I don't really recall.  I know I received some

Melissa Read
July 18, 2012

Page 32

1      faxes, which I gave to somebody, whom I don't

2      remember.

3   Q   Do you know what the faxes would have been about?

4   A   I think it was probably about using their images.

5      I don't remember exactly.  It was a really long

6      time ago.  So --

7   Q   Were you, at that point in time, responsible for

8      deciding what images would be used?

9   A   Yes.

10  Q   And so what were your responsibilities then for

11     image usage?

12  A   The same.

13  Q   It's the same responsibility as now.  Now my

14     understanding is if it's on the catalog server,

15     then you're understanding is you're free to use it?

16  A   Right.

17  Q   Was that what your understanding was when the

18     Howards would have been faxing you?

19              MR. GEITNER:  Objection to form.

20              THE WITNESS:  It was a really long time

21     ago, and I just am very foggy on any details.

22  BY MR. POLLACK:

23  Q   Have you ever -- prior to today, have you ever met

24     either Richard or Laura Howard?

25  A   I don't think so.

Melissa Read
July 18, 2012

Page 33

1    Q    Do you have any -- the faxes that you mentioned, do

2         you have copies of those faxes?

3    A    No.

4    Q    Do you have any correspondence that you would have

5         had with the Howards?

6    A    No.

7    Q    Were you, at any point in time, responsible for

8         negotiating image usage with the Howards?

9    A    I don't -- I don't know.  I just know that we used

10        them and I got faxes.  I don't remember anything

11        else.

12   Q    And you don't remember what you would have done

13        with the faxes?

14   A    I gave them to somebody else.

15   Q    Who would you have given them to?

16   A    I don't remember.

17   Q    What type of person?

18   A    It would have been somebody higher up than me or in

19        a different area.  Because I didn't do anything

20        with getting approvals or arrangements or being

21        paid for anything.

22   Q    Okay.  Who does that now?

23   A    I don't really know because I don't know that we do

24        a lot of that.  So I don't know if it's

25        merchandisers that work with our vendors to get

Melissa Read
July 18, 2012

1      those images, those vendor images from them.  I

2      don't know -- I don't know if we use any other

3      images outside of what I've described to you.

4    Q   If you received an unsolicited fax today from some

5      photographer saying, "I would love for you guys to

6      consider using my images on your web sites," what

7      would you do with that fax?

8              MR. GEITNER:  Objection to form.  This

9      calls for a hypothetical, and I don't want her to

10     answer hypothetical scenarios.

11             MR. POLLACK:  Are you instructing her to

12     not answer?

13             MR. GEITNER:  Yes, I believe I am.

14             MR. POLLACK:  Are you going to follow

15     that instruction?

16             THE WITNESS:  I suppose I ought to.

17             MR. GEITNER:  Why don't you set a

18     foundation for it, whether she's gotten anything

19     along those lines and what she's done with it.

20             MR. POLLACK:  Well, she says she has, but

21     she can't remember, which is why I went to a

22     hypothetical, to say what if it happened today.

23     And I understand it happened a while ago, and I can

24     understand not remembering what you did then.  So I

25     would be curious what you would do today.

Melissa Read
July 18, 2012

Page 35

1          MR. GEITNER:  Why don't you ask her about

2     your clients then.

3          MR. POLLACK:  Well, I'm going to ask the

4     questions I want to ask.

5          MR. GEITNER:  Okay.  That's fine.

6          MR. POLLACK:  I don't think it's proper

7     to instruct her not to answer just because it's a

8     hypothetical.  If it calls for a privilege or

9     there's an order, then I can understand the

10    instruction, but she can respond to a hypothetical.

11         MR. GEITNER:  But your hypothetical is

12    different.  You're not talking about a specific

13    vendor or any variety of vendors.  You're saying an

14    unsolicited intake of a message from somebody, what

15    she would do with it.

16         MR. POLLACK:  That's right.

17         MR. GEITNER:  And there's pure

18    speculation.

19         MR. POLLACK:  She's entitled to

20    speculate.  You can instruct her not to answer if

21    it's a privilege or there's a court order.  I'm not

22    aware of either for this case.

23         MR. GEITNER:  All right.  Under the

24    preface that whatever you say from this point

25    forward is pure speculation on your part, go ahead

Melissa Read
July 18, 2012

Page 36

1        and answer the question.

2                MR. POLLACK:  Not from this point

3        forward.  In response to the question.

4                MR. GEITNER:  Sure, exactly.  It is pure

5        speculation.  Go ahead and do the best that you can

6        with that.

7                THE WITNESS:  So if I had to speculate --

8                MR. GEITNER:  Yes.  If you had to

9        speculate you got a fax from some photographer --

10               MR. POLLACK:  Can you stop making

11       speaking objections?  You've made your objection.

12               MR. GEITNER:  I'm not speaking -- I'm

13       giving her what the question was because that's

14       what --

15               MR. POLLACK:  I give her the question or

16       the court reporter gives her the question.

17               MR. GEITNER:  I'm restating.

18               MR. POLLACK:  And I appreciate it if you

19       don't restate it.

20               MR. GEITNER:  Okay.  That's fine.

21               THE WITNESS:  So if I had to speculate

22       and I got a random fax from somebody who wanted us

23       to use their images, I would probably give it to my

24       manager.

25       BY MR. POLLACK:

Melissa Read
July 18, 2012

Page 37

1    Q    And who is your manager?

2    A    Deb Adams.

3    Q    Who does Ms. Adams report to?

4    A    I don't know if it's John Powers right now or Race

5         or Marty or all three of them.

6    Q    Did you understand, when you were using the

7         Howards' images in the 2005-2006 time frame, that

8         there was a time limit on when you were allowed to

9         use those images?

10   A    Not that I recall.

11   Q    Do you recall ever negotiating an extension of that

12        time with the Howards?

13   A    No.

14   Q    Do you think that's something you might have done?

15   A    I don't remember.

16   Q    Would it have been possible for you to negotiate an

17        extension with the Howards back in the 2005 time

18        frame?

19   A    I don't -- I'm not clear on what your term

20        "negotiate" would mean.

21   Q    Ask them for an extension.

22   A    I guess I don't know.

23   Q    You don't know if it would be possible, or you

24        don't know if it happened?

25   A    Both.

Melissa Read
July 18, 2012

Page 38

 1    Q    Were you ever responsible for figuring out what

 2         rights Foster & Smith had to any of these images on

 3         the catalog server?

 4    A    No.

 5    Q    So since you've worked at Foster & Smith, if an

 6         image is on the catalog server, it is your

 7         understanding, and has always been your

 8         understanding, that you're entitled to use it for

 9         any purpose?

10              MR. GEITNER:  Objection to form.

11              THE WITNESS:  Yes, yes.

12    BY MR. POLLACK:

13    Q    And do you recall ever speaking with the Howards?

14    A    No.

15              (Exhibit No. 3 was marked.)

16    BY MR. POLLACK:

17    Q    I'm handing you Exhibit No. 3.  Do you recall ever

18         seeing any of these documents before?

19    A    I don't remember.

20    Q    The documents we're looking at are Invoice No.

21         FS1038, a check stub for check 2601, and then a

22         letter from Laura Howard to Melissa Read, dated

23         January 12th, 2002.  Looking at the letter, you

24         don't recall receiving this letter?

25    A    No.

Melissa Read
July 18, 2012

Page 39

1    Q    Or other letters that look like this from

2         Ms. Howard?

3    A    No.

4    Q    Would it have been possible that you would have

5         spoken with Ms. Howard?

6                   MR. GEITNER:  Objection to form.

7                   THE WITNESS:  Yeah.

8    BY MR. POLLACK:

9    Q    And what would you have done -- the letter seems to

10        be forwarding the invoice to you.  What would you

11        have done with that invoice?

12   A    Given it --

13                  MR. GEITNER:  Objection to form.

14                  THE WITNESS:  -- to somebody else.

15   BY MR. POLLACK:

16   Q    To process?

17   A    Yeah, or to deal with.

18   Q    Okay.  You weren't responsible for paying vendors?

19   A    No.

20   Q    Looking at the front page of the exhibit, the

21        "Terms of Use" sections, would you have read those

22        "Terms of Use" sections if this invoice had been

23        sent to you?

24   A    Yes.

25   Q    And the "Terms of Use" sections indicate expiration

Melissa Read
July 18, 2012

Page 40

1     dates for the two photographs that are being

2     invoiced here.  Would you have done anything with

3     that information?

4  A   No.

5  Q   Why not?

6  A   Because I would have just given this invoice to

7     somebody else to deal with.  That's not my job.

8  Q   Okay, okay.  And you can't recall today who that

9     other person would be?

10  A   It could have been any number of people.

11  Q   Who are those people, the number?

12  A   It could have been Pat --

13          MR. GEITNER:  Objection to form.

14          THE WITNESS:  It could have been Pat

15     Heerey.  It could have been SueEllen.  It could

16     have been Barry Benecke.  I don't remember if he

17     was there or not.  It could have been Ryszard, but

18     I don't remember his role at the time.  I don't

19     know if it could have been Beth Jacobson, but I

20     don't remember what she was doing at that time.

21  BY MR. POLLACK:

22  Q   Who is Beth Jacobson?

23  A   She was a designer.  She's not with the company

24     anymore.

25  Q   Before Oceans of Images sued Foster & Smith and

Melissa Read
July 18, 2012

Page 41

1          after 2005, 2006, so between the 2006-2010-2011

2          time period, had you heard of the Howards?

3     A    No.

4     Q    Had anyone at Foster & Smith spoken to you about

5          the Howards?

6     A    I don't remember, no.

7     Q    Was there a point in time when the marketing

8          shift -- or the marketing focus of how products

9          were being marketed moved from the glory shots or

10         colorful wildlife-type pictures to product

11         pictures?

12                    MR. GEITNER:  Objection to form.

13                    THE WITNESS:  I don't think that ever

14         happened.  There's a mixture of all of that.

15    BY MR. POLLACK:

16    Q    What do you mean, there's a mixture of all of that?

17    A    Well, you can have a button that has a pond filter

18         on it that says, "This is on sale," or you can have

19         a picture of a pond plant saying, "We're having a

20         pond filter sale."  They're interchangeable.

21    Q    Okay.  In the mid-2000 time frame when you would

22         have been using the Howards' images, the Oceans

23         images on the web site, would you have known you

24         were using Oceans images when you selected them off

25         the catalog server?

Melissa Read
July 18, 2012

Page 42

1    A    No.

2    Q    They would have just appeared as any other image?

3    A    Yes.

4    Q    Do you have any responsibility for managing the

5         catalog server images?

6    A    No.

7               MR. POLLACK:  Why don't we take a few

8         minutes break because I'm going to have to set this

9         exhibit up and I think it's easier that way.

10              MR. GEITNER:  Sure.

11              (Recess taken.)

12   BY MR. POLLACK:

13   Q    So if I wanted to go back in time and look at a

14        Foster & Smith web site from two years ago, your

15        binders that you mentioned earlier is one option?

16   A    Mm-hmm.

17   Q    Is there any other way in which I could see what

18        the web site looked like two years ago?

19              MR. GEITNER:  Objection to form.

20              THE WITNESS:  Not completely, that I know

21        of.

22   BY MR. POLLACK:

23   Q    Other than your binders, you don't have another way

24        to see historical versions of the web sites?

25              MR. GEITNER:  Objection to form.

Melissa Read
July 18, 2012

Page 43

```
1              THE WITNESS:  No, not like the full web

2        site, no.

3    BY MR. POLLACK:

4    Q    To see individual pages of the web site?

5    A    You could maybe see a homepage partially or a

6         division page partially.

7    Q    How would I do that?

8    A    That would be HTML documents.

9    Q    Where would they be?

10   A    On our Internet servers.

11   Q    And the old HTML documents are still on the

12        Internet servers?

13              MR. GEITNER:  Objection to form.

14              THE WITNESS:  Probably.

15   BY MR. POLLACK:

16   Q    Why do you say that they would probably be there?

17   A    Well, sometimes the network goes down and things go

18        bye-bye.  So I hope they're there, but we don't

19        usually -- we don't use them.  They're just there.

20   Q    But you -- before this litigation, you have gone

21        through your binders?

22   A    Yes.

23   Q    And produced web pages?

24   A    They're printouts.

25   Q    Printouts of your web pages?
```

Melissa Read
July 18, 2012

1   A     Yes.

2               MR. POLLACK:  Chuck, do you believe you

3          produced that to me?

4               MR. GEITNER:  I think so.  I'm sure it

5          was provided if asked for or Zack would have

6          produced it, he would have done it.

7               MR. POLLACK:  At a break, can we find out

8          because I don't believe it has been produced to me.

9          I don't believe any web pages have been produced to

10         me.

11              MR. GEITNER:  Sure.

12              (Exhibit No. 4 was marked.)

13  BY MR. POLLACK:

14  Q     Exhibit 4 is printouts that my client did on

15        February 9th of this year -- I'm sorry, of last

16        year of the active Foster & Smith or LiveAquaria

17        web site, and it's reflected in the URL on the

18        bottom of the page, with the addition that on many

19        of the pages my client handwrote some information.

20              Putting aside the handwriting, for each

21        of the web page printouts that are in front of you,

22        to your knowledge, are these true and accurate

23        copies of the FOSTER&SMITH.COM web sites or web

24        pages?

25              MR. GEITNER:  Objection to form.

Melissa Read
July 18, 2012

Page 45

1                    THE WITNESS:  So these were from 2011?

2                    MR. POLLACK:  Yes.

3                    THE WITNESS:  They look like the web site

4          in 2011.

5     BY MR. POLLACK:

6     Q    Did the web site have a different look in 2011 as

7          compared to a different year?

8     A    Yes.

9     Q    What was different about the look?

10    A    Mast head changes, left map changes, layouts.

11         These look like they're from last year.

12    Q    This year has a different mast head and left map?

13    A    Yes.

14    Q    Does the mast head and left map change every year?

15    A    It's an evolution.

16    Q    Are you familiar with the Wayback Machine?

17    A    Yes.

18    Q    What's your understanding of the Wayback Machine?

19    A    You can look at web sites from way back.

20                    MR. POLLACK:  So Exhibit 5 -- which I'm

21         about to hand you.

22                    (Exhibit No. 5 was marked.)

23    BY MR. POLLACK:

24    Q    Exhibit 5 is printouts that my client did from the

25         Wayback Machine to try and get historical versions

Melissa Read
July 18, 2012

1        of Foster & Smith web pages.  And now, aside from

2        my client's handwriting on many of the pages and

3        the Wayback Machine mast head that gets put on the

4        very top of the page, do these pages look like fair

5        and accurate copies of the respective Foster &

6        Smith web pages?

7                    MR. GEITNER:  Objection to form.

8                    THE WITNESS:  Yeah, they look like our

9        sites.

10   BY MR. POLLACK:

11   Q    Have the mast head and left map pieces changed?

12   A    Yes.

13   Q    And just throughout time --

14   A    Yes.

15   Q    -- those changed for different --

16   A    Yes, things change.

17   Q    Do you have the ability to look at a mast head and

18        say, "Oh, that would be from this general time

19        period"?

20   A    I could guess, but I wouldn't know for sure.

21   Q    So looking at the first document on the front of

22        Exhibit 5, it has a -- in my client's handwriting,

23        a No. 32 and then a B-108.  Are we looking at the

24        correct document?

25   A    Mm-hmm.

Melissa Read
July 18, 2012

Page 47

1   Q    The bottom of the page has the URL that was

2        actually being printed out here, which is a Wayback

3        Machine URL, and after the

4        HTTP://REPLAYWAYBACKMACHINE.ORG/, there's a number

5        of numbers, 20090216004600.

6                    My understanding is that number

7        corresponds to the time as when Wayback collected

8        this web page, which would mean it would be in the

9        year 2009.  Does the mast head and left map and

10       look and feel of this page look like a 2009

11       version?

12  A    Yeah.

13  Q    Okay.  Can you turn to the -- this isn't going to

14       work because mine are two-sided.  Can you turn

15       until you get the document that looks like that,

16       then I will read what the URL is so that the record

17       is clear.

18  A    I don't know if these are similar.

19                    MR. GEITNER:  What's the handwritten

20       stuff at the top?

21                    MR. POLLACK:  No. 37, January 23rd, 2008.

22                    THE WITNESS:  There we go.

23  BY MR. POLLACK:

24  Q    Okay.  URL there at the bottom,

25       REPLAY.WAYBACKMACHINE.ORG/, and then the numbers

Melissa Read
July 18, 2012

Page 48

1          begin 2008 and some other numbers.  Does this web

2          page look like --

3     A    Yes.

4     Q    -- what the page would have looked like in 2008?

5     A    Yep.  I forgot about the eTropicals web site.  When

6          you asked about our web sites, because we don't

7          have it anymore.  I don't remember when we stopped

8          using it, but --

9     Q    But like the Pet Aquatics, it's another site you

10         used to have, and you don't have anymore?

11    A    Right.

12    Q    So turning to the next page in that exhibit, which

13         was the eTropicals page, with my client's

14         handwriting No. 38 at the top.

15    A    Yes.

16    Q    Does that look like what the ETROPICALS.COM web

17         site would have looked like in 2008?

18              MR. GEITNER:  Objection to form.

19              THE WITNESS:  Yes.

20    BY MR. POLLACK:

21    Q    Turning to the next page, the next web page, which

22         would have my client's handwriting No. 38A with a

23         handwritten date of 2/19/08, and the

24         WEB.ARCHIVE.ORG date at the bottom for the year

25         2008, does this printout look like what the web

Melissa Read
July 18, 2012

Page 49

1          site would have looked like in 2008?

2                    MR. GEITNER:  Objection to form.

3                    THE WITNESS:  Yes.

4     BY MR. POLLACK:

5     Q    Next document, No. 39, in my client's handwriting.

6     A    Mm-hmm.

7     Q    With the handwritten date of February 8th, 2008, at

8          the top.

9     A    Yes.

10    Q    Same question.  Does --

11    A    Yes, it looks like it should.

12                   MR. GEITNER:  Same objection.

13    BY MR. POLLACK:

14    Q    For the rest of the documents in that packet, can

15         you take your time and look through them, comparing

16         the date at the bottom with the general look and

17         feel, and tell me are there any documents that do

18         not -- that you do not think look like that?

19                   MR. GEITNER:  Objection to form.

20                   THE WITNESS:  They all look fine.

21    BY MR. POLLACK:

22    Q    Do you know if your binders that you have the

23         historical printouts that you did of the web sites,

24         were you doing that in 2008?

25    A    I think so.

Melissa Read
July 18, 2012

Page 50

1   Q   In 2009?

2   A   Maybe.  Those printouts were only of division and

3       home pages.  They weren't of the web site, though.

4   Q   The distinction there, when you say "the web site,"

5       what do you mean?

6   A   Well, I'm not sure.  Like, I don't have printouts

7       of every page of our web site for every time -- I

8       have only printouts of our homepage and the

9       division pages that changed.

10  Q   The document at the front of Exhibit 5 with the

11      handwritten No. 32, B-108, is that a homepage or

12      division page?

13  A   No.

14  Q   What is that?

15  A   That's a general page.

16  Q   Aside from homepage, division pages, and general

17      pages, are there other types of pages?

18  A   There's article pages, category pages, just off the

19      top of my head.

20  Q   But the only pages that would be in your binders

21      would be the home pages and the division pages?

22  A   Yes.

23  Q   Aside from the Wayback Machine, can you think of

24      any way to see a historical version of a Foster &

25      Smith category page?

Melissa Read
July 18, 2012

Page 51

1   A   No.

2   Q   So when you create a web page and release that,

3       make it active, I believe you testified that you

4       create a low res version of the image.

5   A   Mm-hmm.

6   Q   Where does that low res version of the image get

7       stored?

8   A   It gets put on our Internet network file and then

9       we load it to our servers, so there's two areas,

10      and what's loaded to the server is actually what

11      displays on the web site.

12  Q   When I go to that web page as just a member of the

13      world?

14  A   Yes.

15  Q   But there's another copy of that image on the

16      Internet network file?

17  A   Yes.

18  Q   And is that an internal location within Foster &

19      Smith?

20  A   Yes.

21  Q   Do you know who's responsible for maintaining that?

22              MR. GEITNER:  Objection to form.

23              THE WITNESS:  No.  I don't think anybody

24      in particular maintains it.  It's just a

25      repository.

Melissa Read
July 18, 2012

Page 52

1    BY MR. POLLACK:

2    Q    Are images deleted from it?

3    A    Yes.

4    Q    When?

5    A    When we get told we can't use an image for whatever

6         reason.

7    Q    Were there Oceans images in the Internet network

8         file?

9    A    Yes.

10   Q    Were those images deleted?

11   A    Yes.

12   Q    When were those images deleted?

13   A    Was it last year when all this started happening?

14        I don't know the date specifically.

15   Q    After the litigation?

16   A    I don't know the date.

17   Q    But it was last year.

18   A    Yes.

19   Q    It wasn't five years ago.  And were those images

20        also deleted off of the web server?

21   A    I don't know.

22   Q    Would there be a way to find out what images were

23        on the Internet network file that were deleted?

24             MR. GEITNER:  Objection to form.

25             THE WITNESS:  We printed out every one

Melissa Read
July 18, 2012

Page 53

```
 1          that we deleted, and I gave them to Janine, and I
 2          would assume she passed those on to the appropriate
 3          people.
 4     BY MR. POLLACK:
 5     Q    Janine?
 6     A    Yeah, Janine Fuchs.  She's the owner/secretary.
 7     Q    Of Foster & Smith?
 8     A    Yes.
 9     Q    And you printed out copies of the images that you
10          were deleting?
11     A    Yeah, printed out like this; I printed it out.
12          Here's the images I deleted.
13     Q    Were you the one who deleted those images?
14     A    I did, along with possibly five or six other people
15          in my department.
16     Q    Who told you to delete the images?
17     A    I think that Pat said to -- you know, "We need to
18          remove any of these images we're using because
19          we're not supposed to be."  So we removed them.
20     Q    And pat was Pat Heerey?
21     A    Yes.
22     Q    And did she provide you a list of images to remove?
23     A    No.  Initially, she just said remove them, and we
24          got a small list, like a thumbnail, and then maybe
25          a day or two later we got a bigger list with a
```

Melissa Read
July 18, 2012

Page 54

1      bunch more.  So what we did is we went through all

2      of our articles and our general pages like these

3      and found the image on our Internet network and

4      deleted it, and deleted it off the HTML, which

5      would show here, and then changed the file so it

6      was no longer showing on the Internet.

7   Q  So it was a manual process of looking at the

8      thumbnail and then digging through?

9   A  Yes.

10  Q  How many images were on the Internet network file?

11  A  I don't know.

12  Q  Tens?  Hundreds?  Thousands?

13  A  Thousands.

14  Q  So you and the five or six other people were

15     looking through those thousands of images --

16  A  Yes.

17  Q  -- to find the handful that --

18  A  Yes.

19  Q  -- Pat had provided to you?

20  A  Yes.

21  Q  And, then, after they had been deleted -- after the

22     images were deleted on the Internet network file,

23     someone also went out to the web server to try and

24     delete those images?

25  A  Not that I know of.  We don't have access to the

Melissa Read
July 18, 2012

Page 55

1    server.  It's a thing out there that I don't have

2    anything to do with.  So as far as, you know, we

3    were concerned, once we deleted it off the

4    Internet, they're gone because nobody can access

5    those files.

6  Q   Internally?

7  A   Right.

8  Q   But on the external web pages, what, if anything,

9    did you do to make the images disappear from the

10   web pages?

11              MR. GEITNER:  Objection to form.

12              THE WITNESS:  On the HTML, we changed the

13   actual -- say this was named 1234, that's the

14   Howards' image, we went into the HTML and changed

15   it to be XYZ, which is a different image.

16  BY MR. POLLACK:

17  Q   For all the web pages you found, you replaced the

18   image with a non-Howards' image?

19  A   Right.

20  Q   Okay.  And so the images -- how does -- excuse me.

21   How do the images get from the Internet network

22   file to the web server?

23              MR. GEITNER:  Objection to form.

24              THE WITNESS:  We have an interface on the

25   Internet that we use that we load the image and it

Melissa Read
July 18, 2012

Page 56

1          pushes it to the server.

2     BY MR. POLLACK:

3     Q    You go to some internal web page and hit a bunch of

4          buttons?

5     A    Yes.

6     Q    And the end effect is things get pushed out to the

7          web server?

8     A    Yes.

9     Q    There's not a way -- a corresponding way for you to

10         go out and pull things back from a web server?

11    A    No.

12    Q    So if -- if we pull -- are the images all stored in

13         a central location on the web server?

14    A    I don't know anything about the servers.

15    Q    Okay.  In the Internet network file, are the images

16         all stored in a single directory?

17    A    They're stored in multiple directories.

18    Q    Is there a kind of set structure, or is it kind of

19         random?  Someone wants a directory, they make a

20         directory.

21    A    It can be random, yes.

22    Q    If we looked at all the images that are on the

23         external web server, would that provide us a list

24         of all of the images that had been on the Internet

25         network file and then were pushed to the web

Melissa Read
July 18, 2012

1       server?

2    A  Yes.

3    Q  Have you seen this thumb drive before that's

4       plugged into my computer right now?

5    A  No.

6    Q  Were you involved in a project recently in the last

7       couple of weeks to gather all of the images from

8       the web server?

9    A  I forwarded that information to Jason Coe.

10   Q  And you mentioned Mr. Coe before.  Who is he again?

11   A  He's the Internet programmer.  I don't know if he's

12      a manager.  I think he is.

13   Q  Okay.  He works here in Rhinelander?

14   A  Yes.

15   Q  You forward -- you said you forwarded that

16      information.  What information did you forward to

17      Mr. Coe?

18   A  The information that he -- we needed to give them

19      the images from the servers.

20   Q  Okay.  So Mr. Coe was who would be the type of

21      person to go out and do that?

22   A  Yes.

23   Q  And after you forwarded that information to

24      Mr. Coe, did you have any involvement in that

25      process?

Melissa Read
July 18, 2012

Page 58

1    A     No.

2               MR. GEITNER:  Can we go off the record

3         real quick?

4               MR. POLLACK:  Sure.

5               (Recess taken.)

6    BY MR. POLLACK:

7    Q     Do you recall a photo contest in 2008?

8    A     Yes.

9    Q     What was the photo contest?

10   A     It was for our anniversary, our 25th anniversary,

11        and we requested people to submit their photos, and

12        every month we picked a bunch of winners.  And in

13        the end, we gave away some grand prizes, and it was

14        a lot of work.

15   Q     A lot of work for you or for everyone?

16   A     For -- well, for everybody, yeah.  Not something we

17        want to repeat.

18   Q     What did you do with all of those images?

19   A     They're stored on a server.

20   Q     And who selected the winners?

21   A     It was a group of employees.

22   Q     Were you in that group?

23   A     No.

24   Q     Do you recall how the photo contest was promoted?

25   A     Not specifically.

Melissa Read
July 18, 2012

Page 59

1   Q    Would it have been promoted with email blasts?

2   A    Yeah, typically the promotion goes in email, goes

3        on the homepage, on the web site.

4   Q    Would -- okay.  And would your department have

5        built that web site?

6   A    Well, Austin, another -- the Internet -- the

7        programmers, yeah.

8   Q    The back end --

9   A    It was all on our Drs. Foster & Smith web site.

10  Q    Okay.  So there may be historical web pages, for

11       instance, on the Wayback Machine showing how the

12       photo contest was promoted?

13  A    Mm-hmm, yes.

14                MR. GEITNER:  Objection to form.

15  BY MR. POLLACK:

16  Q    Did the participants who submitted photos have to

17       sign any documents?

18  A    I think there was a legal release that they had to

19       agree to.

20  Q    And do you recall what the legal release related

21       to?

22  A    No.

23  Q    Were you involved in drafting the legal release?

24  A    No.

25  Q    Does Foster & Smith have something they call an

Melissa Read
July 18, 2012

Page 60

1        affiliates program?

2    A   Not anymore.

3    Q   Not anymore.  They used to?

4    A   Yes.

5    Q   What was the affiliates program?

6    A   What it is is like a personal web site, could

7        display our banner ad and use a special URL, and if

8        somebody made a purchase off of that person's web

9        site through that URL, then that affiliate would

10       get a small percentage back to them.

11   Q   And who created the banner ads?

12   A   Multiple people, myself and probably Beth Grasser.

13   Q   But Foster & Smith people?

14   A   Yeah.

15   Q   How would you have created those?

16   A   In Photoshop.

17   Q   Would you still have copies of those -- all the

18       banner ads?

19   A   Probably.

20   Q   Where would those be?

21   A   In a folder on the network.

22   Q   Do you know the name of that folder?

23   A   Internet shares, affiliate marketing maybe,

24       something like that.

25   Q   But that's where you would start looking?

Melissa Read
July 18, 2012

Page 61

1    A    Yeah.

2    Q    Internet shares would be the name of the --

3    A    Yeah, mm-hmm.

4    Q    Have you looked in there to produce documents in

5         this litigation?

6    A    I don't know.  Probably not since we discontinued

7         the affiliate program several years ago.  So when

8         this came about, we probably disregarded them since

9         they're not used anymore.

10   Q    When did you discontinue the affiliates program?

11   A    I don't know the date, but it's been several years.

12   Q    Before 2005?

13   A    No.  After 2005.

14   Q    Before 2010?

15              MR. GEITNER:  Objection to form.

16              THE WITNESS:  I'm thinking two to three

17        years.

18   BY MR. POLLACK:

19   Q    Okay.  Not this year?

20   A    No.

21   Q    But not ten years ago?

22   A    Right.

23   Q    So in the beginning we talked about some of the

24        many things you do.  Creating web pages, one of

25        them.  You also said you create the email blasts.

Melissa Read
July 18, 2012

Page 62

1        What's involved in that process?

2                MR. GEITNER:  Objection to form.

3                THE WITNESS:  I get a Word document that

4        has the subject and email introduction and

5        suggested copy and what products need to go in the

6        email, and then I create the email in Photoshop,

7        and then it goes through our proofing and routing

8        process, and then it gets sent.

9   BY MR. POLLACK:

10  Q    And the email that you create in Photoshop, does

11       that get stored somewhere?

12  A    Yes.

13  Q    Where does that get stored?

14  A    On one of our networks, Internet shares somewhere.

15  Q    Did you search that area for potential documents

16       for this litigation?

17  A    I think so.

18  Q    You think so?

19  A    Well, we have years of email, and I don't -- we

20       don't -- I don't know if we have those documents as

21       far back as 2002.  So --

22  Q    But if you had them for --

23  A    I know I went back as far as I could.

24  Q    Okay.  So you looked at whatever it is you would

25       have still had?

Melissa Read
July 18, 2012

Page 63

1  A   Yes.

2  Q   And what would you have done in deciding whether or

3      not to produce it?

4  A   To produce it as in what?

5  Q   To give to your lawyers or to give it to whoever

6      had asked?

7  A   Oh, we identified one, we print it out, and I gave

8      it along with whatever else I provided to Pat or

9      Janine.

10 Q   What do you mean, identified one?

11 A   We identified that an email had one of the Oceans

12     of Images images in it.

13 Q   Looking, again, at the thumbnails you had looked at

14     --

15 A   Yes.

16 Q   -- for the deletion task?

17 A   Yes.

18 Q   So there are likely many emails that didn't have

19     Oceans --

20 A   Right.

21 Q   -- images that you would not have printed out?

22 A   Right.

23 Q   Do you know how many of the Howards' images have

24     been used since 2005?

25 A   No.

Melissa Read
July 18, 2012

Page 64

1   Q    Do you know of any way to figure that -- figure out

2        the -- figure out the number?

3                 MR. GEITNER:  Objection to form.

4                 THE WITNESS:  All I know is that I

5        provided printouts of the images we deleted

6        initially last year, and then we went through

7        divisions and printed those out, and I've given

8        those to Janine and/or Pat.  So --

9   BY MR. POLLACK:

10  Q    Would you recognize the images -- earlier we were

11       talking about the web site -- the images that are

12       on the web site.  There's the Internet network

13       folder and then somehow they get pushed to the web

14       server.  Would you recognize the web server images

15       if I showed you a directory structure with images

16       in them?

17                MR. GEITNER:  Objection to form.

18                THE WITNESS:  I might recognize some of

19       them, but I don't -- I couldn't say I would know

20       all of them, no.

21  BY MR. POLLACK:

22  Q    When you changed the HTML on the web pages --

23  A    Uh-huh.

24  Q    -- you went from, let's say, 123.JPEG to XYZ.JPEG,

25       how did you know what the name of the new JPEG was?

Melissa Read
July 18, 2012

Page 65

1   A    I made it.

2   Q    You made it?

3   A    Yes.

4   Q    What does that mean?

5   A    I named it that.

6   Q    You pushed a new image from the Internet network

7        server to the web server?

8   A    Mm-hmm.

9   Q    And how did you know what directory that image was

10       going to be on in the web server?

11   A    This tells me, the HTML behind this.

12          MR. POLLACK:  Okay.  All right.  I have

13       no further questions.

14          MR. GEITNER:  Okay.  Can I talk to her

15       real quick?  I don't think I have any either.

16          MR. POLLACK:  While we're still on the

17       record, if we're able to get the web pages

18       today -- not necessarily today, while we're up here

19       on this trip, whenever you can confirm whatever has

20       happened with the web pages that she thinks have

21       been produced, the things she printed out.

22          MR. GEITNER:  Right.

23          MR. POLLACK:  I might have a quick

24       question or two on them.

25          MR. GEITNER:  Sure.

Melissa Read
July 18, 2012

Page 66

1        MR. POLLACK:  But other than that.

2        MR. GEITNER:  Sure, no problem.

3        MR. POLLACK:  All right.

4        MR. GEITNER:  We're going to take a

5   previous break.  I may not have anything.

6            (Proceedings adjourned at 3:24 p.m.)

Melissa Read
July 18, 2012

Page 67

STATE OF WISCONSIN   )
                     ) SS:
COUNTY OF MILWAUKEE  )




            I, ANDREA REICHLE, a Registered

Professional Reporter and Notary Public in and for the

State of Wisconsin, do hereby certify that the above

deposition of MELISSA K. READ was recorded by me on July

18, 2012, and reduced to writing under my personal

direction.

            I further certify that I am not a

relative or employee or attorney or counsel of any of

the parties, or a relative or employee of such attorney

or counsel, or financially interested directly or

indirectly in this action.

            In witness whereof I have hereunder set

my hand and affixed my seal of office at Milwaukee,

Wisconsin, this 27th day of July, 2012.


                    _____
                              Notary Public
                    In and for the State of Wisconsin


My Commission Expires:  April 14, 2013.

Melissa Read
July 18, 2012

Page 68

1   STATE OF              )
                          ) SS:
2   COUNTY OF             )

3

4

5              I, MELISSA K. READ, do hereby certify

6   that I have read the foregoing transcript of

7   proceedings, taken on July 18, 2012, at Best Western

8   Inn, 70 North Stevens Street, Rhinelander, Wisconsin,

9   and the same is true and correct, except for the list of

10  corrections noted on the annexed page.

11

12             Dated at _____

13  this _____day of _____, 2012.

14

15

16                        _____

17                        MELISSA K. READ

18

19  Subscribed and sworn to before me
    this_____day of _____ 2012.
20

21

22  _____
    Notary Public
23

24  My Commission Expires:

25

Melissa Read
July 18, 2012

Page 69

1          C O R R E C T I O N S

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25