UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION


OCEANS OF IMAGES PHOTOGRAPHY,)
INC.,                         )
             Plaintiff,       )
                              )
vs.                           )CASE NO.8:11-CV-01160
                              )          -JSM-AEP
FOSTER AND SMITH, INC.,       )
                              )
             Defendants.      )
_____)


DEPOSITION OF PROFESSOR JEFFREY SEDLIK

LOS ANGELES, CALIFORNIA

FRIDAY, NOVEMBER 9, 2012


REPORTED BY:  MARIA LINDA MORALES, C.S.R. NO. 10234

JOB NO.:      59815

1    The deposition of PROFESSOR JEFFREY SEDLIK, taken

2  on behalf of Plaintiffs at 1840 Century Park East, Suite

3  1900, Los Angeles, California, commencing at 9:42 A.M.,

4  Friday, November 9, 2012, before Maria Linda Morales,

5  C.S.R. NO. 10234.

6

7

8  APPEARANCES OF COUNSEL:

9  ON BEHALF OF THE PLAINTIFF:

10      GRAY ROBINSON
        BY:  WOODROW H. "WOODY" POLLACK
11      ATTORNEY AT LAW
        401 East Jackson Street
12      Suite 2700
        Tampa, Florida 33602
13      (813) 273-5000

14

15  ON BEHALF OF THE DEFENDANTS:

16      HINSHAW & CULBERTSON LLP
        BY:  CHARLES G. GEITNER
17      ATTORNEY AT LAW
        100 Foothill South Ashley Drive
18      Suite 500
        Tampa, Florida 33602-5301
19      (813) 276-1662

20

21  Also present telephonically:
    Mr. Richard Howard
22  Mrs. Laura Howard

23

24

25

1                          I N D E X

2

3    WITNESS              EXAMINATION                PAGE

4    PROFESSOR JEFFREY SEDLICK

5

6                    MR. POLLACK                     6

7

8

9

10                     E X H I B I T S

11   PLAINTIFF'S          DESCRIPTION                PAGE

12       1          Document titled "Notice          7
                    of Expert Deposition of
13                  Jeff Sedlik" 2 Document
                    titled "United States
14                  District Court Middle
                    District Of Florida
15                  Tampa Division Preliminary
                    Expert Report And Disclosure
16                  Of Professor Jeff Sedlik"

17       2          Preliminary Expert Report        7
                    and Disclosure of Professor
18                  Jeff Sedlik

19       3          Document consisting of          31
                    an invoice 4 Document
20                  titled "Check History
                    Report" Activity from
21                  1-1-2002 to 12-31-2002

22       4          Document titled "Check          87
                    History Report" Activity
23                  from 1-1--2002 to 12-31-2002
                    Bates stamp FNS 0138

24

25

1                    E X H I B I T S (Continued)

2     PLAINTIFF'S           DESCRIPTION                 PAGE

3          5         Document titled "Pricing           108
                     Photography|American
4                    Society of Media Photographers"

5          6         Document titled "Licensing,        113
                     and the Value of Copyright"
6

7          7         Document titled "How to            137
                     Write a License| American
                     Society of Media Photographers"
8

9          8         Document titled "In                162
                     The United States
                     District Court For
10                   The District Of Delaware"

11         9         Document titled "Tropical          167
                     Reef Fish Over Soft
12                   High-Res Stock Photography|
                     Getty Images| 135458575"
13

14         10        Document titled "United            177
                     States District Court
                     District Of Arizona
15                   Confidential Supplementary
                     Expert Witness Report Of
16                   Jeff Sedlik"

17         11        Document titled "Oceans            180
                     of Images, Inc. Richard
18                   & Laura Howard"

19         12        Document titled "Goldfish          189
                     on Black Background Studio
20                   Shot -42-29248140 - Rights
                     Managed - Stock Photo -
21                   Corbis"

22         13        Document titled Internet           196
                     Archive: Legal FAQ"
23

24

25

1              E X H I B I T S (Continued)

2    PLAINTIFF'S           DESCRIPTION                    PAGE

3         14      Document titled "Factors              197
                  Affecting Availability Of
4                 Aquatic Life" 15 Document
                  titled "terms And Conditions
5                 For Your Forms| American
                  Society Of Media Photographers"
6
         15      Document titled "terms                208
7                 And Conditions For Your
                  Forms| American Society
8                 Of Media Photographers"

9         16      Document titled "Fish                 219
                  Product Unit Sales"
10

11

12                INSTRUCTIONS NOT TO ANSWER

13                        NONE

14

15

16                INFORMATION REQUESTED

17                    PAGE      LINE
                       20        11
18

19

20

21

22

23

24

25

1    LOS ANGELES, CALIFORNIA; FRIDAY, NOVEMBER 9, 2012

2                9:42 A.M. - 5:33 P.M.

3

4

5            PROFESSOR JEFFREY SEDLIK,

6        having declared under penalty of perjury

7            to tell the truth, was examined

8                and testified as follows:

9

10                    EXAMINATION

11        MR. POLLACK:  Good morning, Mr. Sedlik.

12        THE WITNESS:  Good morning, Sir.

13    BY MR. SEDLIK:

14        **Q.   How many times have you been deposed?**

15        A.   I can't guess at that number, but a good

16    number of times.

17        **Q.   More than a dozen?**

18        A.   More than a dozen.

19        **Q.   More than 50?**

20        A.   Possibly right around that number.

21        **Q.   So you understand everything we say today is**

22    **being recorded by the court reporter?**

23        A.   Yes, Sir, absolutely.

24        **Q.   Is there anything that prevents you from**

25    **giving your best testimony today?**

1    A.   No, Sir.

2    Q.   **Have you ever been convicted of a felony?**

3    A.   No, Sir.

4    Q.   **I'm going to hand you what I'm about to mark**

5    **as Exhibit 1.**

6         **(Plaintiff's Exhibit 1 was marked for**

7         **identification by the reporter and is attached**

8         **hereto.)**

9    Q.   **BY MR. POLLACK:  Have you seen that document**

10   **before?**

11   A.   Yes, Sir.

12   Q.   **What is it?**

13   A.   It is a notice of expert deposition of

14   Jeff Sedlik.

15   Q.   **Okay.  And you are Jeff Sedlik; correct?**

16   A.   I'm Jeff Sedlik.  My full name is Jeffrey

17   Brian Sedlik.

18   Q.   **Okay.  Exhibit 2.**

19        **(Plaintiff's Exhibit 2 was marked for**

20        **identification by the reporter and is attached**

21        **hereto.)**

22   Q.   **BY MR. POLLACK:  Do you recognize Exhibit 2?**

23   A.   Yes, Sir.  It's the preliminary Expert Report

24   and Disclosure of Professor Jeff Sedlik.

25   Q.   **Did you author this report?**

1    A.   I did.

2    **Q.   Did you physically type it?**

3    A.   Yes, Sir.

4    **Q.   Did anyone else help you in typing it?**

5    A.   Nobody helped me in typing it; however, I have

6  staff members that assist with identifying foot notes

7  and placing footnotes and reviewing for -- for typos,

8  that sort of thing.

9    **Q.   Okay.  Aside from those staff members, did**

10  **anyone else assist in the preparation of the physical**

11  **document?**

12    A.   No, Sir.

13    **Q.   If you can turn to Page 38 of the report.**

14    A.   (Witness complies.)

15    **Q.   It's just before the tabs begin.**

16    A.   Okay.

17         (Pause in the proceedings.)

18         THE WITNESS:  Yes, Sir.

19    **Q.   BY MR. POLLACK:  At the bottom of the page is**

20  **that your signature?**

21    A.   Yes.

22    **Q.   Okay.  Does this report have all of the**

23  **opinions you intend to offer in this case?**

24    A.   Should you, um, ask me questions regarding

25  information that is not in this report, and should there

1  be no objection to my answering, I may answer -- I may

2  end up answering questions that aren't stated in the

3  report.

4       Should I be called into courtroom testimony

5  and be asked certain questions, it may be that part of

6  my answers might fall outside the scope of the opinions.

7       But, to answer your question, my intent is --

8  that this currently limits the scope of my opinions in

9  this matter.

10      There is some information, as indicated in the

11  report, with regard to the evidence provided by the

12  plaintiff, and I am awaiting revised evidence of

13  infringement, when I review that revised evidence of

14  infringement, I may form revised opinions or additional

15  opinions.

16      **Q.   But, as you sit here right now, you don't have**

17  **any other opinions that aren't reflected in this report?**

18      A.   That is true.

19      I have two errors in this report that I need

20  to bring to your attention, Sir.

21      **Q.   Okay.  What are those?**

22      A.   There are -- in putting the report together, I

23  draft, in a single document, the entire report.  And

24  before completing the report, I sort the paragraphs, so

25  as to most effectively present my opinions, in an order

1    that allows readers to make sense of what I'm attempting

2    to communicate.

3          And in doing so, there are two duplicate

4    paragraphs included in this report, that got past my

5    proof reading.

6          **Q.   Okay.**

7          A.   And I'm going to identify the page number.

8    Page Number 28 is the first instance.  We have two

9    paragraphs that are identical in all respects, except

10   for the word "plaintiff" is replaced by the name of the

11   company, Oceans of Images.

12         And this is a -- just a duplicate paragraph

13   that occurred at the time that I was moving paragraphs

14   around.  I think I copied and pasted instead of just

15   dragged.

16         **Q.   Okay.  So only one of those should exist.  It**

17   **doesn't matter which one.**

18         A.   Right.

19         **Q.   Okay.**

20         A.   It doesn't matter which one.  I would say that

21   the second paragraph should be the one, because I -- I

22   went through and I replaced the word "plaintiff" with

23   "Oceans of Images" just to more clearly communicate who

24   I was talking about.

25         And then there's one other instance of that,

1   and that is in section R of the report, I believe.

2   Section R: "Actual Damages."

3          There is an illustration there.  And then

4   immediately below that illustration, the first sentence

5   says:

6               "The above indicated actual damages of

7           $12,400 unpaid fees."

8          And there an identical paragraph below it,

9   except for the number for the dollar amount is $12,550.

10         After drafting that amount, and in going back

11  through all the calculations, I do three audits of the

12  information in the report, in terms of all the

13  calculations of damages.

14         In one of those audits, I discovered an Excel

15  error that was in favor of the plaintiff, and I reduced

16  that amount to 12,400, which is the correct amount,

17  according to the exhibit at the back of this document.

18         And so the second paragraph would be in in

19  error.  The amount in the second paragraph would be in

20  error.

21     Q.   And which Excel document are you referring to?

22     A.   It's just the -- the -- it's the document that

23  is represented in the -- in Exhibit J:  Actual Damages

24  Calculations.

25         The total of those calculations is 12,400,

1  which is consistent with the illustration -- the summary

2  illustration in Section R of the report.

3      **Q.   And what was the nature of $150 Excel**

4  **miscalculation?**

5      A.   I believe it was just a duplicated row in --

6  in -- with the exact same information in each row of

7  $150 dollar item.

8      **Q.   Do you recall which row was duplicated?**

9      A.   I believe it was the first row, which said --

10 says license number 1, amber angel fish.  I just had the

11 same information in there twice.

12          At the time that I completed this report, we

13 were having rolling blackouts in the Pasadena area.  Our

14 power was turning on and off.  Battery backups were worn

15 out.

16          My computer was -- you know, it was a -- it

17 was an situation in which we were losing power and power

18 was coming back on, and I was repeatedly saving.  It was

19 a very interesting situation -- circumstances under

20 which to complete a report.  But the repeated paragraphs

21 are part of that situation most likely.

22     **Q.   So, aside from those two repeated paragraphs,**

23 **are there any other corrections that --**

24     A.   No, Sir.

25     **Q.   -- you are aware of?  Okay.**

1          **When did you complete the report?**

2          A.    I completed the report on the date on which I

3     signed the report.  Just take a look at that here.

4     September 24th, 2012.

5          **Q.   And how long did you work on the report?**

6          A.    In working on the report, my work commenced

7     when I was provided with all the information from the

8     defendant.

9               And that involves reviewing all the documents,

10    having discussions with various parties, reviewing the

11    depositions, et cetera.

12              So I would say that my work began on the date

13    that I was retained -- unfortunately, I don't have that

14    date with me here -- and continued until the actual

15    submission of the report to the defendant to the

16    defendant, to be forwarded to you.

17         **Q.   Is there a document that would indicate the**

18    **date you were retained?**

19         A.    There would be a document, indicating the date

20    I was retained, and that would be my engagement letter.

21         **Q.   What other information would be in the**

22    **engagement letter?**

23         A.    The terms, in terms of my hourly rate,

24    compensation for depositions, travel, trial.  That sort

25    of thing.

1    Q.    **What is your compensation for depositions?**

2    A.    $650 per hour.

3    Q.    **And I didn't mean to interrupt.**

4          **Travel?**

5    A.    It's portal to portal.  So whatever time I'm

6    working on the case, I'm compensated at that rate.  If

7    my clients pay my invoices within 10 days of receipt, I

8    reduce my fee, as a courtesy, by 5 percent, I believe.

9    Q.    **And is your hourly rate for trial time the**

10   **same?**

11   A.    The same.

12   Q.    **Okay.**

13   A.    And that is throughout the history, as an

14   expert, from the first job, to the present day.

15   Q.    **You've always charged the same?**

16   A.    Always the same.

17         The only exceptions being I also do forensic

18   work on images where there is alleged child abuse, child

19   molestation, child pornography.  And I work, either at a

20   reduced rate for the prosecution, or at -- on a pro-bono

21   basis.

22   Q.    **Aside from your child porn-related forensic**

23   **work, is there other forensic work you do?**

24   A.    My practice -- my consultancy practice expands

25   various subject matter related to photography,

1    advertising, marketing and the arts.

2           I analyze images for manipulations.  I am able

3    to analyze metadata associated with images, which is

4    information about the imagine which, either might be

5    stored within the imagine, or otherwise recoverable.

6           I also testify on copyright matters, right of

7    publicity matters, contractual disputes, and all -- all

8    matters related to the arts, advertising, photography.

9    That sort of thing.

10         **Q.   In your forensic work, what do you mean you**

11   **analyze images for manipulation?**

12         A.   There are circumstances under which an imagine

13   can come to be manipulated.

14         A person might want -- might switch the heads

15   on a body, to make it appear as if a person was in a

16   certain place, at a certain time.  A person might remove

17   evidence from a photograph.  That sort of thing.

18         So part of my practice involves forensic

19   examination of images to determine if there was

20   manipulation or when and where the photograph was taken.

21   Those sorts of things.

22         **Q.   Have you done that type of forensic analysis**

23   **on any of the images in this case?**

24         A.   No, Sir.

25         **Q.   You said that you also analyzed metadata**

1  **associated with images.  Is -- is -- is that looking at**
2  **the EXIF data?**
3       A.    EXIF data is data that's typically stored by
4  the camera or device that records or captures an imagine
5  is additional information that can be stored by the user
6  or by any party who comes into possession of a copy of
7  the image.
8            I sit on the IPTC photo metadata working
9  group, where we establish global standards for image
10 metadata.
11           I also am the president and CEO of the PLUS
12 Coalition, P-L-U-S.  This is a global organization that
13 sets standards for image rights information, including
14 metadata associated with rights information that is
15 associated with images.
16      **Q.    A couple of points there.  IPTC.  What does**
17 **that stand for?**
18      A.    International Press Telecommunications
19 Counsel.
20      **Q.    And the PLUS is the -- I understand PLUS has a**
21 **image rights imbedding capability or piece of software**
22 **that they, at least, make available on their website?**
23      A.    That's part of what the PLUS Coalition does.
24           Essentially, we establish standards for the
25 communication and management of rights information

1    associated with images and video.

2           This information can be stored in what's

3    called the header of an imagine which is a part of a

4    digital image file that is reserved for storing

5    additional data, not the visual data, but additional

6    data about the image.

7           Part of that information stored can be

8    technical information, such as, the EXIF information

9    that you've mentioned.  And that would include things

10   like the date and time that the image was created and

11   what camera was used and information such as that.

12          But there is a wide variety of additional

13   information that can be stored, such as, the caption

14   describing what is in the image, rights information,

15   such as, copyright information that is particular to a

16   licensed granted from one party to another, or that it's

17   just general rights information, such as, a copyright

18   notice or credit line creation date, publication date,

19   indication as to whether or not the image is a protected

20   image or a public-domain image.  Those sorts of things.

21      Q.   So the copyright info that may be imbedded in

22   an image is the PLUS image -- and forgive me if I'm

23   using the wrong terminology.

24          Does the PLUS have a thing they call an image

25   imbedder?

1    A.   We have a -- it's called The PLUS Imbedder

2    Reader Tool.  That's a paraphrased title.  And that can

3    be used to imbed rights information into am image.  But

4    there are many other ways.

5         For example, in most software created by

6    Adobe, such as, Photoshop or Illustrator or In Design,

7    you can metadata using what are called file info panels,

8    which allow to you add the same information into an

9    image and also to read information from the image.

10         The tool that you're referring to is more of a

11    demonstration tool that was created at the time that we

12    first lunched the PLUS licensing standards, to enable

13    people to be able to make use of the standards on a

14    low-volume basis, to understand the concept of imbedding

15    information into an image and reading information from a

16    image.

17         It's not intended for high-volume use.  People

18    would use professional software that includes the

19    ability to read and write metadata from an image for

20    that purpose.

21    **Q.   Okay.  Have you done any forensic image**

22    **investigation, in connection with this case?**

23    A.   Sitting here at this moment, I can't recall

24    conducting forensic image investigation in this matter.

25         If, during the course of this deposition, I

1    recall doing any such investigation, I will advise you.

2        Q.    **Thank you.**

3            **If you had done so, would you have put that in**

4    **your report?**

5        A.    I don't believe that I was called upon to

6    investigate any technical aspects of the images in this

7    matter.

8            The only examination that I can recall doing,

9    at this moment, was comparing, I think, it's image 1397

10   or image 1550.

11           There's an image of a fish against some coral,

12   and I -- and I just looked at those two images to

13   determine whether they looked like they were the same

14   image or not.

15           But I was not really called upon to do that

16   just in the course of reading some of the materials of

17   this case.

18       Q.    **Did those two images look like they were the**

19   **same image?**

20       A.    They appeared to be the same image flipped 180

21   degrees.

22           But I did not have access to high-resolution

23   copies of the image, so I -- I want you to take my

24   phrase literally when I say they appeared to be.

25           I could confirm that they're the same image by

1    analyzing high-resolution copies.  I -- I have not done

2    so because that wasn't part of the scope of the work

3    that I was asked to do in this matter.

4         **Q.   You can't identify precisely when you were**

5    **engaged.**

6              **Do you have a sense of when you were hired?**

7    **Was it this year?**

8         A.   It was within the last 12 months, I believe.

9              And I would be happy to provide the actual

10   date.  During a break, I can contact my office and

11   determine the actual date.

12        **Q.   Okay.  Would you provide me the engagement**

13   **letter?**

14             MR. GEITNER:  Um, if you want items, let's

15   make a list of what it is you're looking for and then

16   we'll discuss, you know, that production.

17             MR. POLLACK:  Okay.  Can you just identify

18   that on the record.

19             THE REPORTER:  Yes.

20             MR. POLLACK:  Thank you.

21        **Q.   Who hired you?**

22        A.   Hinshaw Culbertson.

23        **Q.   I'm sorry, I didn't hear you.**

24        A.   Hinshaw Culbertson, the law firm.

25        **Q.   The law firm.**

1          **Was it Mr. Geitner?**

2      A.    Yes.

3      **Q.    What were you hired to do?**

4      A.    To review testimony and documents and

5  materials produced in this matter, and to arrive at the

6  opinions expressed in my preliminary expert report.

7      **Q.    Why is it titled "Preliminary Expert Report"?**

8      A.    When I'm retained in a federal copyright

9  matter, the first report that I generate is titled

10  "Preliminary Expert Report."

11          And then it could be that the any other party

12  in the matter could bring forward an expert witness, who

13  might also produce an expert report, and I might be

14  called upon to rebut that report, in which case, I would

15  draft a rebuttal.

16          In addition, evidence might come to light or

17  information might come to light, after the drafting of

18  my report, in which case, I would issue a supplemental

19  report.

20          The first report that I issue is always called

21  a "Preliminary Report."

22      **Q.    Do you know how many federal copyright matters**

23  **you've been retained, as an expert, in?**

24      A.    In my report, there is a listing of the

25  matters that I have testified in, in the last four

1    years, as required under the federal rules of evidence.

2          I'm not able, sitting here at the moment, to

3    provide you with a more comprehensive list from than

4    from memory.

5          However, if I would like to review that list

6    with me, I can point out which matters were

7    copyright-related matters.

8       **Q.   I will do that in a minute.**

9          **When did you -- do you recall when your first**

10   **time being an expert witness was?**

11         MR. GEITNER:  I'm just -- objection to form.

12   Just the scope of it -- is it globally as to witness or

13   just copyright matter?

14         MR. POLLACK:  Globally, as an expert witness.

15         MR. GEITNER:  Gotcha.

16         THE WITNESS:  I can't recall the date.  I -- I

17   operate a number of businesses.  I believe four

18   businesses.  And I'm, occasionally, called upon to serve

19   as an expert witness.  And the dates and times and

20   amounts over time sometime escape my memory.

21         I -- I recall the first case.  The plaintiff's

22   name was Bodionics, B-o-d-i-o-n-i-c-s, but I don't

23   recall the other party's name.  I do know that it was a

24   right of publicity matter.

25      **Q.   BY MR. POLLACK:  And was that, do you think,**

1    **more than ten years ago?**

2         A.    Possibly approximately ten years ago, but I'm

3    not -- I'm not really certain.

4         **Q.    You say you operate four businesses.  What are**

5    **the four businesses?**

6         A.    I am the president and CEO of the PLUS

7    Coalition, which is a non-profit organization, based in

8    Pasadena and in -- and near London as well.

9              Those are two separate corporations; one in

10   the USA, which is a New York corporation, and one that's

11   registered with Companies House in the UK.

12             I operate Mason Editions, M-a-s-o-n

13   E-d-i-t-i-o-n-s, a publishing company.  We produce

14   posters of photographs for wholesale and retail sale.

15             I am a professor at the Arts Center College of

16   Design, where instruct students on the subject of

17   copyright, right of publicity, image licensing,

18   advertising, marketing, and branding in general.

19             In addition, I operate Jeff Sedlik

20   Photography, a photography studio, primarily focusing on

21   the licensing of images for advertising use, but also

22   offering images for editorial use and fine art sales.

23        **Q.    What is editorial use?**

24        A.    Editorial would mean publication in magazines,

25   newspapers, what would be classified as non-commercial

1    use.

2        Q.    Is -- is the use accused of infringement in

3    this case commercial use?

4        A.    Usage in a catalog would be classified as

5    commercial use.  Usage on a website would be classified

6    as commercial use, if the website is used to display or

7    offer products or services.

8        Q.    Are Foster and Smith's websites used to

9    display offers for products or services?

10        A.    Foster Smith has multiple websites.  And I

11    believe they have one website, at least, that is

12    educational in nature.  How to take care of your pets.

13    That sort of thing.

14            That might be classified, as what we would

15    call, an advertorial type of website, where it is

16    offered as a public service by a for-profit company, to

17    provide information to their customers and potential

18    customers about pet care.  That sort of thing.

19            But, in addition, there might be offers of

20    products through that site.  I have not looked at that

21    site.

22        Q.    Do you know which site that is that we're

23    referring to?

24        A.    I'm not sure.

25            In the back of my mind, I recall reading that

1  there was such a site that was operated by Foster and

2  Smith, but it is possible that my memory is incorrect

3  and that it was offered by Pet Warehouse.

4      **Q.   And an "advertorial site," is that a term of**

5  **art, in your industry?**

6      A.   Advertorial can be a combination of editorial

7  content, meaning, it could be educational content or

8  information that's not focused on selling products or

9  services.

10          But within the boundaries of that site,

11  perhaps, there are offers of products or services that

12  are secondary to the educational informational purposes

13  of that site.

14      **Q.   Does a for-profit business that sells products**

15  **use advertorial content to help increase sales of**

16  **products?**

17          MR. GEITNER:  Objection to form.

18          THE WITNESS:  I would have to say that that

19  would be a determination made by each individual

20  company.

21          There are some for-profit companies that have

22  purely informational public service websites or

23  publications that are secondary to their business that

24  are not intended to promote their company or sales.

25          That's just part of what they do for the --

1    either their customer community or the public at large.

2    And then there are other companies who use it as part of

3    their marketing strategy.

4        **Q.   BY MR. POLLACK:  And how does advertorial**

5    **content help those companies that use it as part of**

6    **their marketing strategy?**

7        A.   I'm not sure that it actually helps them.

8            You'd have to really analyze the -- each

9    particular site to determine if there was any actual

10   benefit.

11           In terms of attracting potential customers or

12   customers to read more about certain subjects and

13   whether there is a nexus between that, um -- those

14   visits to a website, let's say, and then any sales or

15   promotion of the brand would have to be analyzed on a

16   case-by-case basis, to demonstrate if anything actually

17   happened as a result of that.

18       **Q.   Returning to your work, as an expert witness,**

19   **I'm looking at Tab A, which, I believe, is your resume**

20   **or your CV.**

21           **On Page 2 -- it's Tab A of Exhibit 2.  Page 2**

22   **lists your other professional experience.  And the last**

23   **item up from the bottom is consultant and expert**

24   **witness.  And the date listed there is 2000 to present.**

25           **Does that -- in light of that, do you think**

1   you've been an expert witness prior to 2000?

2       A.   2000 seems -- it's consistent with my memory.

3   I don't know if I was retained, actually, in 1999 on a

4   case.  That sort of thing.

5           But if you want -- if you want to say that

6   I've been providing expert or consulting services since

7   approximately 2000 for about a dozen years, that's most

8   likely close to being accurate.

9       Q.   In the four companies you've listed right now

10  that you -- or the four businesses you're involved with

11  right now, PLUS Coalition, Mason Editions, your

12  professor responsibilities, and Jeff Sedlik Photography,

13  is there a fifth, that is, your consultancy business, or

14  does that operate under one of these other four?

15      A.   I don't have a separate business license for

16  any kind of consultancy business.

17          I suppose that it operates under Jeff Sedlik

18  Photography, but it's not a corporation or a formal

19  company.

20          If I receive a call or an inquiry, asking if I

21  am qualified to provide, either consulting expert

22  services, or testifying expert services on a certain

23  subject, and if my service apply, I might accept that

24  engagement.

25      Q.   As a percentage of your time, how much time do

1   you spend with your consultancy work, as compared to the

2   other responsibilities you have professionally?

3        A.   Less than one percent.

4        Q.   Less than one percent consultancy?

5        A.   I'm employed full time by the PLUS Coalition.

6   I work seven days a week, 18 to 20 hours a day, for the

7   PLUS Coalition.

8        Q.   As a percentage of your income, what

9   percentage of your income is from the consultancy part

10  of your responsibilities, as compared to your other

11  professional responsibilities?

12       A.   I do not recall, and I'm not prepared to

13  answer that.

14       Q.   Because you --

15       A.   I'm not refusing to answer.  I just, actually,

16  do not know.

17       Q.   As an estimation, is it half?

18       A.   I'm not sure.  I am salaried by the PLUS

19  Coalition.  I generate licensing revenue from my

20  photography business.  I'm paid on a part-time basis by

21  the PLUS Coalition.

22            I receive income from my publishing business,

23  and I don't track the income from each of those

24  separately on an active basis.

25            So had you subpoenaed that information, I

1    would have done an analysis in advance and come

2    prepared.  I'm not prepared.

3         **Q.  Okay.**

4         A.   And I don't think it would be appropriate for

5    me to take a swing at that and just guess at it.

6         **Q.  Well, would it be as low as one percent of**

7    **your income comes from consultancy work?**

8         A.   It could be.  I'm not sure.

9         **Q.  How much have you been paid, to date, by the**

10    **defendant, Hinshaw Culbertson?**

11        A.   I came prepared to answer that question.

12             You didn't list that in any kind of

13    requirement for me to bring information, but I

14    anticipated that you might ask that.

15        **Q.  Thank you.**

16        A.   So I came prepared -- I'm actually not

17    prepared to answer how much I have been paid, because

18    I'm not sure of the status of accounts receivable or

19    anything like that.  But I did ask my assistant to give

20    me the amount that we have invoiced.

21             (Pause in the proceedings.)

22             THE WITNESS:  I also brought a blank invoice

23    for today.

24             MR. GEITNER:  Gotcha.

25             THE WITNESS:  So we can fill that out.

1    MR. GEITNER:  Let's go off the record real

2  quick, while he's looking for the information.

3    MR. POLLACK:  Sure.  Let's be on the record

4  for one second.

5    If, at any time, you want a break, happy to

6  take a break at whatever pace and time you need it.

7    THE WITNESS:  I have some bad knees, so about

8  every 45 minutes I need to stand up and walk around.

9    MR. POLLACK:  Great.  Now we can hop off.

10    MR. GEITNER:  Okay.

11    (Recess.)

12    **Q.   BY MR. POLLACK:  You were gathering the**

13  **invoices or the amount you had invoiced?**

14    A.   Yes.

15    The total number of hours is 80.5.  And my

16  fees that are -- have either been billed, or are in the

17  process of billing are $52,325.  That includes this

18  deposition, apparently.

19    **Q.   What was the charge for this deposition?**

20    A.   It appears that my office billed eight hours

21  for this deposition, $5,200.

22    If the deposition requires less time, I

23  believe that my minimum number of billable hours for a

24  deposition is, either five or six hours.  I'm not -- I'm

25  not sure.

1    But we would bill for the minimum and then

2 refund the money.  If we have been paid, refund it back

3 to the defendant.

4    **Q.   And those terms are reflected in your terms --**

5    A.   Yes.

6    **Q.   -- on that engagement letter?**

7    **Can I mark that document as an exhibit?**

8 **The -- whatever document you're looking at.  It's looks**

9 **like --**

10    MR. GEITNER:  I've got no objection.

11    MR. POLLACK:  We'll mark that as 3.

12    (Plaintiff's Exhibit 3 was marked for

13    identification by the reporter and is attached

14    hereto.)

15    THE WITNESS:  Just to be clear, your question

16 to me was how much have I been paid, and that was before

17 our break.

18    And so I want to clarify I'm not aware of

19 which amounts I've been paid or not.  I just asked my

20 office manager to put together a list of billable time

21 or time that had been billed as of yesterday.

22    MR. POLLACK:  And you're right.  It wasn't a

23 very good question.  I should have asked how much have

24 you been billed or have you billed.

25    Looking at Exhibit 3, it appears there's five

1    invoices, which begin at identifier FOS 1201, but then

2    it's dash 02, 03, 04, 05.

3        **Q.   Do you know -- does that mean there was not an**

4    **01?  There may have been an 01?**

5        A.   01 may have been a first payment of $5,000,

6    which I don't call a retainer.  It's just my minimum fee

7    for a matter.

8            My policy is that, upon being engaged, my

9    clients provide a $5,000 deposit that is recoupable, but

10   nonrefundable.

11           Meaning, that should they use my services,

12   they can recoup that 5,000.  It is recouped at the end

13   of the matter off of the final invoice that we issue.

14           So it's not a retainer replenishment scenario.

15   It's a deposit that is then refunded, at the end of the

16   matter, or when I eventually terminate it.

17       **Q.   Or applied as the last $5,000 for payment**

18   **services?**

19       A.   Right.

20       **Q.   And I don't have the exhibit in front of me.**

21   **You can keep it.  I know there's two columns.  One of**

22   **them, the sum of which I think was the $52,325 figure.**

23   **The column to the right had a 60-some odd thousand**

24   **dollar figure.**

25           **What's the difference there?**

1    A.    Expenses associated with the matter, whether

2  I'm using -- as I mentioned staff members, to assist

3  with applying the footnotes to a report or to answer the

4  phone or document inbound materials, create invoices,

5  track time.  Those sorts of functions.

6        So that additional amount would be expenses

7  associated with the matter.  I have certain expenses

8  that are billable, under my agreement, such as,

9  photocopying and mileage, are two examples.

10    **Q.    Is the number on the right, the bigger number,**

11  **is that the total amount, to date, that would have been**

12  **invoiced to Hinshaw?**

13    A.    Either invoiced, or in the progress of

14  invoicing.

15        I don't know how clear I was in my request to

16  my office manager, whether I -- I asked her to look at

17  the outbound invoice and make sure that we get a total

18  of my hours, a total of my fees, and the total amount,

19  either billed, or in the process of being billed.

20        So the $5,000 initial invoice would -- she

21  probably wouldn't have considered that to be something

22  that I had earned, because it's unearned, until the end.

23    **Q.    But there wouldn't be any other expenses that**

24  **have been incurred, as of this moment, that are not**

25  **reflected on that?**

1        MR. GEITNER:  Objection to form.

2        THE WITNESS:  Can you restate that?

3        MR. POLLACK:  I can try.

4    **Q.    There's no other work -- maybe I can't.**

5        **The total amount of work you've done and**

6  **expenses you've incurred, to date, that you have billed,**

7  **or in the process of invoicing Hinshaw for is reflected**

8  **on Exhibit 3?**

9        MR. GEITNER:  Objection to form.

10        THE WITNESS:  If you were to ask me, if I

11  have -- forgive me for restating.  I'm just going make

12  sure I answer you to the fullest extent possible.

13        If you were to ask me, if I have any unbilled

14  fees or expenses associated with this matter, I would

15  say most likely, because I have not billed for time to

16  drive here today.  I was up at 6:00, reviewing my

17  report.

18        So those are going to be some billable

19  expenses that -- you know, part of today falls under

20  your obligation -- it's my understanding of the federal

21  rules, in part, it's going to fall under the defendant's

22  obligations, in terms of compensation, and I haven't

23  billed that yet.

24    **Q.    BY MR. POLLACK:  Okay.  The -- the invoiced**

25  **amount, in advance of today's deposition, that requires**

1  **prepayment before deposition testimony, that's just for**

2  **the testifying time.  That's not your preparation time?**

3       A.   If this -- if this document is correct, where

4  my office manager has entered eight for the hours

5  worked, you know, it's my understanding that you don't

6  need to compensate me for, if we take a lunch break.

7  That sort of thing.

8            And so that may or may not be your

9  responsibility.  You know, it took me almost two hours

10 to drive here today.  And it will probably, depending on

11 what time we stop, take me an hour and a half to drive

12 back.

13           I'm paid on portal to portal, leaving my

14 office and returning to my office.  And I can't

15 anticipate what that's going to be.

16           There's one thing I would like to clarify,

17 because you earlier used the word expenses that I have

18 incurred.  And I don't necessarily bill my clients

19 exactly the amount that I incur, you know.

20           For example, if we make a photocopy, I don't

21 know the exact amount that that cost me.  I have a flat

22 rate.  Something, like, a dollar per page.  So it's not

23 incurred.  It's just billed under the rate specified in

24 the agreement, which I'm happy to provide.

25       **Q.   And thank you for the clarification.**

1          **Prior to this litigation, have you ever spoken**

2     **with Mr. Geitner?**

3          A.    No.

4          Q.    **Do you know Zach Harrington?**

5          A.    I don't know him; however, in the course of my

6     preparation for the report, Mr. Harrington provided me

7     with some of the documents and materials associated with

8     this matter.

9          I believe he was working as an associate or at

10    some level, in connection with this matter.  He -- he

11    was able to provide me with documents that I requested.

12         Q.    **Prior to this litigation, had you interacted**

13    **with Mr. Harrington before?**

14         A.    Not that I know of.

15         Q.    **Do you -- is it your practice, when you're**

16    **engaged for a potential expert representation to run a**

17    **conflict check?**

18         A.    Yes.

19         Q.    **What do you do in that conflict check?**

20         A.    We ask clients -- well, they're not clients,

21    at that time, because we're -- we're in the process of

22    doing a conflict check.

23         But we ask who the parties are on all sides,

24    who the law firms are, and what the subject matter is,

25    so that we can determine whether or not we have any sort

1    of conflict that would affect our opinions or make it

2    inappropriate for me to accept a matter.

3         **Q.  Did you do such a conflict check in this case?**

4         A.   Yes.

5         **Q.  Do you know who Kevin Crosby is?**

6         A.   Yes.

7         **Q.  Who is Kevin Crosby?**

8         A.   He's an attorney, I believe, with your firm

9    out of the Tampa office, or it might be Fort Lauderdale

10   office.

11         **Q.  South Florida.  Either Fort Lauderdale or**

12   **Miami.**

13         **Do you know Evin Aple?**

14         A.   I know of Evin Apel, but I can't recall, um,

15   how I know him.  He might be an associate of Kevin

16   Crosby's.

17         **Q.  He is one of Kevin's associates.**

18         **You are aware and, as you point out, he is one**

19   **of my partners.  You were aware of that in the**

20   **beginning, before you took on this representation?**

21         A.   I was aware of that.

22         **Q.  And did you conclude that it did not present a**

23   **conflict of interest for you, to represent the defendant**

24   **in this case?**

25         A.   Correct.  Because my services were terminated

by your firm the last time that I had anything to do with that -- with -- the matter in question was I believe two years ago.

I also contacted Mr. Crosby. I contacted his client to reconfirm that I was terminated, because I was told that I was terminated at the time.

**Q. You contacted Mr. Crosby and the client, in connection with your conflict search for this case?**

A. As a final -- I'll restate my answer.

Upon receiving the call and learning who the parties and the law firms were in this matter, I understood that you worked for that firm.

I knew and understood that I had been terminated from the matter, which I had worked, and I did not consider it, and do not consider it to be a conflict for that reason.

And, even if I was still retained by that firm, I would not consider it to be a conflict. There are very few experts that work in my field. And I'm very frequently called upon by the same firm, for a matter that might be a plaintiff matter or defense matter.

And I have to take it on a case-by-case basis, to determine whether there might be a conflict involved. In this case, I took the step of -- upon being contacted

1    by the defendant's counsel, I took the step of

2    contacting my brother, who is an attorney, and asked him

3    to confirm my conclusion that there would be no

4    conflict.

5              He confirmed.  I proceeded.

6         Q.   **You indicated that were you terminated.**

7              **Were you terminated by my law firm?**

8         A.   I believe both law firm and your client.

9         Q.   **Were their allegations -- and -- and just to**

10   **be clear, that case is the Katherine Lawrence V.**

11   **Sunshine Products matter?**

12        A.   It is a right of publicity matter, yes.

13        Q.   **Was there also a copyright angle in that case?**

14        A.   That was rejected to my knowledge.

15        Q.   **The plaintiff made a copyright claim that the**

16   **court rejected.**

17        A.   I believe so.

18        Q.   **Did you offer an opinion in that case,**

19   **connected to authorship of copyright?**

20        A.   I don't recall.

21        Q.   **Was there an allegation in the Lawrence matter**

22   **that you were being harassed by a witness on the other**

23   **side?**

24        A.   The witness, actually, the plaintiff, I

25   believe, contacted me and threatened me with the lawsuit

1    because of the content of my report.  But I disregarded

2    it.

3         **Q.   But that harassment or threatened --**

4    **threatened litigation -- is that the way -- it was**

5    **threatened -- I'm not intending to bring up bad**

6    **memories.  I apologize if -- if -- if I am.**

7            **Are those threats of litigation -- have those**

8    **impacted your opinions that you're expressing in this**

9    **case?**

10        A.   No.

11           The threats by the plaintiff in that matter

12   are laughable.  And much to the chagrin of her attorneys

13   who found out from Mr. Crosby rather quickly that their

14   client was contacting the opposing expert to threaten me

15   that if I continued my testimony in the matter that I

16   would be sued.

17           I -- I wasn't at all concerned with it.  And I

18   didn't take it seriously and, certainly, it's had no

19   impact on my opinions in this matter.

20           The type of conflicts that I run in to,

21   typically, are -- I'll be contacted, let's say, by a

22   book publisher or the law firm or a book publisher, who

23   is a defendant in an infringement matter, and they will

24   want to retain me as their expert.

25           I have to look through my database of PLUS

1    Coalition members and board members and volunteers and

2    determine whether I have a connection with that book

3    publisher.

4           I have a connection with, literally, thousands

5    of publishers, add agencies, design firms, trade

6    associations of all kinds in 85 countries.  And so we

7    have to make sure that my responsibilities to PLUS

8    Coalition don't overlap any of my expert services.

9           And so I will reject and have rejected many a

10   call from participants in the PLUS Coalition.

11       **Q.   Was your termination in the -- in the Lawrence**

12   **matter, with regards to my firm, was it amicable?**

13       A.   Oh, yes.

14       **Q.   You don't bear any grudges against Gray**

15   **Robinson?**

16       A.   None whatsoever.

17           I have a very positive working relationship

18   with Mr. Crosby, who's an excellent attorney.  And as

19   far as I knew, I was done with that matter, with the

20   caveat that, in the future, if their matter continued,

21   that they could come back to me at any time.

22       **Q.   Are you an economist?**

23       A.   I'm not an economist.

24           However, I do teach students at a college

25   level advertising, marketing, business practices, some

1    aspects of accounting.  But I'm not an economist.

2        **Q.    Are you an accountant?**

3        A.    I'm not an accountant.

4        **Q.    Exhibit B, to your report, which is Exhibit 2,**

5    **there is a listing of materials considered.**

6            **Is this a complete list of all the facts or**

7    **materials that you considered, in rendering this report?**

8        A.    To the best of my knowledge, this list, which

9    is rather extensive, includes everything that I

10   considered in drafting the report.  I'm just going to

11   take another quick look through here.

12       **Q.    Take your time.**

13           **(Pause in the proceedings.)**

14           THE WITNESS:  I did have several telephone

15   interviews, to obtain information that was not included

16   in any declaration or deposition or materials that were

17   provided to me.

18           And this is a materials-considered list, but I

19   should say that I did have telephonic conversations with

20   several people that are mentioned in the footnotes to my

21   report.

22           I don't, at first glance, see those

23   conversations listed in this materials-considered list,

24   because they were not materials.

25       **Q.    BY MR. POLLACK:  Aside from those phone calls,**

1  which we'll discuss in a little while, any other

2  materials that -- that you reviewed that wouldn't be

3  listed here?

4      A.    Something that wouldn't have made it into our

5  considered list would be my review of the archive dot

6  org website, in particular, the Wayback Machine

7  information on the website and telephonic conversations

8  with the people at archive dot org, with regard to the

9  operation of their system in capturing websites and

10 images.

11         And that wouldn't have been something that

12 would have been received and logged by my office

13 manager, and didn't make it on to this list of materials

14 considered.

15     Q.    I believe you said you had some calls with

16 people at archive dot org?

17     A.    I believe so.

18     Q.    Who did you speak with?

19     A.    I do not have that name here with me.  I could

20 find that name.

21     Q.    What did you speak about?

22     A.    I wanted to verify the -- or clarify the

23 meaning of the statements on the archive dot org site,

24 with respect to the means by which the images appearing

25 for any particular date in the Wayback Machine search

1    results are related or unrelated to the websites that

2    are also captured by the Wayback Machine web spiders.

3         Q.   **Aside from the image cap- -- the piece you**

4    **just mentioned, did you talk about anything else with**

5    **the archive dot org person?**

6         A.   I don't believe so.

7         Q.   **How did you find out the name of the person to**

8    **call?**

9         A.   I don't recall.  I -- I have had previous

10   interaction with archive dot org.

11        Q.   **Do you know people who work at archive dot**

12   **org?**

13        A.   I do not know them.

14             However I know that I have had previous

15   interaction by phone with an employee or employees

16   there, and I do not recall the names.

17             MR. GEITNER:  Can we take a break.  I have

18   allergy issues.

19             (Pause in the proceedings.)

20        Q.   **BY MR. POLLACK:  But you have documents**

21   **somewhere -- we're back on -- you have documents that**

22   **would indicate that person's name?**

23        A.   I'm not positive.  But I'm willing to look for

24   them.

25             In addition, after the sneeze break, I

1    recalled two other conversations that I had that

2    wouldn't be classified as materials considered but,

3    certainly, they were informational in nature.

4              I wanted to confirm the policies of Getty

5    Images and Corbis, which are two stock photo licensors,

6    the two largest in the world.

7              These are referenced in my report in footnotes

8    and possibly in the body text, as to their policies,

9    with regard to in-context usage of images that are

10   licensed for catalog use.

11        **Q.   Any other materials that you can think of that**

12   **might not be listed in Exhibit B to your report?**

13        A.   Not that I can think of, no.

14        **Q.   Turning to the third page of Exhibit B**

15   **(indicating).**

16        A.   (Witness complies.)

17        **Q.   About halfway down, where it starts listing**

18   **fish catalogs, just under an entry where it says**

19   **"Copyright office records search," the first fish**

20   **catalog listed there says fish catalog 2007 O1, vol O9,**

21   **and then it says Trace Elements section from FNS OO2 dot**

22   **OO1 through 168.**

23             **What does "Trace Elements section" mean?**

24        A.   A section of Foster and Smith catalog.

25             And I requested this so that I could review

1   sales figures that, from particular catalog, um --

2   particular catalogs produced by Foster and Smith, where

3   the -- where certain photographs appeared or did not

4   appear in association with a certain product on a

5   certain page.

6       **Q.   But is "Trace Elements" the name, which is**

7   **capitalized here, is that the name of a section in the**

8   **catalog?**

9       A.   Trace Elements was the name, appearing at the

10  top of the document that was delivered to me.

11           And so my office manager's instructed to copy

12  those verbatim from -- if there's a title on the

13  document, she puts that title here so that parties,

14  reviewing the report, would be able to reference back to

15  that document.

16           And I believe that there are some copies of

17  that in -- in -- in the exhibits to my report.

18           MR. GEITNER:  Just so you know it just so

19  happens also that it is also title for a section of the

20  catalog called Trace Elements.

21           MR. POLLACK:  And is that what's being

22  referred to?  Or I think I've asked -- I'm not intending

23  to go ask the same question.

24           Sitting here right now, as I read that

25  sentence, I don't know what that means.

1         MR. GEITNER:  Well, if you open up the

2    catalog, you know, they've got like filtered stuff --

3         MR. POLLACK:  Yeah.

4         MR. GEITNER:  -- in one area and something

5    else too.

6         They each have their own little colloquial

7    name for a section of products that are offered.  One of

8    the sections within the catalog is the Trace Elements

9    section, which encompass the pages that were requested

10   from our office, in connection with those sales figures.

11        MR. POLLACK:  And so your office --

12        MR. GEITNER:  I don't know if it's all of them

13   or just, you know, a portion of them.  But the pages

14   from each of those catalogs came from the Trace Elements

15   section of the Foster and Smith fish catalogs.

16        Make sense?

17        MR. POLLACK:  I'm -- I understand all the

18   words you have said.

19        MR. GEITNER:  I'm trying to be clear.

20        MR. POLLACK:  And I'm -- okay.

21        MR. GEITNER:  I wish I had one here.  I'd show

22   it to you.

23        MR. POLLACK:  I have an electronic -- you

24   wanna look at -- I'll just hand this to you, so I can

25   keep talking to him.

1              MR. GEITNER:  Oh, yeah.

2              MR. POLLACK:  If you don't mind me --

3              MR. GEITNER:  Hey, no.  That way, I can't

4     object that way, and, you know.

5              MR. POLLACK:  Off the record for a second.

6              (Discussion off the record.)

7              MR. POLLACK:  Mr. Sedlik, if we can turn now

8     to your report, the body of your report, Page 6.

9              MR. GEITNER:  Here you go.

10             MR. POLLACK:  Oh, great.  Let's go back to

11    that.  Thank you.

12             MR. GEITNER:  It's in the upper, right-hand

13    corner.  It says Trace Elements.

14             MR. POLLACK:  Okay.

15             MR. GEITNER:  There's a section that's fairly

16    consistent between catalogs.  It's called Trace

17    Elements.  It's got that kind of stuff on it.  "That

18    stuff," being products.

19        Q.   BY MR. POLLACK:  Mr. Sedlik, let's return to

20    the Trace Elements line of questioning.  I don't have

21    this printed out, but I'll just show it to you, which is

22    FNS OO2 dot 070 and FNS OO2 dot 0701.

23             Sitting here today, does that look like the

24    Trace Elements section that you think --

25        A.   It -- it -- it looks familiar.  It looks to be

1  the Trace Elements section of the catalog.  Of course,

2  every issue has a slight variation in the pages.

3         And, in this instance, I didn't rely on each

4  and every one of these, but they were materials

5  reviewed.

6         In other words, thumbed through them, to find

7  issues where -- where there -- in the catalog there was

8  a -- one of the Howards' images above a certain product

9  there.  And then, in other instances, where, in the same

10 catalog, there was no Howard image and just -- just the

11 product.

12    **Q.   Okay.  Thank you.**

13         **Back to your report on Page 6 -- sorry,**

14 **actually, Page 1 first.  The fourth paragraph down of**

15 **the last sentence:**

16         **"In addition to supplemental expert**

17         **reports I may also offer rebuttal expert**

18         **reports in response to reports filed, at any**

19         **time, by defendants or by experts retained by**

20         **defendants in this matter."**

21    A.   It should be "plaintiffs."

22         Should be: "Reports filed, at any time, by

23 plaintiffs or experts retained by plaintiffs in this

24 matter."

25    **Q.   You're not aware of another defense expert?**

1       A.    No, Sir.  That's a typo.

2       **Q.    Okay.  Thank you.**

3       **Page 6, the background section, you indicate**

4  **that Richard Howard is the president of Oceans of**

5  **Images Photography.**

6       **Do you believe that to be true?**

7       A.    I would have obtained that title, either

8  from -- I believe, from his own deposition.

9       I'm not positive as to his current role in the

10  company, and I'm also not positive as to whether any

11  testimony was accurate or not.

12      **Q.    Did you make an assessment as to the**

13  **credibility of Mr. Howard's testimony?**

14      A.    When I'm retained in a matter, of course, all

15  the parties are under oath when providing deposition

16  testimony and when -- when submitting declarations.

17      And, to a significant extent, I need to rely

18  on their testimony.  But, in reviewing their testimony,

19  if I see inconsistencies in that testimony, I am forced

20  to take those parties' testimony with -- under

21  consideration, in terms of factual background and

22  careful examination of the facts associated with every

23  statement that they make.

24      There have been certain inconsistencies in

25  Mr. Howard's testimony, as well as, Mrs. Howard's

1   testimony, and I have relied quite a bit on their

2   testimony.  I look very carefully at it.

3        **Q.   But where there were inconsistencies, did you**

4   **assess the credibility, to decide which inconsistency**

5   **you would rely on?**

6        A.   In certain instances, if I've got Mr. Howard

7   saying one thing in a deposition and something

8   conflicting with that in a declaration, one of those two

9   statements has got to be in error or perjuring.

10       And I have to, either disregard both

11  statements, or seek out other information available to

12  me that would help me to come to a conclusion as to

13  which one is most likely to be correct.

14       Basically, you know, the sum total of all the

15  evidence and materials presented to me in this matter

16  and there are thousands upon thousands of pages of

17  information or documents provided to me in the matter.

18       **Q.   Did you find inconsistencies in the deposition**

19  **testimony of the defendant's witnesses?**

20       A.   I found some inconsistencies, between the

21  defendant's witnesses and the plaintiffs' witnesses.  I

22  don't recall specific inconsistencies with the

23  defendant's witnesses' testimony.

24       I -- in -- in reading through the testimony of

25  either party, I, of course, take a neutral position and

1    have to take note of inconsistencies in the testimony,

2    and I did see that with both Mr. and Mrs. Howard.

3             I did not see that with other witnesses in the

4    matter.  I did see situations in which time might have

5    clouded certain witnesses' ability to recall certain

6    facts.

7             But I didn't see the same sort of

8    inconsistencies as I did with Mr. Howard and

9    Mrs. Howard.

10        **Q.   Did you determine that the defendant's**

11   **witnesses were more credible than the Howards were?**

12            MR. GEITNER:  Objection to form.

13            THE WITNESS:  We'd have to refer to certain

14   statements.  Where ever I see a conflict between the

15   version of events presented by the defendants and the

16   version of events presented by the plaintiffs, then I

17   have to look at everything available to me, in order to

18   attempt to determine which is accurate.

19            When I have testimony, such as, from Mr. and

20   Mrs. Howard, where they give completely conflicting

21   testimony on certain issues, and where, on that same

22   issue, the defendant's testimony is consistent, I do

23   consider that.

24            However, ultimately, there are quite a few

25   documents in this matter and some of those documents

1   fill in the blanks.  I mean, do you want examples, Sir,

2   or...

3       Q.   Can you site examples?

4            Well, let me ask that differently.

5            Are the examples -- would they be in the

6   report, or are there examples outside the report?

7       A.   There is one example that I highlighted in the

8   report, which was, I believe, during one of

9   Mrs. Howard's deposition, or -- or, if she only had one

10  deposition, it was from that one deposition, where she

11  was testifying first that an invoice was requested, and

12  then a break was taken in the deposition.  She came back

13  and said no an invoice was never requested, never

14  mentioned.

15           With respect to Mr. Howard, and I'm just

16  thinking of examples here that come to mind.  There's

17  something that's happened between his deposition and

18  between -- and, um, subsequent to my report.

19           In -- in deposition, Mr. Howard testified that

20  they did not contact Foster and Smith, to provide any

21  kind of information subsequent to the alleged

22  termination.

23           But then in his recent declaration related to

24  the motion for summary judgment, he had testified that

25  they did provide notification of the status of

1   licensing, and he produced a document that's alleged to

2   have been delivered to Foster and Smith.

3         And these are -- this is polar opposite, in

4   terms of deposition testimony versus declaration

5   testimony, and I -- I have to wonder which is accurate.

6   **Q.   Did you come to a conclusion as to which was**

7   **accurate?**

8         A.   I did not.

9              I -- I haven't, um, had time to consider the

10  declaration testimony.  I, um, only obtained the

11  declaration yesterday and noted that, upon reading it

12  last night.

13             But my review of it was cursory in nature.  I

14  haven't had time to thoroughly review the responses for

15  the motion to summary judgment or the declarations or

16  anything to do with the documents produced or testimony

17  after my report was issued.

18  **Q.   You acquired one of Mr. Howard's declarations**

19  **last night.**

20             **How did you acquire that?**

21        A.   I download it from Pacer.

22  **Q.   You went on line yourself and downloaded it?**

23        A.   I downloaded it from Pacer.

24  **Q.   And why did you do that?**

25        A.   I wanted to see if there were any documents

that might affect my opinions.

**Q. Were there any documents that might affect your opinions?**

A. Upon further review of those documents, they might. I only noted that inconsistency in -- in that -- in that declaration.

But I -- I honestly have not had the chance to thoroughly review them and then compare them against past testimony or any of the evidence in the matter.

Usually, I would, given the time, or given a request from my client, I would engage in a thorough review and possibly generate an additional report, supplementary report. But that has not been requested of me.

**Q. Prior to yesterday, when you accessed Pacer for this litigation, have you accessed Pacer, to review any of the documents in this litigation before that?**

A. I -- I don't recall that.

**Q. Okay. Page 7, second full paragraph that begins "In 2001." You're describing the transition from Pet Warehouse to Foster and Smith.**

**And the last sentence of the paragraph says:**

**"Defendant and selected certain photographs for usage in its marketing efforts and compensated Oceans OF Images upon receipt**

1      **of invoices from Ms. Howard."**

2          **What is your understanding of the work flow**

3  **for how Images made their way from the Howards into**

4  **Foster and Smith's marketing materials?**

5      A.   The particular paragraph that you've selected

6  requires a more expanded answer, because you've selected

7  a paragraph, referring to the acquisition of Pet

8  Warehouse.

9          When -- it's my understanding that, when Pet

10 Warehouse was acquired by Foster and Smith, that there

11 were a server of or physical equipment, computers and

12 servers that were acquired by Foster Smith as part of

13 the acquisition, where I understand that Foster and

14 Smith acquired bottom physical equipment and

15 intellectual property from Pet Warehouse.

16         In the course of that, they acquired servers

17 that had images stored on them, that had been stored on

18 those -- on that equipment by Pet Warehouse previous to

19 the acquisition.

20         It's my understanding that there were

21 approximately 4,000 images on the server, but I am

22 stating that from memory.  It may or may not be

23 accurate.

24         In the course of transitioning from one

25 company to the other, I understand that employees of

1    each company worked with each other, and there were

2    several transition catalogs.

3            And -- and -- and, um, that, um, there were

4    some licenses that had been issued by the Howards to Pet

5    Warehouse for certain images that were stored on the Pet

6    Warehouse server.  And that it is unclear as to, um,

7    what the status of the licenses were that were issued by

8    the Howards to Pet Warehouse.

9            However, when Foster and Smith acquired Pet

10   Warehouse, there was an agreement.  I've been provided a

11   copy of the agreement.

12           And there are certain representations and

13   warranties in there with regard to the intellectual

14   property transferred from Pet Warehouse to Foster and

15   submit that would indicate that Pet Warehouse warranted

16   that they had the right to transfer those images -- or

17   not -- not specifically the images, but intellectual

18   property to Foster and Smith.

19           And -- and that they provided, basically, a

20   warranty that -- that they had the right to transfer and

21   that those rights were unencumbered.

22        **Q.   Are you a lawyer?**

23        A.   I'm not a lawyer, Sir.

24        **Q.   Okay.  I believe Exhibit L, to your report, is**

25   **a portion or pieces of the -- I believe it is pieces of**

1  the agreement, between Pet Warehouse and Foster and

2  Smith, in the acquisition.

3          In your response you gave a moment ago, you

4  said were you provided a copy of the agreement.

5          Were you provided more than what is in this

6  Exhibit L.

7      A.   I don't recall.  I believe that I got this out

8  of the materials produced.  So that would -- I would

9  assume that that would be something that you would also

10 have.  I was -- let me just check my, um, footnote here.

11     Q.   Which footnote are you referring to?

12     A.   I'm looking for any footnote that refers to

13 this Exhibit L.  I don't believe that it's in the same

14 section that we're discussing right now.

15          To, um -- I wanted to determine whether or not

16 I used the term "excerpt from" the agreement or not.

17 And if you just give me one moment, I'm gonna find that.

18     Q.   Pages 26 and 27 are where you discuss the Pet

19 Warehouse images.  And then footnote 38 may be what

20 you're looking for.

21     A.   Right.  Exhibit L.  Excerpt from purchase

22 agreement between Foster and Smith and Pet Warehouse.

23          MR. GEITNER:  Go off the record real quick.

24          MR. POLLACK:  Okay.  Off record, Mr. Sedlik

25 we -- Mr. Geitner and I briefly discussed that the

excerpt certificate is what you were provided.

    **Q.   If we can turn to that for a minute -- first off, do you know what "indemnity" is?**

    A.   Yes.

    **Q.   What is your understanding of "indemnity"?**

    A.   This is -- this is one of concepts that I actually teach in my class and put that in context as to how it applies to a photograph or -- or a photographer's client.

        One party agrees to accept liability in the event that a claim arises, resulting from an action of that party in transferring, could be property to another property, or making another representation to another party; to put it in context for how I might teach it in my classes.

        An advertising agency, who has received a license to an image from a client, might ask that photographer to indemnify them against liability for copyright infringement claims that might arise, if they are sued by somebody, who alleges the photographer infringed on the copyright of another party.

        Or that one of the models, appearing in the photograph, sues the advertising agency.  They might ask the photographer to indemnify them.

    **Q.   Are you an expressing an opinion that Foster**

1    **and Smith may have a claim for indemnity against Pet**

2    **Warehouse?**

3           MR. GEITNER:  Objection to form.

4        **Q.    BY MR. POLLACK:  If the images it's accused of**

5    **infringing are images that Pet Warehouse provided?**

6           MR. GEITNER:  Objection to form.

7           THE WITNESS:  Some of the employees of the

8    defendant indicate that they believed that they had the

9    right to make use of the images that were transferred to

10   them, on the equipment provided by Pet Warehouse.

11          And this document can -- is informative as to

12   the nature of the transfer, what the representations and

13   warranties were.

14          But, ultimately, I'm not in a position to

15   render an opinion, as to who, as to any liability on the

16   part of anyone connected with Pet Warehouse or Foster

17   and Smith, coming out of this agreement.

18          I -- I merely checked the agreement, to

19   determine whether there was anything in the agreement

20   referring to the intellectual property transfer and then

21   making any kind of actual determination, as to the

22   application of this to the -- a determination about

23   liability for predecessors to Foster and Smith.  I'm not

24   in a position to do that.

25          There was a suggestion or a claim that the --

1  some of the infringement or alleged infringement on the

2  part of Foster and Smith was willful and this document,

3  in addition to other testimony, is informative in terms

4  of providing indication as to what Foster and Smith

5  might have relied upon, in proceeding to make use of

6  images delivered to them on the equipment by Pet

7  Warehouse during the transition.

8      **Q.  A couple of points to get into.  We'll talk**

9  **more about willfulness later but, since you just**

10  **mentioned it, what is your understanding of what that**

11  **word means, in connection with the**

12  **copyright-infringement case?**

13      A.  An intent to infringe.

14      **Q.  So the definition you're using for "willful"**

15  **is that the party charged with infringement intended to**

16  **infringe the plaintiff's copyright?**

17      A.  They -- they -- to use the actual word, within

18  that sentence, they -- a party -- and I'm not referring

19  to any party in this matter -- would have understood

20  that they were, um, engaging or about to engage in

21  infringement and then proceeded to infringe.

22      **Q.  And, in the case of a corporation, where it's**

23  **a corporation and not Foster and Smith, a generic**

24  **corporation, how does a corporation have an**

25  **understanding that it was engaged in or about to engage**

1    **in infringement?**

2        A.    The employees and principles of the company

3    may or may not have information on which to base their

4    conclusions, as to whether or not they have the right to

5    proceed with making use of images.

6            The understanding of those principles or

7    employees arises from a number of factors.  One, being,

8    documents that are exchanged by the parties.  But the

9    other being the behavior of the parties, especially, in

10   a long-term relationship, between, let's say, a

11   photographer and their client, where the documents might

12   state one thing but the behavior of the parties indicate

13   that they've behaved in a matter that's not entirely

14   consistent with the documents that are exchanged.

15           And, usually, that just has to do with

16   work-flow issues, utilitarian issues related to making

17   use of photographs.

18           To use an example unrelated to this matter, to

19   illustrate what I'm saying, when a photographer issues a

20   license, allowing for images to be used by a certain

21   party, in a brochure, there is certain copying of the

22   image that occurs, for utilitarian purposes, as part of

23   work flow, to allow the licensee to make use of the

24   image.

25           And by "utilitarian copying," I mean, maybe

1      the -- the printer contracts with a company that scans

2      the image, and then they make -- they might make

3      separations or -- or possibly not of the image.

4              They make derivative works of the image, along

5      the way, in order to reach a point at which they're

6      ready to reproduce that image in that brochure.

7              None of that copying, distribution, display or

8      creation derivatives is typically memorialized in an

9      agreement.

10             What is typically memorialized is the end

11     usage and it's, basically, by standard and practice

12     understood by the parties that certain copying is going

13     to be made, certain copying distribution derivatives

14     are going to be made a long the way, in order to

15     facilitate the use of the image, under the license.

16         Q.   **Do those standards and practices override**

17     **copyright law?**

18         A.   They are both expressed licenses and implied

19     licenses.

20             And, when parties engage in behavior, you have

21     to have a good look at that behavior, to see what the

22     understanding of the parties were, in terms of the types

23     of usages that are allowed by the -- by the rights

24     holder and -- and the types of usages that are actually

25     made by the licensee.

1          And I wouldn't say that it would override

2     copyright law, but I would say that a court would look

3     at that behavior, to determine what the understandings

4     of the parties were, especially, with respect to

5     willfulness, but also with respect to what -- what is

6     actionable copying when -- when copies are made or

7     reproductions are made and distributed or displayed in

8     the course of making use of an image.

9          Very widespread standard practice in the

10    industry is to allow certain types of copying to

11    facilitate the licensed use.

12          If those types of copying were not allowed,

13    the entire advertising industry and editorial industry

14    would come to a grinding hault.

15          And so to determine whether the parties

16    involved actually had an understanding that that type of

17    copping was allowed, you just look at how they behaved.

18    **Q.    Come back to the definition of willfulness**

19    **with a corporate accused, the definition you provided**

20    **was that that the accused infringer understood they were**

21    **engaging in or about to engage in infringement.**

22          **In the corporate context, if the corporation**

23    **is aware that an image belongs to another, in one**

24    **section of the corporation, but a different party of the**

25    **corporation uses that image without the permission of**

1  **the third person who owns the rights to the image, is**

2  **that intentional infringement -- I'm sorry -- willful**

3  **infringement, on the part of the corporation?**

4          MR. GEITNER:  Objection to form.

5          THE WITNESS:  That's a rather extended

6  hypothetical.  You have situations, and I'm not

7  referring to either party here, where a corporation --

8  everybody at a corporation may or may not be aware of

9  every term and every condition associated with every

10  asset that passes through that corporation.

11          You also have situations where the copyright

12  owner, their communication, might be with certain

13  persons within that organization who might have an

14  understanding of what rights their receiving, while

15  other people at the corporation do not.

16          I'm not in a position to make -- to provide an

17  opinion on a hypothetical question like that, because it

18  really involves specific facts of that case.

19     Q.   BY MR. POLLACK:  Well, let me try to narrow it

20  **down.**

21          **Is it your opinion that a person, a human**

22  **being, must understand that they're engaging in or about**

23  **to engage in infringement, in order for the company that**

24  **that person is working for to be deemed to have**

25  **willfully infringed a copyright?**

1     A.    The determination of willfulness is one of the

2  more complex aspects of copyright law.

3          And, while I'm not an attorney, I have a

4  significant amount of expertise in the practical

5  application of copyright law, as it applies to the

6  licensing of visual art.

7          And I have enough expertise to know that those

8  sorts of determinations as to willfulness are very much

9  fact based and could not be answered in a hypothetical

10  situation.

11     **Q.    You do express an opinion, in your report,**

12  **that the infringement Foster and Smith is accused of is**

13  **not willful infringement.**

14          **Is that -- are you making an assessment that**

15  **is not willful infringement as that is interpreted to be**

16  **meant under the copyright law, or are you making an**

17  **assessment that that's the practical determination in**

18  **the industry that they haven't willfully infringed?**

19          MR. GEITNER:  Objection to form.

20          THE WITNESS:  We'll need to turn to my -- the

21  section of my report that addresses that.

22          MR. POLLACK:  Okay.

23          THE WITNESS:  Do you happen to have that?

24          MR. POLLACK:  Page 31, Section Q.

25          (Pause in the proceedings.)

1           THE WITNESS:  On reading that section:

2                "A thorough review of all the testimony,

3           communications, documents and other materials

4           produced by the parties yields no indication

5           of dishonesty or willfulness on the part of

6           defendant."

7           I came to that opinion, after reviewing all

8      the documents and materials provided to me in the

9      matter, and in addition interviewing a number of the

10     staff members and -- and reading their testimony, which

11     indicated to me that there was no intent to infringe and

12     that the practice by the Howards of retroactively

13     delivering license documents and retroactively invoicing

14     for usage led to a certain amount of uncertainty as to

15     what -- what -- what rights were received.

16           Q.   BY MR. POLLACK:  Why did -- why did you

17     include the word "dishonesty" here?

18           A.   Ms. Howard, in her deposition testimony, which

19     I do not recall specifically, suggested that she

20     believed that Foster and Smith lied to her and was

21     dishonest with her.  There's a section of her deposition

22     in which that's discussed.

23           And she -- I'm -- I'm the word "dishonesty"

24     there is really referring to that accusation.  She

25     explained her believe that Foster and Smith acted in a

1  dishonest manner by limiting it to a specific

2  circumstance.

3          And she testified that she didn't have any

4  other believe that the defendant had acted in a

5  dishonest manner.

6          And, as I recall, and I'm very willing to

7  revise my recollection, if -- if that testimony is put

8  in front of me, as I recall, she was referring to Foster

9  and Smith's scanning of certain images that were

10  delivered by the Howards to Foster and Smith, for

11  review.

12          And she believed that they had lied to her,

13  had intentionally copied those, with the intent to make

14  use of them, without paying the Howards.

15          Whereas, my review and my resulting

16  determination was that the Foster and Smith was merely

17  scanning images for the purpose of allowing their

18  employees, such as, art directors, to view the images

19  for consideration for potential use.

20      **Q.   You mentioned that, in your interviews and**

21  **discussions with current Foster and Smith employees,**

22  **none of them intended to infringe any of the Howards'**

23  **copyrights.**

24          **Is that a fair restatement of what you said?**

25      A.   I wouldn't say that's a fair restatement, but

1  you're very close.

2      **Q.   Tell me how I mis- --**

3      A.   I -- I don't know with certainty that there

4  was no intention.

5          I only know that, based on all of their

6  statements and all of the documents in this matter that

7  there's no evidence that anybody proceeded to attempt to

8  purposefully use images, without paying the Howards in

9  this matter.

10     **Q.   Did you analyze, whether or not Foster and**

11 **Smith used any of the Howards images with reckless**

12 **disregard, as to whether or not Foster and Smith was**

13 **entitled to use the respective image?**

14         MR. GEITNER:  Objection to form.

15         THE WITNESS:  I believe that the business

16 practices of the plaintiff led to a certain informality

17 in terms of the exchange of images and the usage of

18 images by Foster and Smith.

19         I believe that Foster and could have done a

20 much better job of -- of managing the licensed assets in

21 this matter.

22         Foster and Smith had an employee, Sue Allen

23 Hobb, who was charged with managing a list of images

24 that were, either provided to them for free by the their

25 vendors, who provide products to Foster and Smith, or

1    obtained from other sources.

2           There's testimony in this matter that the

3    Howards were the only photographers that Foster and

4    Smith was working with at the time.

5           And Foster and Smith thus had no formal policy

6    with regard to the management of -- of images provided

7    by vendors, because the Howards were the only vendors.

8           At a certain point in time, Sue Ellen Hobb was

9    moved to another department, had different

10   responsibilities, and her responsibilities of dealing

11   with this image list were parsed out to multiple parties

12   with -- or multiple employees, within the Foster and

13   Smith organization.  Each of which handled some aspect

14   of what Sue Ellen Hobb had previously done.

15          The missing piece was that each of them

16   assumed that the other or that, at least, within of them

17   was removing images from the server, at the time that

18   the license had expired.

19          And, based on the information provided to me

20   or available to me, it appears that they -- after

21   Sue Ellen's departure, there was nobody who took charge

22   of removing images.

23          Now, in some corporations, images are not

24   actually removed because those corporations might use a

25   system called the "digital asset management system,"

1    whereby they're able to mark certain records or append

2    rights information to certain records that would allow

3    everybody in the organization to understand what they

4    can and can't do with those images.

5            And, in fact, that's the core focus of my PLUS

6    Coalition organization, is assisting all parties with

7    those kind of communications of rights information.

8            The problem has been, to date, that there are

9    no standards with how to handle or -- or there are no

10   universal standards for how to handle digital assets,

11   like, photographs.  And so it can be a very time

12   consuming and -- and difficult process.

13           And so, in the case of Foster and Smith, where

14   they had only one vendor, who was providing licensed

15   assets, they didn't really have a procedure for dealing

16   with those assets, other than what I was -- or rather,

17   um, the word -- the word escapes me right now.

18           But, actually, just removing the image from

19   the entire system to prevent anybody from ever accessing

20   it was in Sue Ellen Hobbs' determination the best way to

21   ensure that rather than adding information to it.

22           Because, certainly, if the image doesn't exist

23   in the system, the likelihood of it being found and used

24   in the system is close to zero.

25       Q.    BY MR. POLLACK:  Well, did the system work

1   **when Sue Ellen Hobb was managing that workload?**

2        A.    It's a rather broad question.

3             But I would say that I was impressed with

4   Sue Ellen Hobbs' testimony as to her procedures.  It

5   seemed to me that she had a real handle on a way to

6   manage those assets, given the lack of a system for

7   managing those assets.

8             I'm not able to answer your question directly

9   because I don't know whether or not there were other

10  issues or other incidents where someone perceived that

11  their images were being used, outside the scope of what

12  was allowed.

13            So I can't say whether the system worked or

14  not.  I can say that the system that she described in

15  her deposition seemed to be a system that would, while

16  primitive in nature, would work.

17            Now, that word "work" is an interesting word,

18  because there are certain aspects to the alleged

19  infringement here that require a mention in -- in any

20  answer to your question.

21            So, for example, Foster and Smith used

22  images -- copies of the cover of their catalogs, in

23  order to distribute catalogs that they had previously

24  printed.

25            And it's unclear from Sue Ellen Hobbs'

1    testimony, as to whether that was ongoing at the time

2    that she was handling the management of the assets.  But

3    my assumption would be that it was ongoing.

4            Such as that, whenever catalogs were printed,

5    in order to make those catalogs available to their

6    customers, Foster and Smith would reproduce, what we say

7    a, "thumbnail-size copy" of the front of the catalog,

8    and those catalogs had images pictured in them in text,

9    et cetera.

10           And it's my understanding that some of those

11   images were images that were owned by, either the

12   Howards or one of their corporations.  We call this

13   "in-context use."

14           And, in the industry, it's typically allowed

15   under licensing agreements, where you have a catalog use

16   that's allowed and -- and, when you obtain a stock

17   photograph, you're typically allowed in-context usage of

18   that catalog, in order to facilitate distribution of the

19   catalog.

20       Q.   We'll get to context usage in a minute.

21           You indicated that, after Ms. Hobb, left the

22   role of being responsible for managing the rights with

23   the Howards' pictures, the roles got divvied up and

24   different people had different responsibilities.

25           And the Foster and Smith employees assumed

1   that, if the image was on the server, they were entitled

2   to use it.

3         Is the fact that they made that assumption, is

4   that a smart business practice, on behalf of Foster and

5   Smith?

6         MR. GEITNER:  Objection to form.

7         THE WITNESS:  If I was advising Foster and

8   Smith on establishing a policy for handling intellectual

9   property, I would have advised them of certain

10  occurrences that are common, when employees leave

11  organizations.

12        Employees who have a significant amount of

13  responsibility and keep some of the information in their

14  head and other information in files and other in their,

15  perhaps, in their E-mail in box, et cetera, how to more

16  effectively manage those assets and make sure that

17  everyone, who comes into contact with those assets, is

18  able to also access information as to the rights

19  associated with the assets.

20        This is a widespread issue that is not

21  specific to Foster and Smith and is, in fact, the reason

22  that I founded the PLUS Coalition, to give companies a

23  means of managing the assets.

24     Q.   BY MR. POLLACK:  Should Foster and Smith

25  employees have known that a vendor's images may have

1    **been subjected to usage restrictions?**

2            MR. GEITNER:  Objection to form.

3            THE WITNESS:  Foster and Smith could have done

4    a better job in making information about those images

5    available to the employees, who had come in contact with

6    those images.

7            They have a couple of different departments.

8    They have a department that handles print and a

9    department that handles web.  And there are subdivisions

10   within that.

11           And the exchange of assets between those

12   departments exposes those assets to possible usage that

13   may or may not be licensed.

14           So I would say that Foster and Smith could

15   have done a better job in ensuring that information

16   traveled with those images.

17           At the same time, usage, like, in-context

18   usage, which I understand we're going to get into later,

19   are not necessarily mistakes, because the company

20   understands that they're allowed that sort of usage.

21       **Q.   BY MR. POLLACK:  So you say Foster and Smith**

22   **could have done a better job of making sure Internet and**

23   **the catalog people had access to the information, as to**

24   **the usage limits.**

25           **Does that mean Foster and Smith itself had the**

1    **knowledge it needed?**

2              MR. GEITNER:  Objection to form.

3              THE WITNESS:  In reviewing the invoice

4    associated with this matter, I found that the licensing

5    practices of the Howards left an information gap,

6    between the delivery of the images and the issuance of

7    the licenses.

8              In one example, I think there was a two-year

9    gap, between when the images were used and the -- and

10   when the Howards finally got around to issuing a license

11   to the -- not issuing the license, but memorializing the

12   license in an invoice delivered to Foster and Smith.

13             During the time, between the commencement of

14   the use and the receipt of the memorialized license, the

15   usage went on, apparently, with the knowledge and

16   consent of the Howards and, eventually, they delivered

17   an invoice, thanking Foster and Smith for using the

18   images previously to their receipt of the memorialized

19   license, and then accepting payment.

20             And this is a repeat pattern of usage and

21   then licenses issued or memorialized license delivered

22   and then payment made.

23        I don't think I answered your question.  Can

24   you restate your question.  I'll do a better job.

25        **Q.   BY MR. POLLACK:  I don't even recall my**

1    question.

2              But let me -- you touched on a few things that

3    I'd like to get to, and I know we've been going for a

4    little bit, so let's dig down this rabbit whole a

5    little.

6              First off --

7              MR. GEITNER:  Object form --

8              MR. POLLACK:  First off --

9              MR. GEITNER:  -- to the term rabbit hole.

10             MR. POLLACK:  I withdraw whatever it is I said

11   that was objectionable.

12             MR. GEITNER:  No, I understand what you're

13   getting at.

14             MR. POLLACK:  Yeah.

15        Q.   You mentioned that part of the -- the unique

16   aspect of this was that the Howards were the only

17   vendors and -- non-merchandise related vendor.

18             I understand that Foster and Smith had -- the

19   filter people may have given pictures of their filters.

20             Does your opinion change at all, if you learn

21   that, indeed, Foster and Smith had other non-merchandise

22   vendors, supplying images?

23        A.   If there were a good number of them, over

24   time, and it was Foster and Smith's regular practice to

25   purchase licenses from photographers and stock agents, I

1    would have expected Foster and Smith to have a better

2    system in place for managing those assets.

3          I see, as a consultant, instances in which

4    companies just have no documentation whatsoever and mix

5    images altogether and don't even have image numbers.

6          That's at the extreme one end -- extreme end.

7    And then I -- in the middle, we see situations, like,

8    Foster and Smith, where they're actually applying image

9    numbers, as they come in.

10         And -- and then to the other extreme, every

11   image is assigned rights information and there are

12   warnings that are automated, when licenses expire,

13   et cetera.

14         In this instant matter, we have a situation,

15   where the employees believed that they had the rights to

16   make usage of the images and proceeded to make use of

17   the images, under the assumption that they had the right

18   to do so.

19         And whether that translates that into

20   willfulness, under the corporate level, I'll have to

21   leave that up to the court, to make an actual decision

22   or determination, of course.

23         I've seen no indication, at any level, of any

24   Foster and Smith employee, trying to pull a fast one on

25   the Howards by making use of images to save $125 or $150

1   or any of these amounts, which are very reasonable

2   license fees.

3          I seen no indication that -- that anybody was

4   trying to pull a fast one by getting away with image

5   usage, without compensating the Howards.

6          A company, of the size of Foster and Smith,

7   you would rarely see such a thing, given the liability

8   involved and given the low cost of securing the rights

9   information or securing the rights, to make use of the

10  images.

11  **Q.   Do you now big Foster and Smith is?**

12  A.   I -- in drafting the report, I reviewed some

13  information.  But I'm not sure as of today.  I -- I --

14  it wasn't a factor in the determination, for example, of

15  what the actual damages were.

16  **Q.   Had you heard of Foster and Smith, before this**

17  **litigation?**

18  A.   No.

19  **Q.   Have you seen their revenue information?**

20  A.   I believe that I have.

21         I haven't seen, like, details, but I have,

22  since become aware that they are the largest online

23  retailer of pet and animal fish supplies.  Whether

24  that's accurate or not, I'm not sure.

25  **Q.   Have you seen their total revenue numbers?**

1    A.   I believe that I saw some of that somewhere in

2 some of the documents that were delivered to me, among

3 the thousands of thousands of pages.

4        But I was not asked to make any kind of

5 determination of -- as to their gross revenues or

6 profits.  That, I would leave to a forensic accountant.

7    Q.   **Without saying any numbers, because the**

8 **Howards are on the phone, and they're not aware of them,**

9 **do you have an understanding that their revenues are**

10 **substantial?**

11        MR. GEITNER:  Objection to form.

12        THE WITNESS:  Substantial is a relative term,

13 but much more revenue than I make, and I believe that

14 they are a significant company.

15        MR. POLLACK:  I'm going to put the Howards on

16 mute for a second, because I'm going to say a number.

17 We'll hit the mute button.  The red means we're on mute.

18        MR. GEITNER:  No, I know.

19    Q.   **BY MR. POLLACK:  You understand that the**

20 **revenues are over a billion dollars a year?**

21    A.   I would find that very believable.

22    Q.   **Okay.**

23        MR. GEITNER:  Objection to form.

24        MR. POLLACK:  Move to strike.

25    Q.   **Have you heard the name Jim Hour (phonetic)**

1    before?

2         A.   Yes.

3         Q.   **Who is Jim Hour?**

4         A.   I've heard the name, but I'm unclear as to

5    whether that individual is an executive at Foster and

6    Smith or was a Pet Warehouse executive.

7         Q.   **Do you have any understanding as to whether or**

8    **not Mr. Hour has provided images that have been used by**

9    **Foster and Smith?**

10        A.   That puts the name in context.

11             But I -- um, out of everything that I've read

12   in the matter, I'm having a slight recollection that

13   this is a photographer or a person who is a photo

14   enthusiast who donated images for usage by Foster and

15   Smith.

16             And I'm not entirely sure that that's

17   accurate, But that's in the back of my head or

18   recollection from a couple of months ago, reading

19   through the materials.

20        Q.   **Do you know the name Tony Vargas?**

21        A.   Doesn't sound familiar.

22        Q.   **Do you know the name, in connection with this**

23   **lawsuit, Michael Scott?**

24        A.   Um, no.

25             You know, all these people could have been

1    mentioned in the document, but I was reviewing the

2    documents for very specific purposes and -- and didn't

3    memorize everything.

4        Q.    And I appreciate that.

5            Earlier, when you were talking about the Pet

6    Warehouse -- the server -- there was a Pet Warehouse

7    server or servers, and you mentioned 4,000 images.

8            Where did you get that number from?

9        A.    I think I read that information last night in

10    a declaration by Richard Kotula, K-o-t-u-l-a.

11            And I don't know how to spell his first name.

12    I believe it's R-y-z-a-r-d.

13        Q.    I think you're right.

14            Have you seen those 4,000 images?

15        A.    I received by UPS delivery a hard drive with

16    backups on it with images on it, with quite a lot of

17    information on it.

18            But I have not been asked to review that

19    information in detail, and I only became aware that I

20    received it yesterday or the day before.  I've been

21    traveling, so it might have come in this the last month

22    or so.

23        Q.    Do you know if you've seen the 4,000 images

24    that were supposedly on the server that went from Pet

25    Warehouse to Foster and Smith?

1    A.   I don't believe that I've seen every one of

2    them.  At the time I was drafting the report, I was

3    interested in determining whether any of the images --

4    any of those 4,000 images were images that created by

5    Richard Hour or owned by one of their corporations.

6         And I believe that I did not see in -- the

7    group of images that I looked at there were just so many

8    images I couldn't determine which were which.

9         But what I did was I looked at images that

10   were used by Pet Warehouse in their media, such as,

11   catalogs, and was able to find images there were --

12   where Pet Warehouse had made use of images and, where

13   Foster and Smith made use of what appeared to be the

14   same images at a later time.

15        I don't believe that I was -- that I had the

16   time or that I was authorized to put the amount of time

17   into it necessary, to go image by image and determine

18   which images were the Howard images and which were not.

19   **Q.   You also mentioned that you believed there was**

20   **an invoice that was submitted two years after the use by**

21   **Foster and Smith.**

22        **If you can turn to Exhibit D of your report.**

23   A.   (Witness complies.)

24   **Q.   Is that the invoice that you're thinking of?**

25        **And to aid your recollection, Page 18 of your**

1    report.

2         A.    Okay.

3         Q.    In the first paragraph, you indicate:

4              "Oceans of Images" -- beginning from the prior

5    page:

6                   "Oceans of Images often failed to promptly

7                   deliver invoices to defendant for defendant's

8                   usages of the images, and often delivered such

9                   invoices months or even years after

10                  defendant's commenced usage."

11             And the footnote, you then point to

12   Mrs. Howard's deposition, as well as, invoice 1069, and

13   invoice 1069 is your Exhibit D.

14        A.    In Mrs. Howard's deposition, she described the

15   circumstances in which there was usage of an image in

16   2004 and no invoice until 2006.

17             And she was asked why -- she was asked to

18   explain the delay.  And I believe that she described --

19   well, I don't want to -- I don't want to guess at what

20   she said.

21             Do we happen to have a copy of her deposition

22   here?

23        Q.    I have an electronic copy.

24        A.    That would do.

25             (Pause in the proceedings.)

1        MR. POLLACK:  I'll just hand you my computer

2   or hand it to Chuck.  This is Mrs. Howard's deposition

3   testimony.  It's turned to Page 113, which is what your

4   citation is to.

5        THE WITNESS:  Line 14.  All right.  I'm gonna

6   go up to line 4 and just read that into the record so i

7   can recall what I was referring to here.

8        This is Mr. Geitner, I presume, saying:

9            "All right.  I'm showing you also part of

10           the Exhibit 2, invoice 1069, dated October 4,

11           2006."

12       The invoice, in my Exhibit D, is dated October

13   4, 2004.  So there's a --

14       MR. GEITNER:  Typo.

15       THE WITNESS:  -- discrepancy there.

16   **Q.    BY MR. POLLACK:  But it does say invoice**

17   **number FS 1069?**

18       A.    It does.

19            And in the -- in Mr. Geitner's question, he

20   says:

21            "-- dated October 4, 2006, the October

22            invoice pertains to licenses for images that

23            were backdated to May and September 2004.

24            "And so my question is -- is it because

25            you recognized the use of the images and

1          backdated the invoice to match the usage

2          period?"

3          And Mrs. Howard replies, "No."

4          Mr. Geitner then asks:

5               "And why is it that the October reflects

6          May 2004 use?  Yellow Coney is the first one

7          and half black angel fish is the second one?

8               "For this particular invoice, I do not

9          know the exact reason."

10          In other testimony, in this deposition,

11     Mrs. Howard explains -- I'm not referring to a specific

12     page or line number here.

13          Mrs. Howard explains that -- that, um, they

14     were not prompt with their bookkeeping and issuing of

15     the invoices.

16          And, in the case of the Howards, their

17     invoices are, actually, the only memorialization of the

18     license terms.

19          Q.   Returning -- thank you -- to Exhibit D, you

20     see the handwriting at the top of that invoice, where it

21     says:  "sent 10/06?

22          A.   Yes.

23          Q.   Is it possible Mr. Geitner was confused when

24     he was asking Mrs. Howard those questions and

25     interpreted that as the invoice being sent in October of

1    the year 2006?

2         A.   It's possible.

3         MR. POLLACK:  I want to hand you Exhibit

4    Number 4, which is a document with a Bates stamp FNS

5    0138.

6              (Plaintiff's Exhibit 4 was marked for

7         identification by the reporter and is attached

8         hereto.)

9         **Q.   BY MR. POLLACK:  Have you seen this document**

10   **before?**

11        A.   I'm not sure.

12        **Q.   This is a document that was produced by Foster**

13   **and Smith, showing their check history report.  And if**

14   **you'll look at the last line, the last full line, not**

15   **the total line, but for check number 050460, with a**

16   **November 4th, 2004, date, and then an amount of $225,**

17   **could that check be the check that paid the invoice**

18   **number FS 1069?**

19             MR. GEITNER:  Object to form.

20             THE WITNESS:  Yes.

21        **Q.   BY MR. POLLACK:  So in light of Exhibit 4 and**

22   **the possibility that Mr. Geitner was confused as to what**

23   **the "sent 10/06 meant, do you still believe that the**

24   **Howards invoiced for images years after defendant**

25   **commenced usage of the images?**

1    A.    This was the most extreme example, and I

2  relied certainly -- relied upon, as I must, the

3  testimony at deposition and Mrs. Howard's response to

4  the question and the date presented by Mr. Geitner.

5         So relying on that testimony, I expressed an

6  opinion that this particular invoice was paid as much as

7  two years after the license.

8         Looking at this check history report, I can

9  see that that's unlikely to be the case.  However,

10  across the board, looking at most of the invoices and

11  the communications between the parties, the behavior and

12  practice of the Howards and Foster and Smith was to

13  invoice for usage, after the fact and to be paid after

14  the fact, after usage had commenced or was in progress.

15         I'm not saying that there were no exceptions

16  to that.  A good example would be a certain invoice in

17  which 39 images were licensed or prelicensed for $100

18  each, I believe, with the option to continue with the

19  usage of those -- each of those 39 images for payment of

20  additional fee agreed by the parties.

21         That's an example of a pre-paid usage.  But,

22  for the most part, looking at the rest of the invoices,

23  the licensed terms were sent over to Foster and Smith by

24  Laura Howard, for the most part, after usage had

25  commenced.

1      Q.    But are you aware of any incidence where it

2    was a year, after usage commenced?

3      A.    Not sitting here today.

4            I'm not saying that that didn't happen.  I

5    look at the most extreme example, and when I said in my

6    report, as much as two years, I was referring to this

7    specific one.

8            The check history report would knock this one

9    out of contention, and I'd have to go back to review the

10   payment history for each and every invoice, to determine

11   what the longest length of time was.

12           And, general though, my opinions in this

13   matter are not reliant upon the two-year span of this

14   particular invoice.

15           My opinions are more reliant upon the standard

16   of practice of the parties in usage commencing and then,

17   at some point, an invoice being issued with the license

18   statement, rather than the Howards, delivering a license

19   description in advance, having Foster and Smith sign off

20   on it, letting usage commence, and then delivering an

21   invoice that, basically, merely repeats the

22   information -- the license agreed to by the parties.

23           MR. HOWARD:  We've been going for a bit.  Why

24   don't we take a break?

25           MR. GEITNER:  Sure.

1         (Recess.)

2         MR. POLLACK:  If we can continue back to the

3  Pet Warehouse acquisition agreement or Exhibit L to your

4  expert report.

5         THE WITNESS:  Okay.

6         MR. POLLACK:  The page number on the bottom of

7  the bottom of the page I want to look at is 14, which is

8  the fourth page in, section 4.17, titled "Intellectual

9  Property."

10     **Q.   Is this the intellectual property section that**

11  **you were considering in saying that certain intellectual**

12  **property had been transferred from Pet Warehouse to**

13  **Foster and Smith?**

14         MR. GEITNER:  Objection to form.

15         THE WITNESS:  I'll need a moment to review it.

16         (Pause in the proceedings.)

17         THE WITNESS:  I think that -- I recall -- I

18  recall reading this section.  I don't know if it's the

19  only section that I relied upon.

20     **Q.   BY MR. POLLACK:  If you see in the middle of**

21  **the paragraph as set forth -- I'm just reading from the**

22  **beginning.**

23             **"As set forth in Schedule 417, each of the**

24             **specified parties has the valid rights to use,**

25             **whether through ownership licensing or**

1    **otherwise, all patents, trademarks, service**

2    **marks, et cetera, copyrights, which this**

3    **contract collectively defines as the**

4    **intellectual property rights" -- and then it**

5    **says -- "that are necessary for the conduct of**

6    **its business as currently being conducted."**

7    **Would the images that Pet Warehouse had**

8    **licensed from the Howards have been images that were**

9    **necessary for the conduct of Pet Warehouse's business as**

10   **it was currently being conducted?**

11        MR. GEITNER:  Objection to form.

12        THE WITNESS:  I think that the principles of

13   Pet Warehouse could determine what is and isn't

14   necessary.

15        But usage of, for example, a, um -- a

16   continued distribution of a catalog, which they had

17   acquired rights but were distributed, let's say, printed

18   during the time that Pet Warehouse -- but before Pet

19   Warehouse had been acquired, but distribution continued

20   after that time.

21        That's just a hypothetical example. That's

22   the -- their license to make use of that content would

23   be, in some respects, necessary to that distribution.

24        However, once -- in that example, once a

25   catalog is printed, Pet Warehouse could have a right to

1    continue distributing those until the supply is

2    exhausted.

3          And that would -- that right would then move

4    to or be transferred to Foster and Smith.  That's just

5    for that example that I used.

6       **Q.   BY MR. POLLACK:  Of the approximately 4,000**

7    **images that Pet Warehouse provided to Foster and Smith**

8    **on the servers when the acquisition took place, how many**

9    **of those -- what is your understanding as to how many of**

10   **those images are images that are, actually, at issue in**

11   **this case?**

12      A.   Sitting here at this moment, I don't have a

13   recollection of how many images there would be.

14         Previous testimony today indicated that I -- I

15   wasn't able, in the time allotted, to fully analyze all

16   of those images and determine which were Howard images.

17         I've also seen some testimony from the Howards

18   indicating that, even they, looking at the images might

19   not be able to determine which were -- which were

20   theres.

21         I just recall some sort of testimony to that

22   effect.  But, um, I don't think it would be any small

23   task to make that determination.  I certainly haven't

24   yet.

25      **Q.   Exhibit M to your report is a number of**

1   images.  Is this your understanding of all the images

2   that are at issue in this case, Exhibit M?

3       A.   At the time that I wrote the report, it was my

4   understanding that these were the images that the

5   Howards had identified as alleged -- as images that had

6   allegedly been infringed by Foster and Smith.

7           After the time of my report, which was about

8   two months ago, it could be that the Howards have

9   continued their quest to identify infringements, and

10  there might be additional images at issue.

11          But I, um -- I haven't been asked to continue

12  my investigation as of yet.

13      Q.   Aside from the images listed in Exhibit M,

14  have you investigated any other images accused --

15  accused of infringement by the Howards?

16      A.   Not that I recall.

17          I am somewhat confused by the Howards' naming

18  conventions for their images.

19          There are images that are referred to using

20  one name in, let's say, a copyright registration and

21  another name on an invoice and yet another name in --

22  in -- in communication between the parties.

23          And so there's some naming convention issues.

24  There are numbers assigned to the images in -- in most

25  instances.

1       And the short answer to your question is this

2   was my understanding, as of the time of the drafting the

3   report, as to the images that the Howards were claiming

4   to have been infringed in some way.

5       MR. GEITNER:  And I believe that this was

6   taken down from Pacer or somehow taken from the

7   complaint.

8       **Q.   BY MR. POLLACK:  Mr. Sedlik, are you aware**

9   **that the Howards have found images in use by Foster and**

10  **Smith, after filing the complaint?**

11      A.   I'm not aware of that, at this time.

12      As I said, I -- I -- there was a cursory

13  review last night of some of the information that was --

14  that I pulled down from Pacer.  And I haven't been

15  instructed by my client to continue my review for any

16  purpose, as of this time.

17      The reason I went on Pacer last night is I

18  wanted to try to become familiar with anything that has

19  happened in the interim.  But I wasn't -- I didn't have

20  the luxury of investing a lot of time in that review.

21      So the answer is no, I'm not aware.

22      **Q.   Page 8 of your report.  You're relaying**

23  **your understanding of a call that took place between**

24  **Laura Howard and Foster and Smith, in around December of**

25  **2011.**

1          **"In that call defendant advised Mrs.**

2          **Howard to search for and report any other**

3          **usage of Oceans Of Images photographs by**

4          **defendant."**

5          **How do you have that knowledge?**

6      A.    In that instance, I had conflicting testimony.

7          MR. GEITNER:  I think that misstates it too.

8  I think it was December 2010.  And the conversation took

9  place in January of 2011.

10         MR. POLLACK:  I didn't misread.  You're saying

11 that there might be a typo here?

12         MR. GEITNER:  Right.

13         MR. POLLACK:  Okay.

14         MR. GEITNER:  We're on Page 8, is that right?

15         MR. POLLACK:  We are.

16         And Chuck is probably right, because we filed

17 it in '11.

18         MR. GEITNER:  Right.

19         THE WITNESS:  So, for the purpose of this

20 discussion, do we want to assume that this is 2010

21 conversation?

22         MR. GEITNER:  Well --

23         MR. POLLACK:  It's your report.

24         MR. GEITNER:  I think it says --

25         THE WITNESS:  Yeah.

1    MR. GEITNER:  I think:

2        "Neither of the Howards contacted the

3        defendant for several years until Howard

4        called the defendant in 2011."

5    I think her testimony, if I remember

6    correctly, was equivocal as to the timing of the call,

7    but it's either the end of December of 2010 or beginning

8    of 2011, January, and I don't remember which.

9    MR. POLLACK:  It was prior to filing the

10   lawsuit.

11   MR. GEITNER:  Prior to filing the lawsuit by a

12   few months, yes.

13   THE WITNESS:  And --

14   MR. GEITNER:  But that's the --

15   THE WITNESS:  End of 2010 or beginning of 2011

16   I was relying on the testimony there, and I believe

17   there was some uncertainty as to when that call occurred

18   and what was said in that call.

19   Mrs. Howard testified that she was asked to

20   review catalogs and the website and to invoice Foster

21   and Smith.  Then there was a break in the deposition.

22   Mrs. Howard came back and said she was never asked to

23   invoice and none of that conversation that she

24   previously testified about took place.

25   I took her -- you know, I have to take one

1    recollection or the other.  I took her first

2    recollection.

3        **Q.   BY MR. POLLACK:  Why did you take her first**

4    **recollection?**

5            MR. GEITNER:  Objection to form.

6            THE WITNESS:  I took her first recollection

7    because I assumed that there was some reconsideration of

8    her testimony, during the break, and that her first

9    recollection was her most accurate recollection.

10       **Q.   BY MR. POLLACK:  And why did you make that**

11   **assumption?**

12       A.   If Mrs. Howard is asked directly what -- what

13   took place in the conversation, and she repeatedly

14   identifies for it looked like over a half-hour span that

15   there was discussion of an invoice, and that she was

16   asked to submit invoices, and that she actually promised

17   to submit an invoice -- that was her testimony

18   repeatedly.

19           And then a break takes place in the

20   deposition.  She comes back and she says, "No, never

21   discussed invoices.  Never promised to send an invoice."

22   You know, I had to -- um, in coming to an opinion as to

23   what her, um -- what the thrust of her testimony was, I

24   had to decide between the -- between the two.

25           And I made a decision to rely upon her most

1  complete testimony, in which she repeatedly answered in

2  the same manner and repeatedly verified that there was

3  invoice and discussion versus the coming back, sitting

4  down and saying, "No.  Never happened."

5      **Q.   So you made a credibility assessment about**

6  **her?**

7      A.   On this issue -- I -- I would make no

8  credibility assessment, in general, about other things

9  in Mrs. Howards life.  I'm talking about -- I'm

10  referring to her testimony.

11      **Q.   Do you have specialized expertise in analyzing**

12  **deposition transcripts for rendering credibility**

13  **decisions?**

14          MR. GEITNER:  Objection to form.

15          THE WITNESS:  In circumstances, such as this,

16  where you have a company, such as, the Howards' company,

17  where they have, as they've testified, one client on

18  which their business, in great majority, depends, and

19  their is a discussion about usage that they've

20  discovered, I would expect Mrs. Howard to recall -- to

21  be able to recall what happened in that discussion.

22          I would expect Mrs. Howard to testify

23  truthfully about that -- that conversation, especially,

24  given the seriousness of this matter.  And, um, the

25  initial testimony of Mrs. Howard seemed more credible,

1   to me, than her later testimony.

2       **Q.   BY MR. POLLACK:  What is "Rights Managed**

3   **Licensing of Photography," Page 10 of your report?**

4       A.   There are a number of different licensing

5   models that have evolved over time.

6           And by "licensing model," I refer to a model

7   or a -- the offering of images, the transference of

8   rights to make use of the images, and then compensation,

9   based on one or more of the criteria of the rights

10  transferred.

11          There are -- there are different models that

12  have evolved of which rights managed is one.  Rights

13  managed refers to a grant of rights by a licensor to a

14  licensee, and a price that's based on scope of usage.

15          And, in general, it would be typical for a

16  greater scope of usage to be associated with greater

17  compensation under rights managed.

18          There are a number of criteria on which the

19  license fees are based in rights managed, and I'm glad

20  to go over those briefly, if you desire, or we can leave

21  it there.

22      **Q.   We can leave it there for now.  Thank you.**

23          **Why did Foster and Smith want to use the**

24  **Howards' images in defendants' marketing efforts?**

25      A.   The question is fairly specific, referring to

1    the Howards' images.

2           And I would say that the defendants wanted to

3    use the Howards -- the Howards' images because they were

4    solicited by the Howards, to make use of the Howards'

5    images.

6           During the acquisition of the company, it's my

7    understanding that there were some introductions made

8    from the Pet Warehouse personnel, introducing the

9    Howards to the Foster and Smith personnel.

10           And that the Howards -- the Howards then

11    pitched Foster and Smith on continuing to use their

12    images and periodically sent images, either

13    speculatively or at the request of Foster and Smith.

14           And -- and -- and that's how Foster and Smith

15    came to be interested in the Howards' images.

16    **Q.   And who selected which images went into the**

17    **catalogs?**

18    A.   The first step in that selection process would

19    be the editing process by the Howards, determining which

20    images they felt were saleable to Foster and Smith.  And

21    then a presentation of those images to Foster and Smith

22    personnel for review and consideration.

23           Then, it's my understanding that within Foster

24    and Smith there were at least a couple of departments

25    with a number of employees, who would look over the

1    submissions from the Howards and make determinations as

2    to which images might potentially be used in any sort of

3    media produced by Foster and Smith, whether that was a

4    catalog or their web presence or other media.

5        **Q.    And how would that Foster and Smith person or**

6    **people -- how would they make that decision?**

7        A.    There's some testimony from Foster and Smith

8    personnel, as an example, I believe somebody wanted a

9    pretty picture of a blue fish, because they felt the

10   blue fish would look nice on a certain page for

11   decorative purposes and selected the blue fish for that

12   reason and put it on the page.

13       I would think that there would be

14   considered -- some consideration -- this is speculative.

15   But I would think that there would be some consideration

16   by Foster and Smith by putting the correct fish or

17   animal on the correct page associated with, you know,

18   other content that relates to that fish.

19       But I -- I -- I'm not positive about that.

20       **Q.    Well, why would that be your speculation**

21       MR. GEITNER:  Objection to form.

22       THE WITNESS:  I notice some consistency in

23   reviewing the Foster and Smith catalogs, for example, if

24   you you open a fish catalog -- and I'm not being

25   sarcastic in this response.  I'm just trying to give you

1    the most rapid response so you can move through this.

2            If you open a fish catalog, you don't see

3    horse stirrups, you know, sort of thing.  So they were

4    making selections based on the nature of the animals

5    that people might have at home that would be interested

6    in purchasing the products.

7            So they were, generally, specific to the type

8    of animal that a product might be used for.

9        **Q.   BY MR. POLLACK:  And I didn't read that as**

10   **sarcastic because that was my next question.**

11       A.   Okay.

12       **Q.   Why not have -- I was going to use birds in**

13   **the fish catalog, but I think the horse stirrups, I**

14   **think, makes the point even better.**

15       A.   Okay.

16       **Q.   Is there -- are you a marketing expert?**

17       A.   I teach advertising, marketing and branding.

18       **Q.   From a marketing standpoint, if you're selling**

19   **fish supplies, is it a smart business practice to use**

20   **decorative images of fish, as opposed to horse stirrups?**

21       A.   I would speculate that, whether you put a

22   horse stirrup in the top, right corner of a catalog page

23   or a fish, the person who's interested and has opened up

24   that catalog to buy, let's say, some kind of pump for

25   their aquarium might find it strange that there's horse

1    stirrups there, but wouldn't affect their buying

2    decision.

3              I can't conceive of a circumstance where it

4    would affect their purchasing decision.  They might find

5    it quite odd that there was a horse stirrup there.

6              But they're -- they're looking through the

7    catalog, looking for a pump for their aquarium, they're

8    not looking to buy a fish.  The way that Foster and

9    Smith described it, they use images of actual animals.

10             In -- in the catalogs that I reviewed, most of

11   the photographs of the actual animals were not animals

12   who were, let's say, on or in a product, except for the

13   images that were -- looked to be provided by the product

14   manufactures.

15             The way that they appeared to use the Howards'

16   images was to keep the content of the catalog relevant

17   to the type of products that were for sale, because

18   it -- it -- it would just make more sense to have

19   relevant content on the page.

20        Q.   **What does that mean, "It makes more sense"?**

21             **Does it help build a brand, if I want to sell**

22   **fish supplies to not include pictures of horse stirrups**

23   **or computer electronics that had nothing to do with fish**

24   **supplies?**

25             MR. GEITNER:  Objection to form.

1       THE WITNESS:  I think that people who
2   appreciate and like fish would appreciate and like
3   seeing images of fish, whether it's in a book or a
4   magazine or a catalog.
5           The nature of the usage of the images by
6   Foster and Smith did not appear to be placement of a
7   fish, in order to convince somebody to purchase a pump.
8   It appeared to me to be decorative in nature.
9       **Q.   BY MR. POLLACK:  And by "decorative in**
10  **nature," does that mean, increasing the aesthetic value**
11  **of the catalog?**
12      A.   If you define the aesthetic value by making
13  the catalog interesting for people who are interested in
14  fish, then I would say yes.
15          But I don't know about the word "value" there.
16  I would say that it's -- if you're interested in fish,
17  you enjoy looking at images of fish.
18      **Q.   And people, reviewing a Foster and Smith fish**
19  **catalog, are likely people who are interested in fish?**
20      A.   Likely.
21      **Q.   And so Foster and Smith would want those**
22  **people to enjoy looking at that catalog?**
23      A.   You're asking me to read Foster and Smith's
24  mind.
25          But if you want to turn that into a general

1  question, I would say yes, a company would want its

2  customers and potential customers to enjoy reviewing

3  their marketing materials.

4      **Q.   Why?**

5      A.   Because if somebody doesn't enjoy reviewing

6  marketing materials, then they won't review them.

7      **Q.   And if they won't review them, what else won't**

8  **they do?**

9          MR. GEITNER:  Objection to form.

10          THE WITNESS:  With respect to the types of

11  purchases that were made -- that are -- were and are

12  made by customers from Foster and Smith, it appears

13  that, if you have somebody who has a fish tank and wants

14  to buy a fish pump, they want to see a picture of what

15  they're going to buy.  And they want to then have some

16  means of purchasing that product.

17          I would say that the picture of the product

18  itself could, in that instance, have a direct impact on

19  their buying decision.

20          The effect of other images that appear in the

21  catalog require further consideration.  And for that you

22  want to look at some sales figures, to determine if,

23  when those types of pictures appear, sales jump up, or

24  when they don't appear, for the same product, the

25  similar layout, sales go up or down or whatever they

1    might do.

2              There are quite a number of factors to a

3    customer's buying decision.  That -- that customer --

4    potential customer might be familiar, for example, with

5    the Foster and Smith brand, and they're going to come

6    buy Foster and Smith products regardless of what images,

7    if any, are in a catalog.

8              They're looking to buy a pump, and they're

9    going to by that pump.  They could be familiar with a

10   certain brand of pump and be coming to Foster and Smith

11   happens to carry that pump, and they're going to buy

12   that regardless.

13             They could -- a pump could have been

14   recommended to them by a friend or fellow enthusiast,

15   and they're going to buy that pump regardless of the

16   image that might appear.

17             And so one of the reference points, and not

18   the exclusive reference points, but one of the reference

19   points I use was asking Foster and Smith to provide me

20   with some example of catalogs, and allowing me to have a

21   look at pages on which the products appeared with -- and

22   the same product appeared in almost the same layout,

23   with and without the fish, and what sales resulted.

24             That's not the be all end all, to making any

25   kind of absolute determination as to which factor

1  resulted in any particular purchase, but it's a good

2  overall indicator.

3      **Q.  BY MR. POLLACK:  Is there literature that**

4  **supports that view that that's a good overall indicator?**

5      A.  You're asking me if there is literature that

6  would -- let me restate the question.  You can tell me

7  whether or not I have this accurate.

8          So you have a marketing vehicle, such as a

9  catalog, and one wants to determine whether or not that

10  catalog is successful in resulting in sales.

11          One would look at, either the performance of

12  that catalog in driving sales, and whether or not

13  changes to the layout or the products or the text, from

14  month to month, or catalog to catalog, affected sales

15  and then fine tune things over time, to result in a

16  maximum quantity of sales and -- and hopefully

17  generating the maximum profits possible.

18      **Q.  Do you know what ASMP is?**

19      A.  American Society of Media Professionals.  It

20  was formerly the American Society of Magazine

21  Photographers.

22      **Q.  Are you -- are you involved in the ASMP?**

23      A.  I am, among many trade associations, I am a

24  member of ASMP.  And I sometimes serve as an advisory

25  capacity of ASMP.

1      I am a speaker on the topic of copyright and

2  occasionally right of publicity and other related

3  issues, advertising photography, business practices,

4  licensing practices for ASMP usually as a volunteer.

5      I speak at their -- I speak at their events,

6  and, occasionally, they ask to draft text for their

7  website or their books.

8      When I do that, I don't have exclusive control

9  over the final result.  I provide a draft, and they work

10  my draft into their documents.  I'm not paid for that.

11  I do that as a volunteer, as a member, kind of, a

12  community-service thing.

13      Q.   I'm going to hand you one of their articles,

14  an ASMP article, Pricing Photography.  This is Exhibit

15  5.  That I printed off of their website on the 5th of

16  this month, which is a couple of days ago.

17          (Plaintiff's Exhibit 5 was marked for

18          identification by the reporter and is attached

19          hereto.)

20      Q.   BY MR. POLLACK:  And the section that I have a

21  quick question on, it begins on the bottom of Page 2.

22  "How can the same image have different licenses fees?"

23          And then continues over to the next page.

24          First of all, did you draft this or -- or text

25  this?

1       A.   Let me have a look at it.

2       Q.   **Yeah.**

3       A.   I did draft a -- the licensing section of

4   their business practices guide.  I don't know that this

5   is that, and so I just need to have a quick look.

6       Q.   **And is this -- well, you said -- is this the**

7   **business -- is this the guide you just mentioned?**

8       A.   I think so.  I think there's a section in

9   that, the book that you're holding up, which is

10  entitled "Professional Business Practices in

11  Photography."

12           They asked me to draft a chapter or part of a

13  chapter on licensing.  I did draft that.  And I'm not

14  sure of what edits they made, after the fact.  I

15  haven't, actually, read whatever was printed in the

16  book.

17      Q.   **Okay.**

18      A.   I'm going to read this Exhibit 5 that you've

19  provided to me.

20           (Pause in the proceedings.)

21           THE WITNESS:  Where did you want me to stop

22  reading?

23           MR. POLLACK:  Just the paragraph -- just the

24  little section of "How can the same image have different

25  licensing fees?"

1        THE WITNESS:  I didn't draft this.

2        I don't necessarily agree with the first part

3 of the sentence, where it says:

4        "Photographers price their work, based on

5        the creative and production needs of each

6        project."

7        That can -- creative and production needs can

8 affect the expense portion of the cost.  But, in terms

9 of the fee that a photographer would charge, the second

10 half of that sentence, where it says, "The specific

11 usage of the images," I would agree with.

12    **Q.   BY MR. POLLACK:  Let me -- I really just want**

13 **to ask a question about the second paragraph:**

14        **"Consider, for instance, a photograph of a**

15        **coffee cup in a nice setting with a book and**

16        **some flowers."**

17    **The next sentence:**

18        **"One-time, editorial rights in a regional**

19        **magazine would cost significantly less than a**

20        **nationally-run ad for a large coffee-house**

21        **chain."**

22    **Do you agree with that sentence?**

23    MR. GEITNER:  Objection to form.

24    THE WITNESS:  I agree with the sentence, but I

25 have to indicate how and why I agree with it.

1           The first part of it says:  "One-time,

2     editorial rights in a regional magazine" what they're

3     referring to is something like Los Angeles Weekly or

4     Los Angeles Magazine.

5           Usage of a photograph in a magazine such as

6     that to illustrate an article versus a very similar

7     photograph that's run for an ad, for a large coffee

8     house chain, when they use the word "ad" here, they're

9     actually, referring to an advertisement, I believe,

10    consumer advertisement, such as, when you insert an

11    advertisement for, let's say, Starbucks into a, you

12    know, Time magazine, sort of -- sort of thing.

13          They're not referring to catalog usage or that

14    sort of thing in this sentence, I don't believe.  But I

15    would agree with that sentence, with the caveats that

16    I've just stated.

17        **Q.   BY MR. POLLACK:  And you went where I was**

18    **going.**

19          **What does Starbucks charge for a cup of**

20    **coffee?  And I'm not going to hold you to it.**

21        A.   You know, we were spending so much on coffee

22    from Starbucks that I actually went out and bought a

23    very expensive espresso machine.  So I don't know what

24    they charge now.  But I would assume about 5 bucks --

25        **Q.   All right.**

1    A.    -- for a cup of coffee.

2    **Q.    Oh, wait this is California.**

3    A.    My wife won't let me go there, but I would

4  love to go there right now, actually.  And I think they

5  probably charge about $1.50 or $2.00.

6    **Q.    And why can Starbucks charge more for its**

7  **coffee?**

8         MR. GEITNER:  Objection to form.

9         MR. POLLACK:  Let me ask a more narrow

10  question, to get us all to Dunking Donuts.

11    **Q.    Doesn't the look and feel of a business, the**

12  **experience it provides to its customers, translate in**

13  **some regard to what that business can charge for its**

14  **goods and services?**

15         MR. GEITNER:  Objection to form.

16         THE WITNESS:  The look and feel is a -- is a

17  bit confusing.  But -- but, if we can restate that as

18  a -- a company would promote its brand and have separate

19  efforts to promote the sale of its products and its

20  brand the way that the public perceives that company,

21  such as, if you even use Foster and Smith as an example,

22  although, I wasn't previously familiar with the company,

23  I now know they are a fairly substantial company and

24  that people go to Foster and Smith, apparently, because

25  they trust that that company is going to provide good

1    products and stand behind its products.

2          And I don't actually have familiarity with the

3    purchasing process there, but I would say that's an

4    example of -- of branding, where it's not promotion of a

5    specific product, but it's the general perception of

6    that company.

7          And you have in this Dunkin Donuts versus

8    Starbucks a bit of a demographic difference.  Those two

9    companies market themselves to different audiences.

10   Dunkin Donuts coffee, actually, I've read is better than

11   Starbucks coffee.

12        **Q.   BY MR. POLLACK:  And they're both great**

13   **companies?**

14        A.   And they're both great companies, right, but

15   marketing themselves to two different kinds of

16   customers.

17        MR. POLLACK:  I'm going to hand you one more

18   exhibit, then we'll break, which will be Exhibit 6,

19   which I need to find a copy.

20          (Plaintiff's Exhibit 6 was marked for

21      identification by the reporter and is attached

22      hereto.)

23        **Q.   BY MR. POLLACK:  Just quickly, Exhibit 6 is an**

24   **article "Licensing And The Value Of Copyright," which**

25   **lists you, Jeff Sedlik, the past president of**

1  **Advertising Photographers of America as the author of**

2  **the article.**

3           **Are you, in fact, the author of this article?**

4       A.    I -- I did write this article back in 2002, I

5  think.  And it was published in 2003.

6           This printout appears to be possibly off the

7  web, and I'm not sure if, in the intervening nine years,

8  if anybody has gone in there and edited anything on the

9  web.

10          Let's just say, assuming that there have been

11  no edits, that I'm responsible for drafting this, every

12  word of it myself.

13      Q.   **Fair enough.**

14           **I just would like to ask you briefly -- Page**

15  **8, in the conclusion section.  It begins "So how does a**

16  **client perceive value?"**

17           **Do you agree with the next sentence:**

18               **"In advertising, the value of a photograph**

19               **to a client is determined largely by the**

20               **ability of the photographer to create an image**

21               **that effectively communicates a desired**

22               **message about the product, service or brand."**

23      MR. GEITNER:  Where are talking about?

24      MR. POLLACK:  Conclusion section.

25      MR. GEITNER:  Okay.  I was looking --

1    MR. POLLACK: Page 8.

2    MR. GEITNER: -- at the upper section. Okay.

3    MR. POLLACK: Yeah, yeah.

4    MR. GEITNER: And it's under which section?

5    MR. POLLACK: Under "conclusion," the one that

6 begins in bold "In advertising."

7    MR. GEITNER: "In advertising," okay, thank

8 you.

9    THE WITNESS: Of course, I agree with this,

10 because I wrote it.

11    To put this in context, this paragraph, and

12 this whole article is -- is referring primarily to

13 assignment photography.

14    There is some reference to stock photography

15 in this -- in this document. To -- to clarify,

16 assignment photography is commission work, where a

17 client approaches a photographer and says, "We need an

18 image of a boy and a tire swing over a river," and the

19 photographer then goes out and creates that image to

20 meet the specifications provided by the client.

21    In stock photography, it's a preexisting

22 image created, not at the direction of the client, but

23 in the -- exists in the archive of the photographer, and

24 is then licensed from the photographer or a stock

25 agency.

And this paragraph, under "In advertising," appears to be referring specifically to assignment photography, the ability of the photographer to create an image.

And then the next sentence goes on to say:

"An art director might provide the starting point."

And so this is -- this sentence is talking about a photographer, bringing value to the table as ability to execute concepts or suggested or required requested by a client.

Different circumstances then what's happened in a relationship between the Howards and Foster and Smith, where the Howards went out and independently created images, whether out in the wild or at home in a tank, or at a bird farm, and then brought those to Foster and Smith and proposed that Foster and Smith make use of those images in their catalogs.

**Q. BY MR. POLLACK: Well, can stock photography create -- be used as an image that effectively communicates a desired message about a product, service or brand?**

MR. GEITNER: Objection to form.

THE WITNESS: Yes.

**Q. BY MR. POLLACK: And then the last sentence --**

1    it's two sentences -- that same paragraph, it's a

2    question with your response.

3            "Do our photographs represent significant

4        value to advertisers?

5            "Absolutely."

6        Do stock photographs represent significant

7    value to advertisers?

8            MR. GEITNER:  Objection to form.

9            THE WITNESS:  To answer that question, you

10   have to look at each instance of use.

11           If you take a stock photograph of a fish, and

12   run it in an advertisement, in a magazine, to sell that

13   type of fish, you're advertising that product to

14   potential customers with a more direct relationship or a

15   direct relationship between the appearance of the image

16   and sales.

17           When you're using photographs more for

18   decorative purposes amongst -- mixed in with products in

19   a catalog, the relationship become more murky as to what

20   affect the appearance of the photograph has.

21           And in order to make any determination, you

22   have to looking at sales figures, driven by that

23   resource, or a reasonably assumed to be delivered by

24   that resource.

25       Q.   BY MR. POLLACK:  You used the phrase "more

1    murky," when it's an indirect-type use of a work.  I'm

2    selling fish related products.  I'm not selling the fish

3    in this picture.

4            Isn't the use of a fish, in connection with

5    selling fish products, still connected to the idea of

6    selling fish products?

7            MR. GEITNER:  Objection to form.

8            THE WITNESS:  There's a difference between

9    branding efforts, which are efforts to effect usually a

10   positive public investigation or public perception of a

11   company and the value it provides versus advertising

12   usage, which might -- might include using an image to --

13   an image such as an image of the fish pump, for

14   illustrative purposes, to allow somebody to see what the

15   fish pump looks like, before they click the buy button

16   or the add-to-cart button.

17           And the extent to which fish often in the

18   corner of the -- of that catalog page affects that

19   decision to click the add-to-cart button can only be

20   really determined by looking at those sales figures,

21   which have been made available by Foster and Smith.

22           And you can see month to month different fish

23   in different places and no fish.  How many people are

24   buying, you know, that fish pump -- the same fish pump,

25   in the same place, without very many other variables

1  that -- some of the variables involved would be seasonal

2  purchases.

3          People buy -- sometimes buy things from -- or

4  products from catalogs on a seasonal -- there are

5  seasonal variations, but if you look -- here's December

6  of one year and here's December of another year,

7  straight across, it's a pretty good indicator as to

8  what's happening with the sales of that product with and

9  without the image.

10          There's a host of variables.  So, as I

11  mentioned earlier, it's not an absolute determinative

12  criteria, but it gives you your best shot at it.

13      **Q.    BY MR. POLLACK:  Last question on this**

14  **exhibit, before we break for lunch, Page 9, immediately**

15  **above the "Respectfully Jeff Sedlik, the sentence:**

16              **"Your copyrights are truly money in the**

17              **bank."**

18          **Is that a true statement?**

19          **Do you believe that statement today?**

20      A.    I believe that, for a photographer, the value

21  of the usage of their work -- the value of their

22  business is based on their ability to effectively

23  license their images.

24          And people often, as I say here, underestimate

25  that value and are not as specific as they should be,

1    not as -- don't put as much effort into helping their

2    clients to understand the rights that their receiving.

3          I've spent a lot of time, attempting to

4    educate photographers, help them understand that it's

5    their job -- part of their job and they are professional

6    responsibility is to make sure that their clients

7    understand what they can and can't do with the images

8    both before and after those images are delivered.

9          MR. POLLACK:  Let's break for lunch.

10         (Recess.)

11    **Q.  BY MR. POLLACK:  Professor Sedlik, you recall**

12   **you're still under oath.**

13    A.  Yes.

14    **Q.  If we can turn now to your report, Exhibit 2,**

15   **to the deposition Page 13.**

16    A.  (Witness complies.)

17    **Q.  The Section F, "Oceans of Images License**

18   **Descriptions."**

19         **You begin the section saying that:**

20           **"Oceans of Images' license descriptions as**

21           **included its invoices, are unorthodox,**

22           **incorrectly stated and unprofessional."**

23         **Why are they unorthodox?**

24    A.  Well, it appears to me that the Howards

25    obtained some information on drafting licenses from -- I

1    mean, conjecture would be they got it from a friend

2    who -- or -- or somebody at one of their pharmaceutical

3    companies and something, and they pieced together

4    language copied over from one of those -- from -- from

5    some other professional invoice.

6            But I've detailed some of the issues in that

7    Section F.  And we can go down through them one by one,

8    if you'd like, if that's...

9        **Q.   Well, okay.  Section F only spans two pages.**

10       A.   Right.

11       **Q.   So go ahead.**

12       A.   So, typically, in a -- in a license, you have

13   a number of criteria that are identified and clearly

14   stated.

15           And you wouldn't mix words in like "unlimited"

16   with "limitations."  So unlimited use that is limited

17   these are -- it's, kind of, an oxymoron situation and

18   can be confusing to clients.

19           So you would go through and state what media

20   the images can be used in.  If there are limitations on

21   size, you would state the size.  You would state the

22   placement.  You would state the quantity of

23   reproductions.

24           If you've got a catalog situation, you need to

25   define what the terms of that catalog usage are and to

1  explain, because that's entirely relevant in this

2  matter.

3          When you license catalog rights to a company,

4  and when they go and print catalogs, when does that

5  license end?  And which parts of it end at which time?

6          You can have an end date specified in a

7  license, but how does that apply to the reproductions

8  that have already been made previous to the end date?

9          Does the end date mean that the party needs to

10 cease all reproduction and recall -- potentially recall

11 catalogs that are out at distribution points?

12         Or does it mean that they can, you know,

13 reproduce right up until the date of the expiration and

14 then distribute until all of the reproductions are fully

15 distributed?

16         And when a photographer fails to make that

17 distinction in a license, in all fairness, the -- the

18 client, receiving those rights, needs to receive the

19 benefit of the supposition that they can continue to

20 distribute the lawfully made reproductions.

21         There is a for-sale doctrine issue that comes

22 into play there, because a lawfully made reproduction is

23 then owned by that licensee, and they can dispose of it

24 as they wish.

25         However, contractually, you can have a

1    contractual prohibition on continued distribution after

2    the end of a copyright license, so you end up with a

3    continued distribution possibly being a breach of

4    contract, but not an infringement.

5           Further reproduction would fall under the

6    copyrights here, but the distribution of a lawfully-made

7    copy is the exact definition proffered under the

8    for-sale doctrine.

9           So you have questions like this.  But the --

10   the -- the point being here that, in a license

11   description, a photographer owes it to his or her

12   client, to make sure that the client understands.

13   "Look, we're granting you the right to go out and make

14   these catalogs, but you can either, yes, continue to

15   distribute catalogs, after the expiration of your

16   reproduction side of the license, or, no, you need to

17   stop distribution of the catalogs."

18          So that's one thing that -- that is missing

19   here.

20          Then we've got the use of this phrase

21   "one-time use, which is something that appears to just

22   be copied off of some other photographer's license

23   description by the Howards and inserted into their

24   license terminology.

25          One-time use is just that.  You can use it one

1    time only.  And the application of a start and an end

2    date to a one-time use requires quite a bit of

3    additional explanation that is not present in these

4    licenses and can also result in misunderstandings on a

5    licensee side as to what they can and can't do with the

6    image.

7            In terms of how the licenses are granted, if I

8    was reviewing this and providing input to the Howards on

9    how they can improve their licenses so that their

10   clients understand it, they don't have any -- any

11   limitations geographically or on the quantities of the

12   catalogs that can be reproduced, the size of the images

13   that can be reproduced, whether they're inset size thumb

14   nails, or full page or whatever they might be.

15           And whatever the size allowed should be

16   stated.  If it's unlimited in size, they should state

17   that so that people on the client side, looking at this

18   license, will understand the size that they can

19   reproduce it at.

20           As I mentioned here, in my report, on the

21   licenses granted by Oceans of Images, the defendant was

22   entitled to reproduce the photographs in catalogs

23   printed in sufficient quantities to deliver Foster and

24   Smith catalogs to every person in every country on earth

25   and that is, in fact, the case, as well as any size and

1    throughout its web page in any -- its websites --

2    unlimited number of websites home page, internal.

3          When you license website usage, you would

4    typically state the placement on the web, whether that's

5    home page or internal.  And you would typically give

6    some pixel dimensions.  And, if that's unlimited, you

7    would state that as well.

8          So there's quite a lot missing from the

9    license statements.  The other issue here is just the

10   licensing practice, where the Howards would issue these

11   licenses but issue them on their invoices instead of

12   issuing a -- a -- a license -- a separate license on

13   a -- on a estimate or confirmation to the client, so

14   that, before the usage, there's an understanding of what

15   can and can't be done.

16          And it's memorialized at that time, rather

17   than after the fact on a invoice, requesting payments.

18          Now, you can have a grant of license that

19   occurs on an invoice, but there should be a previous

20   document to this, whether a job confirmation, or -- or

21   something else that states those license terms.

22          And we can drill down into this as far, as

23   deep as you like but...

24        **Q.   We're about to.**

25        A.    Okay.

1    Q.   You said a lot there, so I'm going to dig

2    through that a bit.

3        A.   Okay.

4        Q.   The last thing you said that -- was that there

5    should be a previous document, prior to an invoice, with

6    the license grant.

7             Is that a legal requirement?

8        A.   It's not a legal requirement.

9             It's just the way that photographers work

10   in -- in -- in the industry.

11            They provide an estimate to their client.  In

12   the absence of an estimate, where there's some kind of

13   pricing that is established, then they would provide a

14   confirmation so that there is a meeting of the minds,

15   or -- and memorialization of the meetings of the minds

16   and the terms under which the images can be used.

17            And so, yes, there would be a document

18   previous to an invoice.

19       Q.   And why --

20       A.   It's not -- not required, you know, expressly

21   under copyright law.

22            Professional obligation of the photographer is

23   to make sure that his or her client understands what the

24   client is buying and to help the client to avoid

25   miscommunications, misinterpretations.

1    Get that client to sign that estimate or

2  confirmation, to make sure that everybody has a

3  understanding of what usage are allowed.

4    **Q.    Is there a similar obligation on the client,**

5  **who's receiving the right, to say, "These are the rights**

6  **I want.  Let's -- let's spell out exactly..."**

7    A.    In the normal course of business, you have a

8  work flow of paperwork or -- you know, it might not be

9  paper these days, but you have an estimate or -- and

10  then possibly followed by a job confirmation.

11    Typically, followed by -- if it's a company

12  that uses purchase orders, the photographer should

13  request a purchase order from his or her client.

14    That purchase order will itself have terms,

15  and that's the opportunity for the client -- for the

16  photographer to satisfy their professional obligation to

17  make sure that the client's perception of what the

18  license includes and what the terms are is in alignment

19  with the photographer -- with what the photographer is

20  granting and the what client has agreed to.

21    Very often you have this exchange of an

22  estimate, then a job confirmation.  The client signs off

23  on it and then issues a purchase order that has entirely

24  different terms.

25    The purchase order might say "Work for hire,"

1  and might have indemnity clauses that were not agreed

2  upon.  It -- it could have other kinds of copyright

3  ownership, in terms allowing jobs to be cancelled,

4  et cetera.

5       So you want to make sure that there is an

6  understanding, so you ask that client for a purchase

7  order.  The client deliveries the purchase order.

8  Then you edit that purchase order, so that the terms

9  match the terms that have been agreed upon and deliver

10  those -- that edited purchase order back to the client.

11       Many clients require a signed purchase order

12  in order to issue payment.  I didn't see purchase orders

13  as a component and work flow of these two parties.  If I

14  was the photographer involved in this, I would be

15  insisting on purchase orders

16  **Q.   Did you ever see -- did you see in all the**

17  **documents you reviewed any estimates from the Howards to**

18  **Foster and Smith for any particular reason?**

19  A.   I saw some price schedules, which I thought

20  was a good and appropriate means of communicating to the

21  client the pricing and establishing schedules so that

22  the expectations of the client would -- as to -- as to

23  what the pricing was for the usage would be in alignment

24  with what the Howards were offer.

25       But in those pricing schedules or the -- I saw

1    a couple of variations of them, but let's just say

2    there's one primary pricing schedule that, again, the

3    licenses were not fully accurately described.

4         **Q.   Did you see -- I'm also only aware of the**

5    **one-price schedule, but we can get into that in a**

6    **minute.**

7         **Did you see other correspondence for "You're**

8    **interested in this type of image.  Here's a bid for**

9    **that.  Here's what that would cost"?**

10        A.   I saw some correspondence that said, "Here's

11   how we use the image.  Send us an invoice."

12        That -- that -- that's -- that is paraphrased,

13   but I saw that.  And I saw similar correspondence

14   throughout the relationship, where the -- there was a

15   discussion of how the images had been used and -- and

16   you  know, send us an invoice for that type of usage.

17        **Q.   If we can turn -- we will be coming back to**

18   **Pages 13 and 14 of your report.  But I want to turn to**

19   **some of the correspondence that's relevant to what we're**

20   **talking about right now.**

21        **Tab G, which is -- it's got the title**

22   **"Plaintiff's Correspondence" on every page.  First off,**

23   **did you at add that title to every page, "Plaintiff's**

24   **Correspondence"?**

25        A.   I'm not sure how that title got --

1      Q.    Okay.

2      A.    -- got on to these pages.

3      Q.    They appear to be in chronological order.  And

4  I want to go in -- they're not numbered, which is a

5  little bit of a challenge here.  The fifth physical page

6  in has a November 14th, 2001 date on it.

7      A.    Fifth physical page.

8      Q.    The fifth physical page.  They're double

9  sided, so it's probably Page 10.  It will look like that

10  (indicating).  November 14th 2001 to Pat Herey,

11  (phonetic) from Laura Howard.

12            MR. GEITNER:  Is that right?

13            MR. POLLACK:  Is that the number --

14            MR. GEITNER:  Yeah.

15            MR. POLLACK:  Yeah.

16            MR. GEITNER:  It says "sent down" at the

17  bottom?

18            THE WITNESS:  Yeah.

19      Q.    BY MR. POLLACK:  You've reviewed this document

20  before; correct?

21      A.    I've -- yes, I've read this document.

22      Q.    Do you recall when Foster and Smith first

23  acquired Pet Warehouse?

24      A.    I believe it was sometime in the 2001 time

25  frame.

1    Q.   And I'll represent to you that this was

2  shortly after that acquisition, and it appears to

3  be Mrs. Howard, following up on a discussion with

4  Pat Herey.

5           And I'd like to focus for a minute on the last

6  paragraph.

7               "We're very excited to be working with you

8               at Foster and Smith, and in doing so, I would

9               like to ask what your photographic needs are."

10          What -- from your review as an expert in this

11  field, what is it you think Mrs. Howard is trying to

12  establish by way of this correspondence to Foster and

13  Smith?

14    A.   Well, they had been previously working with

15  Pet Warehouse.

16          And, according to the testimony, there was

17  some discussion about introductions being made to

18  Fosters and Smith -- or Foster and Smith.  And this

19  appears to be after a phone call.

20          I believe there was also possibly by a meeting

21  of some kind in person.  But I forget if that was at Pet

22  Warehouse or Oceans Images.  And this appears to be

23  Mrs. Howard's approach to Foster and Smith, to solicit

24  them to make use of their images.

25    Q.   Turning to the next page, which is a

1  correspondence from January 1th, 2002, to Melissa Reed

2  from Laura Howard.  The last paragraph -- next to the

3  last photograph:

4          "The cost for the image for a two-year

5          period is $125 per image."

6          Is Mrs. Howard here providing an estimate of

7  image usage to Foster and Smith?

8      A.   She's sending a letter to Foster and Smith,

9  regarding the terms that were to be offered.

10         But it's more of a -- it's a letter -- a

11  proposal rather than what I'm referring to, which is a

12  job confirmation, where you're actually saying we are

13  providing you with this image and here are the terms for

14  this instance.  And you just repeat that every time I

15  provide images.

16     Q.   Well, my understanding of your description of

17  the process was that the photographer would first

18  provide the estimate to the client, and then after that,

19  there would be the job confirmation.

20     A.   Yeah.  That -- that -- it can work that way.

21     Q.   So -- so is this here an estimate to the

22  client, in accordance with -- with the kind of protocol

23  you've described?

24     A.   I don't -- um, this is not what a

25  photographer -- professional photographer would deem to

1    be an estimate, nor most clients who are engaged in

2    licensing images.

3           Certainly, it is accurate to say that the

4    price schedule is put forth and -- and some terms of use

5    are put forth.  But estimates take a different format.

6    Typically have a place for the client to sign and, in

7    addition, would -- would, um, state the usage fees,

8    which are stated here to be "the cost for the image for

9    a two-year period is 125 per image."

10          It's stated in paragraph form, which is not

11   typical for a photographer-client relationship or a

12   stock-photography type of relationship.

13       **Q.   But does it convey the same --**

14       A.   I think it conveys the information.

15       **Q.   You mentioned a professional photographer**

16   **wouldn't do this.**

17          **What is your definition of a professional**

18   **photographer?**

19       A.   Well, I suppose people, who make -- who

20   generate revenue for themselves by licensing photography

21   or creating photography could be deemed professional

22   photography but -- professional photographers.

23          But I'm referring to a photographer, who acts

24   in accordance with professional -- or standard practices

25   and procedures so as to avoid miscommunication with

1    their client.

2          In that event, you deliver a document that

3    says "estimate" at the top.  It says "fee" and an amount

4    for the license fee, and then it has a usage section and

5    terms of use as well.

6          The information is put forward here.  It's

7    just not in a standard manner.

8    **Q.    Is there a licensing body that -- that there's**

9    **such a thing as a licensed professional photographer?**

10   A.    Um --

11   **Q.    Like, to be a lawyer, you need a license to be**

12   **a lawyer.**

13         **Is there...**

14   A.    There's no licensing body for photographers.

15         There are trade associations that set

16   standards for invoicing and estimating practices.  I've

17   been involved in the creation of standardized

18   estimating and invoicing and job confirmation forms,

19   standardized terms and conditions.

20         There's no standardization of prices, of

21   course, because that would be illegal.  But the way that

22   you describe a license is somewhat standardized.

23         And that's -- we've taken it a step further

24   with the PLUS Coalition, which is an organization

25   exclusively dedicated to image licensing standards.

1       But previous to the existence of the PLUS

2  Coalition, you had these types of standards defined in

3  books like the book that you have brought in from the

4  ASAP but, as well as in -- in standard forms that are

5  created by photography associations and major stake

6  holders, in cooperation with companies like Foster and

7  Smith or a large -- an advertising agency or a national

8  advertiser have their representatives participate in

9  creation of standardized forms so that, when a company

10  like Foster and Smith gets estimates from, let's say,

11  three different photographers, they're all in the same

12  format, easily understandable.  Everybody knows what the

13  terms mean and how things can and can't be used.

14       **Q.   Looking still at that -- that letter -- you**

15  **still have the January 12th, 2002?**

16       A.   Yes.

17       **Q.   What is it that Mrs. Howard is conveying to**

18  **Melissa Reed from Foster and Smith in this letter, to**

19  **your eye?**

20            MR. GEITNER:  Objection to form.

21            THE WITNESS:  So we can start at the top,

22  because there's three different paragraphs here.

23            She is retroactively licensing images to

24  Foster and Smith.

25                 "Per our conversation, I'm forwarding

1    along an invoice for the images currently

2    being used on the website."

3    So that tells you right there that she's

4    billing after the fact.  And that -- and then she goes

5    on to mention that the image had not been licensed for

6    web use.

7    That the image of the clown fish had, and that

8    the image of the clown fish is available for use on the

9    website only unlimited until December 31st of 2002.

10    And then she's conveying the terms that she

11    had negotiated with Pet Warehouse, and that she's

12    offering to continue with Foster and Smith.

13    The -- the terms state that photographs can be

14    used on an unlimited basis for the website only, for a

15    period of two years, with a start date and end date.

16    And, at the end, further use of the images must be

17    renegotiated.

18    And, um, images can be used on any other

19    website posted by Pet Warehouse, except for promotional

20    uses of the live aquarium site.  They can be used

21    multiple times on the website pages without size

22    restrictions.

23    And then moving down into the next paragraph,

24    she's stating a cost for that usage for a two-year

25    period of 125.  And she is offering a quantity discount

1    for licenses at multiple images.  And that all the past

2    images are on disks at the Foster and Smith site.

3           So that would be referring to -- it will be

4    acknowledging that the images were passed from Pet

5    Warehouse to Foster and Smith, I believe, on recordable

6    media.

7           That they were licensed for one-time use for

8    the Pet Warehouse catalog covers and will require new

9    usage contracts.

10          However -- it says:

11              "However, if you need a specific image or

12              looking for some ideas, please feel free to

13              give us a call."

14          Bird photos and some mention of other -- it's

15    just miscellaneous.

16          MR. POLLACK:  Okay.  I'm gonna try to find our

17    next exhibit.

18          MR. GEITNER:  While you're getting that

19    exhibit out, I'm going to take a quick restroom break.

20          MR. POLLACK:  We'll go off the record for a

21    moment.

22          (Recess.)

23          (Plaintiff's Exhibit 7 was marked for

24       identification by the reporter and is attached

25       hereto.)

1          MR. POLLACK:  I'm going to hand you what's

2     been marked as Exhibit 7, which is an article I just

3     printed from the ASMP dot org website, tutorial section,

4     "How to Write a License" by Jeff Sedlik.

5          **Q.   Is this an article that you wrote?**

6          A.   Yes.

7               I don't know that it is the actual -- that is

8     identical match to my text that I delivered to ASMP.

9     But they asked me to write something for their book, and

10    this should be an exact match to the book.  I don't

11    recall writing anything for their website like this.

12          MR. GEITNER:  You said this was 7, right?

13          THE REPORTER:  Yes.

14          MR. GEITNER:  Thank you.

15          MR. POLLACK:  Yeah.

16               I have an equivalent -- or -- or I have that

17    book, which we talked about earlier, and I had made

18    photocopies out of that book, but they didn't have page

19    numbers.

20          THE WITNESS:  Okay.

21          **Q.   BY MR. POLLACK:  But turning to the article,**

22    **and barring any modifications that the ASMP people may**

23    **have made on the web version, Page 3 of Exhibit 7 begins**

24    **a list of the media permissions that you'd described as**

25    **the central element -- I'm sorry -- the central element**

1    of the license description.

2              And, based on your prior testimony, you

3    described Oceans' invoices as being unorthodox and

4    unprofessional.  And, in that description, you were

5    pointing to many of these elements.

6              So I'd like to go through these elements and

7    compare them to Exhibit D to your report, which is the

8    invoice that you, kind of, put a section of in the

9    middle of your report in this discussion area.

10             So, in your opinion, does invoice D -- I'm

11   sorry -- invoice FS1069, does that have what you

12   describe in your article as the media description of the

13   category type of media in which the image may be

14   reproduced?

15        A.   Yes.

16        Q.   Next question.  The distribution format.

17             Does the invoice of Exhibit D of your report

18   state the format in which the specified media may be

19   distributed?

20        A.   A distribution format would be usually the

21   term printed or electronic or, if it's some variation of

22   electronic, there are subsets or -- or subcategories of

23   distribution for electronic media.  So I don't see, um,

24   that one here.

25        Q.   Well --

1      A.    It could be inferred from catalog, but there

2   are both electronic catalogs and printed catalogs.

3           And normally you would say "distribution

4   format colon printed."

5      **Q.    Well, so invoice FS1069 has -- do you agree**

6   **that it has one image licensed for website usage, which**

7   **is the yellow Coney image and one image licensed for**

8   **interior pages of the Doctor's Foster and Smith aquarium**

9   **outfitters catalogs, which is the half black angel fish**

10  **image?**

11          MR. GEITNER:  Objection to form.

12          THE WITNESS:  Yes, but I don't agree that

13  there is an expressly stated distribution format, which

14  is normally expressly stated.

15     **Q.    BY MR. POLLACK:  So, in your opinion, stating**

16  **that a renewal rate for website used, which expired 5/4,**

17  **renewal for two years use on the Doctor's Foster and**

18  **Smith website that, to you, does not convey a**

19  **distribution format?**

20     A.    Conveying and stating are two different

21  things.

22          And when you want to -- when a photographer is

23  communicating license terms to a client, the

24  photographer should be as specific as possible and use

25  terminology that is both widely used and widely

1    understood.

2              What you asked me to respond to was a question

3    "Is there a stated distribution format," and my response

4    was distribution format will either say printed or

5    electronic.

6              And, if electronic, it would say one of the

7    types of electronic, one of which is website.  If you're

8    asking me whether this description by the Howards gets

9    the ball over the net, in terms of communicating that it

10   is to be used in a catalog, and -- I -- I -- I would say

11   yes.

12             I have to say no to your question, asking me

13   for specific answer on Number 2.  But I think that they

14   have conveyed the information in their description.

15        **Q.  Are the two examples you site in your article,**

16   **example one printed, example 2 electronic download, are**

17   **those specific terms of art, at the time -- were those**

18   **specific terms of art, at the time you wrote this**

19   **article?**

20        A.   Yes.

21             Those are terms that are included, I believe,

22   in the PLUS standards.

23        **Q.  When was the PLUS Coalition formed?**

24        A.   Approximately, it was incorporated in 2004,

25   but the standards activity started in '90s.

1    Q.    When did they -- what do you mean "the

2   standards activity"?

3    A.    Well, the standard -- the trade associations

4   began to come together.

5         The advertising agencies, trade associations

6   with design firms and publishers and photography

7   associations, stock industry began creating standards in

8   the '80s.  It really heated up in the '90s.  You know,

9   the issue was that every organization was making its own

10  standards, which -- it's in conflict with the word

11  "standard."

12        And so at a certain point, they decided to

13  come together and just form a coalition and merge all

14  their standards.  But things like distribution format,

15  media and placement have been around for a very long

16  time.

17    Q.    Point 3:  Media permission, Item Number 3.

18  The placement.

19        Does invoice FS1069 state the

20  location/positions at which the images may appear in or

21  around the specified media and state the maximum number

22  of placements permitted in each instance of that media?

23    A.    For the website, they're not mentioning the

24  placement of home page versus internal, which would

25  always -- which should always be referenced in a

1  website -- in a usage for web usage.

2          They are saying that it could be used on the

3  website pages and without restrictions.  But they're

4  not, um -- um, calling out the home page.

5          So I recommend and always teach that you need

6  to call out home-page usage, if it's allowed, call out

7  interior website pages, if that's allowed.

8          In terms of the catalog, they are stating

9  interior catalog pages, and they are stating multiple

10 placements.  So they are communicating placement,

11 without using the term placement, which is the standard

12 term.

13    **Q.    Okay.  Page 4.  Do they state image size?**

14    A.    They state -- for web usage, they state

15 without size restrictions.  For catalog use, they state

16 any format.  If I'm missing the size representation let

17 me know.

18    **Q.    I don't think you are.**

19          **But does any format convey to you a size**

20 **representation?**

21    A.    Format would indicate aspect ratio, meaning

22 vertical, horizontal or -- aspect ratio is the length to

23 the width.  Size isn't stated here.

24    **Q.    But does aspect ratio correspond to size?**

25    A.    No.

1    You can have a vertical image that's a

2  thumbnail size or a vertical image that's a whole page.

3  There are two different kinds of size that are usually

4  stated in a license.

5    One would be the size of a media, and that

6  wouldn't really apply in a web or catalog-type of usage.

7  It more applies in a bill-board kind of usage or where

8  the size can very, like, a point-of-sale poster versus a

9  smaller, you know, 8 by 10 point-of-sale print.

10    In this instance, you wouldn't need to state

11  the media size with these two different kinds of media.

12  So you -- with web usage, you generally state pixel

13  size, and they've said without size restrictions here.

14  For the, um, printed use, they haven't it.

15  **Q.   Okay.  Versions on Number 5, on Page 4.  Let**

16  **me ask this one differently.**

17    **Would version -- how -- how does the version**

18  **information in a license, how would that apply to a**

19  **catalog?**

20  A.   It -- you would call it out, you know, with --

21  with, um -- for example, with a magazine, you have

22  issues.  With some types of publications, you have

23  volume.  With books, you have editions.

24    And so that's what -- that's one of the

25  meanings of version.  So, if you're going to say it can

1   only be used in a certain volume of a catalog, that

2   could be called out here.

3       **Q.   Quantity.**

4       A.   Um, I -- I --

5       **Q.   Oh, I'm sorry.**

6       A.   -- should finish that.

7       **Q.   Oh, please.**

8       A.   It sounded like I was finished.

9       **Q.   I thought you were done.  I'm sorry.**

10      A.   In their catalog description, they are --

11  they're saying it can be used in interior pages only,

12  but they're -- but they are -- they're using the plural

13  catalogs for small -- or for Fosters and Smith bird and

14  aquarium outfitters catalogs and they're defining a

15  period of use there.

16          Okay.

17      **Q.   Are you done on versions?**

18      A.   Yes, we are.

19      **Q.   Quantity.**

20      A.   Quantity is the -- depending on the type of

21  media, quantity can mean different things.

22          With, um -- if you're running an advertisement

23  in multiple magazines, you add up the circulation of

24  each magazine and that's your quantity.  If you're

25  printing brochures, and you're gonna print 10,000

1   brochures, that can be your quantity.

2           I don't believe that there are quantity

3   restrictions here.  Similarly with web use, if you have,

4   like, a downloadable file, you can have a quantity limit

5   on the downloadable file.

6           If you're printing it on packaging, you can

7   have a limit on the number of packages that can be

8   printed and used.

9           But this is where the question comes in with

10  respect to catalog use.  With catalog use, you would

11  normally be stating what happens at the end of the

12  license period, with all the undistributed catalogs or

13  the catalogs that have reached some middle man; what

14  needs to be done with those catalogs under this license

15  or agreement, if it constitutes an agreement.  That is

16  missing here.

17      **Q.   Well, who does that -- who does that burden**

18  **fall on?**

19          **Under this -- under this contract, could -- or**

20  **this agreement, this invoice -- could Foster and Smith**

21  **have presented a billion catalog pages, using a Howard**

22  **image -- a billion interior catalog pages, using a**

23  **Howards' image?**

24      A.   I think the burden falls on the licensor, in

25  this case the Howards.

1          And, yes, Foster and Smith could have printed

2    a billion of them on the last day of that license period

3    and then just continued to distribute them.

4          But I think that the parties -- or -- or the

5    Howards may have had an understanding, from looking at

6    the catalog, as to the nature of -- the general nature

7    of the use and -- and scope of use.  Although, I can't

8    speak for the Howards.

9          Just in the routine production of catalogs, it

10   seems that Foster and Smith followed a pattern of

11   periodic catalogs and might have taken that into

12   consideration in, um, establishing their price points,

13   et cetera.

14          But, normally, the parties would come to some

15   kind of agreement as to what needs to be done with those

16   catalogs on the end date, and it's really the

17   professional responsibility of the licensor, who's

18   granting the rights, to make sure that their client

19   understand if there's a limitation on that.

20        **Q.   So your impression or your read of the**

21   **contract says, in your opinion, Foster and Smith could**

22   **print a billion of them on the last day?**

23          **Do you --**

24   A.   That was admittedly a very extreme example,

25   but I was just trying to...

1    Q.   I agree, and I'm trying to understand how --

2  how you came to that conclusion.

3         Are you interpreting the language in this

4  contract agreement -- whatever we're going to call it,

5  FS1069 -- and, based on your interpretation of the words

6  on this page, you think that that would be a permitted

7  activity under this agreement?

8    A.   If I was the Howards, I would have been

9  stating a quantity of restriction, and I would have been

10  stating what would happen on the last day of the -- on

11  the stated expiration date.

12         Absent that, it would be reasonable for Foster

13  and Smith to interpret this as allowing them to print

14  any number of catalogs.

15         I used a billion in my example, but, you know,

16  one catalog or a billion makes no difference here,

17  during that period and -- and distribute them, and then,

18  um, continue to distribute, um, until the catalogs were

19  exhausted.

20         Now, I think the Howards knew well, based on

21  the testimony I've seen, that Foster and Smith was in

22  the habit of revising its catalogs continuously, and

23  that there was this unstated belief and understanding

24  that Foster and Smith didn't have a long-term need of

25  them to continue to distribute them for extended

1   periods.

2           But, in terms of exhausting and being able to

3   fulfill requests for catalogs, I think it would be

4   reasonable for Foster and Smith to believe that.

5       **Q.   And, in forming that belief, the last sentence**

6   **in the interior catalog pages "terms-of-use box, the**

7   **last sentence reads:**

8               **"Once the two-year period has expired,**

9               **continued use of the images require additional**

10              **negotiation."**

11      A.   Yeah.

12      **Q.   So how does that factor into your conclusion**

13  **that Foster and Smith could continue to distribute**

14  **whatever catalog pages it had prepared during the**

15  **license period?**

16      A.   Um, that refers to -- that would appear to

17  refer to the reproduction of catalogs and not to the

18  distribution of catalogs.

19      **Q.   And why do you say that?**

20      A.   That's my understanding of it, based on

21  industry practice.

22      **Q.   Are you interpreting the language here to come**

23  **to that conclusion?**

24      A.   I am.

25              It's a bit different than, for example, for a

1    web use.  For web use, it's up on the page.  The license

2    expires, and you take it down.

3            For a catalog use, you printed these catalogs,

4    you license the right to print an unlimited number of

5    these catalogs, and I interpret that last sentence to

6    indicate that continued reproduction would require

7    additional payment.

8        **Q.   You understand that copyright -- there's a**

9    **number of rights provided to a copyright holder; the**

10   **right to reproduce the copyrighted work, the right to**

11   **prepare derivative works, the right to distribute**

12   **copies.**

13           **Do you agree just as a matter of copyright law**

14   **that those are some of the rights reserved to a**

15   **copyright owner?**

16       A.   Reproduce, distribute, display, perform and

17   prepare derivatives.

18           But then you have for-sale doctrine, where a

19   lawfully reproduced copy, under a license, can be

20   disposed of in a manner that the licensee wishes and

21   that -- that's also a point of copyright law

22   necessarily to make the whole copyright law system work.

23       **Q.   Well, I'll come to the for-sale doctrine in a**

24   **minute.**

25           **But you've pieced out in -- in interpreting**

1    the words of this contract, you've pieced out two

2    separate copyrights:  The right to prepare copies, and

3    the right to distribute copies.

4            And you're saying that Foster and Smith got

5    one of them for a two-year period, but you're reading

6    something in here that says they got the other one for a

7    longer period than the two year period here.

8            MR. GEITNER:  I'm going to object to form.

9        Q.  BY MR. POLLACK:  Have I misstated the

10   conclusions that you're drawing from this -- the

11   durational aspect of this agreement?

12       A.  It's only with respect to printing of things

13   like brochures and catalogs, where the photographer, as

14   a licensor has a responsibility to make sure that they

15   clearly state to the client what needs to be done with

16   the copies remaining at the expiration date of the

17   license.

18       Q.  So is -- is the basis for your creating that

19   distinction -- is the basis for your opinion on that

20   distinction your understanding of the for-sale doctrine?

21           MR. GEITNER:  Objection to form.

22           THE WITNESS:  I brought up the for-sale

23   doctrine, because you brought up the five exclusive

24   rights afforded to a copyright owner, under Title 17.

25           Certainly, the for-sale doctrine has affect on

1    that right to distribute with respect to lawfully made

2    copies.

3           My understanding of this license, as it's

4    stated, relies upon my -- my expertise in the image

5    licensing arena and my awareness of the standards and

6    practices in that arena.

7           And I'm asserting that a photographer has a

8    responsibility to ensure that they communicate clearly

9    what needs to happen with those copies that are made by

10   the client, under the license and during the license

11   period.

12          When that does not happen, it is -- and when

13   the photographer does not clearly communicate a

14   restriction on the continued distribution, then I think

15   the photographer has a professional responsibility --

16   I'm not saying a legal responsibility -- to give the

17   client the benefit of the doubt, because the

18   photographer has been unclear in his or her

19   communications.

20       **Q.   BY MR. POLLACK:  And, in your opinion, the**

21   **phrase "once the two-year period has expired, continued**

22   **use of the images require additional negotiations,"**

23   **that, to you, does not clearly define the bounds of what**

24   **use is and is not permitted?**

25       A.   I think that the way Mrs. Howard should have

1    stated it here would be, upon the expiration of the

2    license, Foster and Smith must destroy all remaining

3    copies or negotiate additional distribution rights.

4            Could be destroy and recall all copies,

5    because Foster and Smith could lease copies to some

6    distribution company, who then fulfills requests for

7    catalogs and it gets into a rather complex area, where

8    third parties need to also be informed and be prepared

9    to account for copies, destroy copies, return copies.

10   That sort of thing.

11       **Q.   You mentioned a comment earlier -- I want to**

12   **get back to this list of 10 in a moment -- that your**

13   **understanding was use outside of the scope of a license**

14   **would constitute a breach of contract and not a**

15   **copyright infringement.**

16           **Have I correctly stated your...**

17       A.   I -- I think I said that it could, if it is a

18   for-sale-doctrine issue and there's a limitation on

19   distribution of lawfully made copies and that limitation

20   or restriction or constraint is stated in an agreement,

21   then if the licensee is within its rights under the

22   for-sale doctrine to continue distribution, it can turn

23   into a contractual issue, rather than a violation of

24   copyright law.

25           I -- you know, the conclusion that I arrived

1  at, in my report, is that Foster and Smith went beyond

2  the period of use in many instances.  And I've provided

3  quite a long list of those instances in which Foster and

4  Smith made use of the images, beyond the two-year

5  period.  And I have indicated fees applicable to that

6  use as agreed by the parties.

7         So I'm not saying that Foster and Smith abided

8  by the terms of this license, and I am -- you know,

9  there are -- there are the issues with the in-context

10  use, but with respect to other types of use, I've, as

11  you've seen, listed out all of the instances, where

12  their usage went beyond the license period.

13     **Q.   If we can return to your article just to**

14  **finish our list of 10, Item Number 7, I think, we've**

15  **talked about enough.  Duration.**

16         **Item Number 8.  A region.  Does -- does**

17  **invoice FS1069 indicate a region?**

18     A.   I have not yet found a region in this invoice.

19     **Q.   Item Number 9.  Does the invoice indicate a**

20  **language?**

21     A.   No.

22     **Q.   Item 10 does it indicate exclusivity?**

23     A.   The last sentence, under "website terms,"

24  indicates that the website terms of use does not grant

25  image exclusivity to Foster and Smith, and that the

1    image may be used by other vendors.

2         The exclusivity, with respect to the interior

3    catalog, doesn't specifically state it as stated on the

4    website.

5         But there is a paragraph above that states:

6              "All image licensed for use by Foster and

7         Smith may be used by other vendors."

8         So that would imply a non-exclusive use.

9         In addition, it says none of the listed terms

10   of use agreements grants Doctor Foster and Smith's

11   exclusivity.  I don't expect that they desired or

12   expected exclusivity.

13   **Q.   If you can turn in the article to Page 6 of 7,**

14   **you have an additional paragraph labeled about duration.**

15        A.   (Witness complies.)

16   **Q.   And it concludes with an example that the**

17   **client licenses the right to print 10,000 brochures and**

18   **to distribute the brochures for one year.**

19             **If, after one year, the client has mailed out**

20   **only 8,000 brochures, the remaining 2000 brochures**

21   **cannot be distributed, without an additional license.**

22        A.   And that is exactly what I'm talking about by

23   telling photographers in this article that it's

24   essential that they state that, or it ends up with

25   misunderstandings as might have occurred in the instant

1    matter.

2         Q.   Do you think Foster and Smith understood that

3    it could print a billion interior catalog pages on the

4    day before this license expired and then distribute them

5    until they were exhausted?

6              MR. GEITNER:  Objection to form.

7              THE WITNESS:  I earlier used an example to

8    drive home the fact that the Howards had failed to state

9    a quantity under catalogs, which, as a result, they

10   licensed Foster and Smith the right to print an

11   unlimited number -- virtually unlimited number -- of

12   catalogs, featuring their images, at any time, during

13   the license period.

14             Foster and Smith would not have had the

15   right to present additional catalogs, after the

16   distribution -- after the expiration of the license

17   period, under the rights described here.

18        Q.   BY MR. POLLACK:  Um, to be fair, I think I

19   came up with the billion dollar -- the billion figure as

20   an exaggeration?

21        A.   Well, I like it.  I mean, I like that example.

22        Q.   Right.  I'm -- I'm not sure --

23             MR. GEITNER:  It's a hypothetical, not an

24   example.  It didn't actually occur that way.

25             MR. POLLACK:  It didn't actually -- I don't

1    think --

2            MR. GEITNER:  No.

3            MR. POLLACK:  -- Foster and Smith has even

4    printed a billion of them, let alone did it on the day

5    before expiration.

6            MR. GEITNER:  Right.

7            MR. POLLACK:  But you've answered, I'm not

8    certain that I got my question across clearly, not

9    because I'm not certain if it was answered.  So I'm

10   going to try it again.  I don't mean to reask the same

11   question.

12           THE WITNESS:  Sure.

13       Q.   BY MR. POLLACK:  Do you think -- in 2004, when

14   Foster and Smith got this invoice and then paid for it,

15   was -- do you think Foster and Smith's understanding was

16   that, in October of 2006, two years after, it had a

17   license -- that at the end of its license to use half

18   black angel fish on interior pages of its catalogs,

19   Foster and Smith thought it had the right to call up its

20   printer and print a whole lot of interior pages,

21   hundreds of thousands of interior pages that included

22   half black angel fish, to then distribute over the next

23   couple-of-year period, without an obligation to

24   renegotiate further rights with the Howards, for use of

25   that image?

1      A.    I don't know whether or not they had that

2   perception.

3            Reviewing all the testimony and materials in

4   this matter, it's apparent that they believed that they

5   could print any number of catalogs and distribute any

6   number of catalogs.

7            And so, whether they thought that at the end

8   or not, I wouldn't know.  I do know that it was

9   incumbent upon the Howards to make it clear.

10           And, if I was writing this license, I would

11  have indicated that it was a one-time press run of up to

12  X number of copies, and that, at the end of the license

13  period, the copies would need to be withdrawn or --

14  or -- not withdrawn, but recalled or destroyed.

15           And Foster and Smith might have come back to

16  me, when I stated that, and they might have said,

17  "That's not acceptable to us."

18           And I -- then I would have negotiated and

19  changed the wording, if necessary, if I wanted the -- if

20  I wanted to complete the license so that we had a mutual

21  understanding.

22      Q.    Did Foster and Smith ever negotiate these

23  invoices with the Howards?

24      A.    I would -- I believe that there were

25  discussions about usage.  And I know that there were

1    discussions about things such as prelicense fees.

2              And those kinds of discussions I would

3    categorize as negotiations.  So, yes.

4        **Q.   So, for the prelicense, are you speaking about**

5    **those 39 images that --**

6        A.   it came out to 39, but, in -- in -- in any

7    instance in which there was a discussion about usage or

8    fees, I would categorize that as negotiation.

9              I think that the Howards fees were on the low

10   side, to where it wouldn't make sense for Foster and

11   Smith to ask for a lesser fee.  So are you gonna ask to

12   pay less than $75 for a renewal, for a website use.

13       **Q.   Agreed.**

14       A.   Yeah.

15       **Q.   A moment ago, you said that, based on the**

16   **evidence you've reviewed and the people you've spoken**

17   **with, that you think Foster and Smith believed they**

18   **could print any number of interior pages, and they could**

19   **distribute any number of interior pages.**

20             **Do you think they believed they could print**

21   **any number of interior pages, after October of 2006, for**

22   **half black angel fish?**

23       A.   Print?

24       **Q.   Yes.**

25       A.   After the license expired?

1    **Q.    Yes.**

2    A.    The question kind of spans a number of topics,

3    so I'll just restate what I -- the question -- my

4    answer.

5         I don't believe that Foster and Smith

6    believed -- I'm going to restate that as well.

7         I think that it would be unreasonable for

8    Foster and Smith to believe that they could continue to

9    print interior catalog pages, after October 31st of

10   2006, without acquiring an additional license from the

11   Howards.

12        That would -- that answer excludes in-context

13   usage.

14   **Q.    Keeping in-context usage out of the discussion**

15   **for the moment, do you think Foster and  Smith believed**

16   **it could distribute any number of interior page --**

17   **interior catalog pages that included half black angel**

18   **fish, after October 2006?**

19   A.    I think that it would be reasonable for Foster

20   and Smith to believe that they could continue to

21   distribute any catalogs in any quantities as long as

22   they were printed before October 31st of 2006, because

23   of the way that this license is stated.

24        That does not indicate my general belief that

25   licensees should or should not be able to continue to

1    make use of images.

2           By "make use," I mean, reproduce or

3    distribute, which are two separate functions.  After the

4    license period ends, I think it's incumbent upon the

5    photographers to make that clear, when they're granting

6    the rights.

7           If they don't, then I think that it's

8    reasonable for clients to be given the benefit of the

9    doubt, when it comes to the communication of the license

10   and understanding of the license.

11   **Q.   If we can return to your report, Page 14, the**

12   **next section is the plaintiff's pricing schedule.  And I**

13   **believe I commented a moment ago that you thought the**

14   **plaintiff's pricing was, um...**

15   A.   Very reasonable.

16   **Q.   Very reasonable.**

17   **Wasn't it cheap?**

18        MR. GEITNER:  Objection to form.

19        THE WITNESS:  Based on the information

20   available to me, the Howards' primary business interest

21   were in their employment or in their -- or however they

22   were contracted to work for pharmaceutical companies.

23          And that this Oceans-of-Images venture was a

24   side venture, to generate revenue from some of the

25   images that Mr. Howard was making.  And everybody can

1   use additional income.  And photography is a good way to

2   raise that income.

3          And I think that they priced themselves at

4   a -- priced their image usage at a place where they felt

5   that the market could bear, because they possibly knew

6   that Foster and Smith or any other company can readily

7   obtain similar images from any number of vendors, at a

8   higher pricing point.

9          But if the Howards could establish a

10  relationship with Foster and Smith and make it

11  frictionless, in terms of delivering images and usage of

12  images and work flow, that Foster and Smith would find

13  it easier just to deal with the Howards, rather than to

14  go to your standard sources for such images.

15         MR. POLLACK:  I'm going to happened you what

16  I'm marking at Exhibit 8, which is a preliminary expert

17  report that I believe you prepared in the Andrew Paul

18  Leonard, the Stem Tech Sciences matter.

19         THE WITNESS:  Yeah.

20         (Plaintiff's Exhibit 8 was marked for

21      identification by the reporter and is attached

22      hereto.)

23      **Q.   BY MR. POLLACK:  Do you recall that case?**

24      A.   Yes.

25      **Q.   And you were an expert witness on behalf of**

1    the plaintiff in that matter?

2         A.    Yes.

3               I work about 50/50 plaintiff and defendant.

4         Q.    Well, that was going to be my next question,

5    so thanks for beating me to the punch.

6               MR. GEITNER:  Was this a signed original -- or

7    maybe I'm -- okay, my bad.

8               MR. POLLACK:  Was this a what?  I'm sorry.

9               MR. GEITNER:  The double side, I think, threw

10   me for a minute, but I found the signature page.  Thank

11   you.

12              MR. POLLACK:  Okay.

13        Q.    Turning to Page 26 of that report, you've got

14   a Section L, Actual Damages, where you appear to be

15   providing an opinion on an estimation of actual damages

16   to that plaintiff, for his works having been infringed

17   or work.  I don't recall if it's more than one.

18              And the second paragraph begins -- I'm sorry,

19   the second paragraph, under Section L:

20              To arrive at a reasonable estimate of

21   licensing fees applicable to the infringing usages, I've

22   obtained comparative stock photography license fee

23   quotes from several stock photography agencies.

24              Is it your opinion that that is an appropriate

25   methodology for calculating a reasonable estimate of

1  **licensing fees applicable to infringing uses of images?**

2        A.    It's my opinion that each infringement or

3  each -- each infringement matter and the determination

4  of actual damages in those matters is fact dependent.

5             In some instances you have an ongoing

6  relationship with established prices with images being

7  used for those -- for -- for -- in a manner that is,

8  let's say, falls under a pricing schedule.

9             And, in this Leonard matter, although it's

10  been a while, I believe that the images were taken and

11  used for all manner of other media that had not been

12  licensed.  So we had to go outside of any pricing of

13  that within that relationship and seek market rates.

14             Now, I could have done a market-rate study

15  here, but the behavior of the parties, with these

16  repeated invoices going back and forth and the usage

17  being relatively consistent with the pricing schedule,

18  eliminated that need.

19        **Q.    What were the last three words you said?  Have**

20  **illuminated?**

21        A.    Eliminated.

22        **Q.    Eliminated.  Thank you.  I bit my ice at the**

23  **wrong moment in your statement.**

24        A.    Yeah.

25        **Q.    I apologize.**

1    A.    A good example would be, um, if -- if I don't

2  license you any rights, and if you find my image

3  somewhere and just begin using it, we don't have an

4  agreement as to what the rates would have been for that

5  usage.

6         And the rate should be what we would have

7  agreed upon, the actual damages, at least, that

8  component of actual damages would be what a reasonable

9  buyer and seller would have agreed upon, at the outset,

10  before the infringement occurred.

11         And, in that instance, you have to go out to

12  the marketplace and find images that have a similar --

13  that are similar in nature, in terms of the scarcity of

14  the image.

15         And, in this case, in Andrew Leonard's case,

16  he's shooting extreme closeups of stem cells, and he was

17  one of the first people to do it.  Relatively scarce

18  commodity.  Very different circumstance.  And also usage

19  that was -- for which there was no agreed-upon fee

20  whatsoever between the parties.

21    **Q.  Well, Section M of this report -- don't you**

22  **make -- in the Leonard report, don't you make an**

23  **adjustment for scarcity?  I think you do a multiplier of**

24  **some sort.**

25         A.    I believe I do.

1        The multiplier is not a punitive multiplier,

2   to be clear.  It is a, um, a multiplier that would be

3   used for images, for example, if you have a photograph

4   of somebody that has passed away and there's no other

5   photographs that exist of that person, there's a certain

6   scarcity of that image.

7        If you have photographs that are quite

8   difficult to capture, or where you're the only one

9   that's been able to capture that type of image, there's

10  a scarcity factor.

11       And I -- and I don't believe that I arrived at

12  a specific number here, but I suggested that the court

13  consider a multiplier for scarcity.

14       **Q.   Then reviewing any of the images that**

15  **Mr. Howard has taken in this case, did they appear to**

16  **you as easy to take, hard to take, somewhere in the**

17  **middle?**

18       A.   I'm a diver and I understand the challenges in

19  making great imagery or successful imagery in that

20  environment.

21       It's even challenging to make them in your own

22  aquarium and come out with good images; however, there

23  are -- there's a great supply of images of all different

24  kinds of fish in all different kinds of environment.  So

25  it's a very different situation.

1          Had Foster and Smith wanted to look outside of

2     their relationship with the Howards, they could very

3     easily have done so.  And there are entire stock

4     agencies that specialize in just photographs of animals

5     and fish and have very, very high quality images that

6     are quite similar to the Howards' images.

7               MR. POLLACK:  I'll hand you Exhibit 9.

8               (Plaintiff's Exhibit 9 was marked for

9          identification by the reporter and is attached

10         hereto.)

11          **Q.   BY MR. POLLACK:  Are you familiar with Getty**

12     **Images?**

13          A.   Yes.

14          **Q.   So this is just -- I have Getty images, which**

15     **is a stock photography house, as I understand it --**

16          A.   Yes.

17          **Q.   -- and found a tropical fish image and priced**

18     **it through their online pricing.  So the first page is**

19     **just the standard page.**

20               **And then pages 2 -- Page 2 of the exhibit is a**

21     **price I received for a brochure and  direct mail of use**

22     **of that image.**

23               **And Page 3 is a price I received for a web**

24     **usage of that image.**

25               MR. GEITNER:  I'm just going to object to the

1    document overall for lack of foundation.

2        **Q.   BY MR. POLLACK:  Well, have you ever used the**

3    **Getty price calculator, the online --**

4        A.   I'm very familiar with it.  It's, in part,

5    based on the PLUS standards that I created.

6        **Q.   Okay, great.  So page --**

7        A.   You can see -- excuse me.  You can see some

8    similarity in the criteria, such as the use of the word

9    "placement" and "duration."  And these things came from

10   the PLUS standards.

11       **Q.   Okay.  Looking at Page 2 of the exhibit, which**

12   **is a rights managed image pricing for a brochure, for**

13   **interior pages.  The placement indicates it's inside.**

14           **Are you aware of Foster and Smith's fish**

15   **catalog circulation, how large that circulation is?**

16       A.   I was at the time that I wrote this, but I

17   don't -- I don't recall what -- what that circulation is

18   right now.

19       **Q.   For circulation, I entered up to one million.**

20   **And for a two-year period, the price it lists for that**

21   **image is $1,670.**

22           **In your opinion, is that a reasonable price**

23   **for usage of the image in Exhibit 9?**

24       A.   For --

25           MR. GEITNER:  Objection to form.

1    Go ahead.

2    THE WITNESS:  To the extent, that the clients,

3  who click on that add-to-cart button are willing to pay

4  that amount for that usage, then I think that -- that's

5  a reasonable price.

6    I think that, in the instant matter, the

7  parties established what they mutually believe was the

8  value for the right to exploit the images in the

9  underlying copyrights by setting up a price scheduled

10  and by repeated transactions.

11    You can also license very similar images of

12  equal or greater quality to any of the -- to this image

13  here or to the Howards' images.

14    Microstock or Royalty Free Stock for 99 cents

15  to $5.00 to, you know, $75, and they're under various

16  pricing models that allow unlimited usage in all media

17  forever for a dollar.

18    So there's a wide variety of images out there.

19  It's certainly takes some skill to create an image like

20  the one that we're looking at in the Getty Images, and

21  it also takes skill to create some of the images that

22  Mr. Howard has created.

23    Q.   BY MR. POLLACK:  And if Foster and Smith had

24  wanted perpetual, forever rights for 99 cents, for an

25  image, to use, to print forever, however many copies and

1  **distribute forever however many copies, they could have**

2  **done that?**

3         MR. GEITNER:  Objection to form.

4         THE WITNESS:  They easily could have done

5  that.

6         I believe that they -- it appeared that they

7  enjoyed a mutually beneficial relationship, with the

8  Howards, until the Howards moved away and shut down

9  their organization.  And then Foster and Smith sought

10  other avenues for image licensing.

11         But, yes, Foster and Smith had that

12  opportunity.  It just so happened that, at a time, when

13  Foster and Smith acquired Pet Warehouse, the Howards

14  popped up and had images that met the quality

15  requirements for Foster and Smith and had terms that

16  were acceptable to Foster and Smith.

17         So Foster and Smith felt that, at those kind

18  of prices, they didn't have a reason to look around.  I

19  expect that, if the Howards would have quoted $1,670,

20  that Foster and Smith would have looked around.

21         MR. POLLACK:  But we don't know.

22         THE WITNESS:  I have a strong suspicion that

23  that would be the case.

24     **Q.   BY MR. POLLACK:  Why do you have that strong**

25  **suspicion?**

1    A.   Getty Images is able to charge this kind of

2    money because they have -- they are the leading image

3    licensor in the world, and they have many clients, who

4    have accounts with Getty Images and corporate approvals

5    to buy through Getty Images.

6         And they have a great number of steady repeat

7    clients.  As a result, they also have one of the

8    broadest scope of content.  It just makes it easy to

9    find content there.

10        Um, that price of 1,670 is steep for a

11   brochure and direct mail and, as a result, I think

12   that -- but I don'know for a fact -- that Foster and

13   Smith would have considered some other options,

14   including Royalty Free and Microstock and Subscription

15   Stock and niche vendors, like, companies, like, Animals

16   Animals, which is a stock agency that just carries

17   images of animals and fish.

18   **Q.   Same question, just quickly, on Page 3 of that**

19   **exhibit, which is a price for a web usage of the image,**

20   **which is a smaller price of $780.  And I'm just getting**

21   **up to look for a stapler.**

22        A.   I'm going to get up too.  The sun is starting

23   to go through that window.  It's blinding me.

24        (Pause in the proceedings.)

25        **Q.   BY MR. POLLACK:  I believe there was a**

1    question pending, when Mr. Geitner took that break.  I'm

2    just kidding.

3              Page 3 of Exhibit 9 has a price of $780 for a

4    web usage of the same image from Getty.

5              Is that a reasonable price for that image?

6        A.   I think that these prices are, in my --

7    you're asking for my opinion, and I would say that these

8    prices are not relevant in any way to this matter,

9    because the parties had agreed upon fees for the usages

10   that were -- that Foster and Smith undertook.

11             And where it went beyond those usages, you

12   could look back at the licenses offered by the Howards,

13   and you'd find the rates that they expected to receive

14   when those usages were undertaken.

15             You don't have to go out to find market rates,

16   which you do have to do that, when there's a -- somebody

17   just nabs an image off the web and starts using it

18   without any discussion or permission.

19             And these type of rates would fall within the

20   scope.  They're on the high end, but they would fall

21   within the scope.  And, if you want to use my images, my

22   images might be even far more expensive than this.

23        Q.   How much would one of your images be?

24             MR. GEITNER:  Objection to form.

25             THE WITNESS:  It depends on the image and the

1  circumstances.  And I would look at the usage.

2         But for some type of usage like this, my -- my

3  rate could be twice that.  Getty Images has to --

4     Q.   BY MR. POLLACK:  The "this," you're talking

5  about the --

6     A.   Like the -- like the web usage there.

7         It depends.  You know, your web usage can

8  range from 99 cents, for unlimited usage forever on the

9  web, you know, on a -- and if you have a particularly

10 rare image -- you know, some of my images are people who

11 have passed away or are very unique images, then you can

12 demand more.

13        If you've got images of fish in front of

14 coral, unless it's some kind of undiscovered fish or

15 image that's taken at some great depth, where there's

16 not a lot of images of -- of that particular kind of

17 fish, then you've got some competition.  It's a

18 supply-and-demand situation.

19        And into play comes ease of the transaction,

20 and we certainly had ease of transaction, between Foster

21 and Smith and the Howards, where Foster and Smith

22 appeared to be able to just use the images, report that

23 usage or send the catalog to the Howards, and the

24 Howards would send an invoice, and on they went.

25     Q.   So forever, for all time, Foster and Smith

1 **should be entitled to pay the price listed on the 2003**

2 **price schedule that Mrs. Howard sent to Foster and**

3 **Smith?**

4      A.    I think that it could be reasonable to look at

5 the last time that the licensed was discussed, and to

6 look at a adjustment, based on the value of the dollar

7 or possibly an adjustment that's based on image

8 licensing prices at one time versus image license prices

9 at another, without looking at the specific prices, but

10 looking at the change in prices, between those two

11 times.

12           Very often and, actually, quite often

13 photographers will establish an expiration date for

14 their price quotes.  And that's highly advisable when

15 you're delivering a price schedule to a client.  And I

16 don't recall seeing such an expiration on the Howards'

17 price schedule.

18           When you deliver an estimate, you can put an

19 expiration on the estimate itself, saying these prices

20 are good for the next 30 days, the next year, or the

21 next five years.

22           And if you don't do that, you're leaving --

23 you're leaving it open to interpretation by the client.

24 I myself have had instances where I have, to maintain a

25 relationship with the client; just guarantee them

1  pricing that lasts essentially forever, so they can come

2  back and license that usage, at any time, in the future,

3  for that -- for that same rate.

4  Only because, if you don't do that, you'll

5  find that clients might demand unlimited usage forever

6  anyway, and -- and that becomes somewhat problematic.

7  **Q.   In your opinion, is it appropriate for a right**

8  **holder -- an image right holder to charge a higher**

9  **amount to an none infringer?**

10  MR. GEITNER:  Objection to form.

11  THE WITNESS:  I would like that to be the

12  case.  I have seen some case law come down, where the

13  courts flatly rejects that notion of a punitive

14  multiplier applied to actual damages in a matter now, to

15  the extent to which some part of statutory damages

16  become punitive in nature possibly.

17  But the instances in which it is acceptable,

18  in my opinion now, given just of the way the courts have

19  come down on it is, if I license to you the right to

20  make use of my images, and I state in that estimate

21  that, if you infringe, that there's going to be a ten

22  times or three times or seven times or two times the

23  licensing fee penalty, then you, essentially, breach

24  that -- if you breach that contract, I'm going to come

25  back and I'm gonna be able to charge you that punitive

1    multiplier.

2          But if I go into court and try and tell the

3    judge that, you know, yes, I would have licensed this

4    image for $75, but I -- I deserve $750, ten times that

5    because of the -- it was an infringing use, I think

6    you're gonna have a tough time with that.

7       **Q.   BY MR. POLLACK:  Putting aside your**

8    **understanding of the law and the actual damages --**

9    **component of damages in a copyright case, is it**

10   **appropriate for a photographer to charge a higher**

11   **amount?**

12         **Not a punitive amount, as a punishment for**

13   **infringement, but a higher amount to caution against the**

14   **risk in licensing a work to a party that has used an**

15   **image outside of license as -- for instance, if the**

16   **party is sloppy about its record keeping and has shown**

17   **it hasn't been able to manage image-right usage in the**

18   **past, wouldn't a photographer be justified in charging a**

19   **higher amount, to license his or her work to that party?**

20         MR. GEITNER:  Objection to form.

21         THE WITNESS:  Compound hypothetical there.

22         So I'm going to answer your question, I think,

23   to your satisfaction, but -- in a different way.  You

24   can tell me whether I've satisfied it.

25         MR. POLLACK:  I appreciate that.  Thank you.

1      THE WITNESS:  Okay.  So once you've filed a

2   federal complaint, the game changes.

3          But if you want to set that aside, as you have

4   in your question, I believe, which sets this case aside,

5   and you want to look at a situation, where a

6   photographer discovers some unauthorized usage by some

7   party that never licensed the work, and the photographer

8   approaches that party, it's my opinion that the

9   photographer -- it would be reasonable for the

10  photographer to, in settlement negotiations, not -- not

11  affecting the rights of the parties should they enter

12  litigation, for the photographer to engage in settlement

13  negotiations in which a higher than normal rate is

14  requested, for that unauthorized use.

15      MR. POLLACK:  I'll hand you Exhibit 10, which

16  is a supplementary expert report that, I believe, you

17  prepared -- excuse me -- in the Kugan V. Abnet matter in

18  2006.

19      THE WITNESS:  Yes.

20      (Plaintiff's Exhibit 10 was marked for

21      identification by the reporter and is attached

22      hereto.)

23  **Q.   BY MR. POLLACK:  Do you recall that matter?**

24  A.   I do.

25      MR. POLLACK:  And, Mr. Geitner, Page 19 is

1    where you'll find the signature on that one.

2            MR. GEITNER:  Yes.  Thank you.

3        **Q.    BY MR. POLLACK:  Not a lot of time on this one**

4    **here.  Again, I think were you representing a plaintiff?**

5        A.    Correct.

6        **Q.    And page ten -- you there?**

7            **You're in the middle of a discussion on actual**

8    **damages in that matter.  In the middle of the page you:**

9            **"In the same way that a mortgage lender**

10           **adds a risk premium to the interest rate of a**

11           **loan applicant with a history of bad credit, a**

12           **photographer adds an infringement premium,**

13           **when computing fees quoted for licenses**

14           **granted to clients with a history of**

15           **infringement.**

16           **"I conclude that, at the time of the**

17           **infringement, it would have been reasonable**

18           **for Kugan, the plaintiff here, to require**

19           **Abnet, the defendant, to pay a premium on his**

20           **licensing fees, based on his past experience**

21           **with Abnet's prior infringements."**

22       A.    And this was prior to the case that I

23   mentioned earlier, which the name escapes me now, but

24   the court came down after this on any sort of notion of

25   punitive multipliers.

1    And so I would stick with my opinion that,

2 because of that case -- I'm trying to remember --

3 remember but, um --

4    **Q.    Do you remember where that case was?**

5    A.    I think it was eastcoast.  I -- I -- I will

6 find it.

7    After that, the courts made clear that a

8 punitive multiplier would be inappropriate.

9    I still believe, as I stated earlier in my

10 testimony here, that a photographer, coming back to a

11 infringer, out of court, and seeking a settlement should

12 feel comfortable, requesting an amount greater than the

13 photographer would have requested in the first place.

14    Otherwise, as you mentioned, there's an issue

15 with having no reason to approach photographers, in the

16 first place, for permission.

17    **Q.    A hypothetical I'll present right now, if this**

18 **case ended today, the case between the Howards, Oceans**

19 **of Images and Foster and Smith, and Foster and Smith**

20 **wanted to license additional Howard images tomorrow,**

21 **this case being done and forgotten, would the Howards be**

22 **justified in charging more than what's listed on the**

23 **pricing schedule from 2003?**

24    MR. GEITNER:  Objection to form.

25    THE WITNESS:  Placed on inflation or based on

1    history here or -- or...

2              MR. POLLACK:  Both.  Or any other factor.

3              MR. GEITNER:  Objection to form.

4              THE WITNESS:  I think that the Howards would

5    be justified, you know, first off in increasing their

6    fees overall just because of the quality of the work.

7              But, with respect to past licensing, which

8    your question didn't apply to, the Howards have already

9    set the value for the license usage of the images in the

10   past.

11             But going forward, I would say that the

12   Howards would be well served to increase their fees a

13   bit.

14             And then, in terms of increasing them, because

15   of past history, with Foster and Smith, they would have

16   to understand that Foster and Smith has the ability to

17   license images from anyone, and that comes into play.

18             MR. POLLACK:  I'll hand you Exhibit 11, which

19   is a packet of documents that starts with the letter to

20   an individual Aquacon dot com website.

21             (Plaintiff's Exhibit 11 was marked for

22        identification by the reporter and is attached

23        hereto.)

24        Q.   BY MR. POLLACK:  Have you seen this document

25   before?

1    A.   I have.  I believe I have.

2    **Q.   Are you aware that the Howards had identified**

3    **another individual, who had used one of the Howards'**

4    **images without a license in the past?**

5    A.   Yes, and that they approached that individual

6    and attempted to negotiate a settlement and, I believe,

7    couldn't do so and eventually abandoned it, because it

8    was not economical to pursue.  I might be wrong.

9    **Q.   Well, turning to Page 2 of the packet I handed**

10   **you, which is an invoice from the Howards to Aquacon,**

11   **where they are invoicing someone who has used a work,**

12   **outside of the scope of a license here, because there**

13   **never was a license.  And they assigned a value of $2500**

14   **for a website banner for one year.**

15          MR. GEITNER:  There is a OOIP560?

16          MR. POLLACK:  Yeah.

17          MR. GEITNER:  Gotcha.

18   **Q.   BY MR. POLLACK:  First off, have you seen this**

19   **document before?**

20   A.   I've seen a lot of documents in this case.  I

21   believe that I've seen this document.  I'm familiar with

22   the circumstances.  I believe, without reading this,

23   that there -- the image was licensed for some other use,

24   and that this person grabbed it and used it for their

25   use.

1      **Q.    Well, do you agree that that's an**

2   **infringement -- an infringing use?**

3           MR. GEITNER:  Objection to form.

4           THE WITNESS:  If -- if -- if this party used

5   the image, without the permission of the Howards and, if

6   it wasn't some type of fair use, then it could be an

7   infringing use.  I'm not familiar enough to make a

8   determination.

9           But, based on the circumstances that I

10  understand, if it was my image, I would have considered

11  this to be an infringing use.

12          MR. POLLACK:  And I believe the Howards did as

13  well.

14      **Q.    Isn't this document, OOIP560, an indication,**

15  **in 2002, of how the Howards valued an infringing use,**

16  **for a website banner of one image, at the time?**

17          MR. GEITNER:  Objection to form.

18          THE WITNESS:  What the Howards -- you know,

19  the rates are -- rates for usage or reasonable fees for

20  usage are not determined unilaterally by the rights

21  holder.

22          There are various different cases in which

23  this has been looked at, and some of the cases say that

24  the rate was determined by what a reasonable seller

25  would have required of a buyer.

1    In other cases, say that -- I think the Sid

2  and Marty Croft case say that the -- it's what a

3  reasonable buyer and seller would have agreed upon.

4    And so the Howards could have asked for, you

5  know, a million dollars or 5,000 or 500 and, if, in a

6  situation in which they have established or they've

7  requested $2500, and the guy at Aquacon -- I'm just

8  remembering -- I believe that this was not paid?

9    MR. POLLACK:  That's correct.

10    THE WITNESS:  Yeah, and then he refused to

11  pay.

12    Um, I can't -- I can't say what -- what a

13  reasonable fee for that would have been.  I have no

14  basis for it.  They could have pulled any number out of

15  a hat.

16    MR. POLLACK:  But they didn't.

17    THE WITNESS:  I don't think that that's an

18  unreasonable number for them to require of a party that

19  they've had no relationship with and no discussion with

20  and just steals their image from somewhere and attempts

21  to use it purposefully, without their knowledge or

22  permission.

23    It's a very different circumstances, and then

24  licensing rights to a client and the client exceeding

25  the terms of use.

1          MR. POLLACK:  Okay.  If you can go forward a

2     couple of pages.

3          THE WITNESS:  (Witness complies.)

4     **Q.   BY MR. POLLACK:  There's one other invoice**

5     **OOIP564.  And now, at this point, they've discovered**

6     **that it's not just on one web page, but if you read the**

7     **terms-of-use box, this is the invoice that's for $9,000.**

8     **This assumes approximately 75 website pages.**

9          **Is this figure -- this $9,000 figure for what**

10    **they've now discovered to be a more extensive use of --**

11    **an unauthorized use of this one image, in your opinion,**

12    **is this a reasonable figure?**

13         MR. GEITNER:  Objection to form.

14         THE WITNESS:  For me and my images, it would

15    be in the ball park of a number that I would personally

16    seek from an infringer who did not -- who I had no

17    relationship with.

18         If that matter then -- if it then became

19    necessary for me to file a federal complaint, and we got

20    into a litigation situation, the court would look at

21    what my normal fees for licensing of images were and, if

22    I never licensed images in that manner, they would look

23    at the market rates and determine what actual damages

24    would be.

25         But, in terms of a settlement offer, I think

1   that's a reasonable settlement offer for the scope of

2   use.

3           MR. POLLACK:  Okay.  Briefly, if we can

4   turn back to your -- I'm done with that exhibit.

5   Thank you -- your -- your Kugan report, which I think is

6   Exhibit 10.

7           THE WITNESS:  (Witness complies.)

8           MR. POLLACK:  Now, on Page 5 of that report,

9   let me give you a frame of reference.  In your section

10  on disgorged profits.

11          THE WITNESS:  Page 5?

12          MR. POLLACK:  Yeah.

13          Page 4 is where the section begins.  You title

14  it "Disgorged Profits."

15          The first numbered section:

16              "Abnet confirmed that Kugan's photographs

17              of Valley are extraordinary and valuable to

18              Abnet."

19          And then you explained -- just -- my

20  understanding is this was a photographer who took a

21  picture or maybe more than one picture of the CEO, and

22  that picture was used throughout some annual reports and

23  that kind of --

24          THE WITNESS:  It was very prominently

25  featured -- the equivalent of running it on the cover of

1   a catalog sort of thing.

2           The photographer shot several portraits for a

3   magazine, and then this company went in and just scanned

4   the magazine and began using it as a featured photograph

5   in their advertising.

6           And it was a situation in which the time

7   factor for the CEO of the company -- it's a very large

8   company, Abnet.  The time factor for the CEO to dedicate

9   another day to have photographs taken, this sort of

10  thing, was at play.

11          **Q.   BY MR. POLLACK:  How large was the company?**

12          A.   I think it's stated in here somewhere but...

13          **Q.   I don't need it to be precise.  Was it bigger**

14  **than Foster?**

15          A.   Gross revenue 52 billion a year -- oh, from

16  2001 to 2005 52 billion.

17          **Q.   So ten billion?**

18          A.   Ten billion a year.

19          **Q.   And so here, because there was Abnet selection**

20  **and extensive exclusive use of this photographer's**

21  **photographs, you deemed that as a demonstration on**

22  **Abnet's parts -- on Abnet's part that Kugan's**

23  **photographs were superior to all other existing**

24  **photographs of the CEO Valley.**

25          A.   Entirely different --

1          MR. GEITNER:  Objection to form.

2          Go ahead.

3          THE WITNESS:  Entirely different fact pattern

4    for the two cases.

5          Here, we have a company that went out and just

6    took images from some other resource and -- and began

7    using them, with no prior licenses from the

8    photographer, no establishment of any terms, nothing,

9    and of a particular individual in which other

10   photographs would have been a burden on Abnet to create.

11         And so very different situation.  I think

12   you're comparing apples to oranges.

13     **Q.   BY MR. POLLACK:  Okay.  What was the exhibit**

14   **number of the Leonard Stem Tech report?**

15         MR. GEITNER:  It was 8.

16         MR. POLLACK:  Thanks.

17         MR. GEITNER:  Yes, 8.

18         MR. POLLACK:  If we can actually turn to the

19   Leonard report, Exhibit 8, for just a moment.

20         THE WITNESS:  (Witness complies.)

21     **Q.   BY MR. POLLACK:  Page 30.  This is your**

22   **Section 0, which is the shorter section on disgorged**

23   **profits.**

24         **You state that:**

25              **"A review of Stem Tech's many usages of**

1          **Leonard's photographs conclusively**

2          **demonstrates that Stem Tech exploited**

3          **Leonard's photograph to promote its brand, to**

4          **promote its understanding of its company and**

5          **products, to train and recruit distributors,**

6          **and to provide those distributors with tools,**

7          **which were used to maximize Stem Tech's**

8          **profits from sales of Stem Tech products."**

9          **So, in your opinion, where one promotes its**

10     **brand, using a photographer's photographs, one has**

11     **created a nexus between the usage of the paragraphs and**

12     **the profits of the company?**

13          MR. GEITNER:  Objection to form.

14          THE WITNESS:  It is, counselor, your -- your

15     clients' responsibility to establish the causal nexus,

16     not mine.

17          But I will state here that the manner in which

18     this image was used is entirely different and

19     incomparable to the manner in which Foster and Smith

20     made use of the Howards' image.

21          In this matter, the image, in fact, became

22     almost the logo for the company.  It was on everything

23     that the company produced.  It was in every

24     presentation.  It was on their home page.  It was on

25     thousands upon thousands of different web pages.  It was

1     the image they chose to represent their company.

2            In other words, if -- if, um, if Foster and

3     Smith had chosen one of the Howards' image to run as a,

4     let's say, make a silhouette out of one of the fish and

5     run it next to the words Foster and Smith everywhere

6     that the Foster and Smith name appeared, then it would

7     be reasonable for you to make some sort of comparison

8     here.  But this has no comparison whatsoever.

9            MR. POLLACK:  All right.  Let's move on.

10        **Q.   You're familiar with Corbis' images?**

11        A.   Yes.

12            MR. POLLACK:  Okay.  I'll hand you Exhibit 12.

13            (Plaintiff's Exhibit 12 was marked for

14        identification by the reporter and is attached

15        hereto.)

16            MR. POLLACK:  And just briefly, I -- the

17     process I went through with the Getty image before,

18     Exhibit 9, I did a similar pricing exercise on Corbis'

19     website.

20        **Q.   Are you familiar with Corbis' stock**

21     **photography licensing?**

22        A.   Yes.

23        **Q.   And I picked a random fish picture.  Page 2 of**

24     **the exhibit I've handed you has a grid of prices for**

25     **print and download for a run of up to a million and for**

1    a period of two years.

2          Do the prices listed there -- are -- are they

3    reasonable prices to you?

4          MR. GEITNER:  Objection to form.

5          THE WITNESS:  First, I think this photographer

6    is within of my lighting students from the Art Center.

7      Q.    BY MR. POLLACK:  Oh, you know Mr. -- I'll --

8    I'll butcher this, Woopner (phonetic).

9      A.    Woopner, yeah.

10          The -- to answer your question, the prices

11    look pretty straight forward to me.  In terms of Corbis'

12    pricing structure, they have a range of content that's

13    called premium content.

14          And let me just see if it says that somewhere

15    in here.

16          (Pause in the proceedings.)

17          THE WITNESS:  Yeah.  So, if you look under the

18    little thumb nail on your pricing page, under the image

19    number it says "premium."

20          MR. POLLACK:  Okay.

21          THE WITNESS:  And, essentially, they require

22    increased prices for what they deem to be premium

23    content like this, where there might have been some

24    retouching made, and you got bubbles floating up, and

25    they're floating under the surface of the water, and

1    it's lit with a soft box and -- you know, very strong

2    imagery.

3           They -- they placed into a separate class and

4    they require a different pricing structure for it.  And

5    that's -- that's what you're seeing here.

6           But I think that -- let me just -- I need to

7    look at your usage selections more carefully.

8           (Pause in the proceedings.)

9           THE WITNESS:  So the second row of pricing, on

10   the second page of your exhibit, includes the -- both

11   the ability to run -- run this in print, as well as to

12   download the image from the website, for presumably

13   other usages, so offering image downloads.

14          So we should be looking at the print-only

15   pricing.  And then separately looking up a web-usage

16   price.

17          MR. POLLACK:  Page 3 would be a web-usage

18   quote.

19          THE WITNESS:  Yeah.

20          MR. POLLACK:  For up to two years.

21          THE WITNESS:  And then, if you combine the two

22   together, usually what happens is, if you -- the way the

23   people license from Getty and Corbis is, you look up the

24   rates, then you call and you negotiate an actual price

25   that you're going to pay.

1          When you -- when you have combined usages like

2     this or sometimes the web sites licensing platform will

3     allow to you combine usages, and then it applies a

4     discount across the two usages.

5          But, in any event, these are high-end usage

6     prices that I -- I wouldn't say are abnormal, but

7     similar images could be had for any range of pricing.

8          And as a photographer frustrated by the low

9     end of the pricing that has happened in the industry,

10    but I would have to say that there's a certain reality

11    to it.

12         I'm talking about the one dollar prices for

13    unlimited use, going on up to the, you know, $4,000 to

14    be able to run it in print and to allow people to

15    download it from -- from the website.

16         MR. POLLACK:  All right.  If we can move to

17    Page 21 of your report.

18         THE WITNESS:  (Witness complies.)

19         MR. POLLACK:  We're going to talk about the

20    Wayback Machine now.

21         THE WITNESS:  Okay.

22         MR. POLLACK:  You've offered the -- part of

23    your opinion is that it was bad of us to rely so heavily

24    on the Wayback Machine, because it doesn't accurately

25    gather pictures, as they were, at the time the web page

1    was collected.

2              THE WITNESS:  I think that that misstates my

3    opinion.

4              I don't think bad of you to do so.  I've used

5    the Wayback Machine myself.  And I've referred to it in

6    infringements of my own work.  And I refer to it in

7    infringements of the works of others.

8              It was not until I noticed that there were

9    2012 catalogs on the Howards' printouts of infringements

10   that happened in 2008 that I realized that the way that

11   the Wayback Machine was archiving those web pages was

12   inaccurate and unreliable and not suitable for use as

13   evidence.

14             Up until that moment, two months ago, I -- I

15   wouldn't have hesitated to recommend that method and

16   have recommended that method.

17             So I would not insinuate or imply that it was

18   bad of you or bad of your client to explore possible

19   usages on the Wayback Machine as a great tool.

20             This discovery of this issue -- I'm sure I'm

21   not the first one to discover it, but it's the first

22   time that I became aware of it.  It was very surprising

23   to me.

24             And it -- it turns out that it's an entirely

25   unreliable method, and it doesn't really leave

1    photographers with many other options for making

2    determinations.  And I would, you know, encourage the

3    Howards to explore other avenues.

4         **Q.   BY MR. POLLACK:  Well, we're going to explore**

5    **now how entirely unreliable it is, but let me get to the**

6    **tail part of what you said first.**

7              **What other options do the Howards have or any**

8    **photographer, looking to recreate the world of web-based**

9    **infringement in the past?**

10        A.   None that I'm aware of, other than finding

11   them and printing them as they -- as they happen.  But

12   the -- in terms of finding past copies of web sites.

13             But the -- you know, the one that people have

14   relied upon, in the past, is, you know, litigation

15   situation, subpoenaing backups of websites, when those

16   backups are kept.

17             And I'm not saying that it is a requirement

18   that every company archive every revision of every

19   website, but if those are available, that's an avenue.

20        **Q.   So the Howards' choice was whatever historical**

21   **information Foster and Smith still had, the Wayback**

22   **Machine, to the extent it is or it is not reliable, and**

23   **that's it?**

24        A.   I don't think that there's another other way

25   to approach it.

1       Q.   So in -- first off, how do you know the

2   catalogs pictured in your exhibit, which is Exhibit K to

3   your report, but you reproduce the two sections on Page

4   23, how do you know those catalogs are from 2012?

5       A.   I asked for copies of them.  And I also

6   interviewed a couple of people at Foster and Smith.

7   Asked them when those catalogs came out.  I believe

8   there was an exception for the ferret catalog.  I'm

9   doing that from memory.

10          But, with respect to the other catalogs,

11  those didn't -- those were not available until 2012.

12      Q.   And on the bottom of Page 21, you -- you --

13  you quote part of the Internet archive, FAQ, and state

14  that:

15              "How can I tell what date a particular

16              image was archived?

17              "The date assigned by the Internet archive

18              applies to the HTMO file but not to image

19              files linked to therein.

20               "Thus -- and then you emphasis this --

21              images that appear on the printed page may not

22              have been archived on the same date as the

23              HTMO file."

24              I'm going to hand you Exhibit 13, which is a

25  printout of the Internet archive legal FAQ.

1          **(Plaintiff's Exhibit 13 was marked for**

2      **identification by the reporter and is attached**

3      **hereto.)**

4              MR. POLLACK:  And if you turn to Page 2.

5              THE WITNESS:  (Witness complies.)

6              MR. POLLACK:  At the bottom is the FAQ on that

7  request.

8                  "How can you tell what date a particular

9              image was archived?"

10         This appears to be where you cut and pasted

11  that text from -- or copied that text from.

12             THE WITNESS:  I'm not sure of that, but it's

13  possible.

14             MR. POLLACK:  Your footnote at the bottom is

15  the same URL that you --

16             THE WITNESS:  Okay.  Thank you.

17             MR. POLLACK:  -- printed this from.

18         But when you read the FAQ, it goes on to

19  explain.  The next sentence after:

20                 "Thus images that appear on the printed

21             page may not have been archived on the same

22             date as the HTMO file."  Period.

23                 "If you would like to find out when a

24             particular image was archived, right click,"

25             parenthesis, "control click for Mac users,"

1          end parenthesis, "and select both an image and

2          new tab or window."

3          It then goes on to explain that the URL for

4   that image will include the date and time information,

5   when the archive crawlers access that image.

6       **Q.   Do you -- do you see that?**

7       A.   I see that, but it doesn't --

8       **Q.   Let me --**

9       A.   -- doesn't address the issue at hand here.

10      **Q.   Well, let me tie it to something a little more**

11  **concrete here.**

12      A.   Okay.

13      **Q.   And the -- the reason I'm doing this, at the**

14  **top of Page 22, you say:**

15          **"As a result, the bulk of the alleged evidence**

16  **of infringement is inaccurate.  But then you site a**

17  **single example.**

18          **And I'm going to hand you Exhibit 14.**

19          **(Plaintiff's Exhibit 14 was marked for**

20      **identification by the reporter and is attached**

21      **hereto.)**

22          MR. POLLACK:  To give you a frame of reference

23  of what we're looking at, this is one of the pages

24  that's on one of our spreadsheets of infringement,

25  indicating infringement on May 1st, 2006, of the image

1   on the right, where there's a diver under water.  Just,

2   for your knowledge, that driver is Laura Howard.

3            And then the third page of the exhibit what

4   I've done is I've right clicked on the image and opened

5   it in the new tab, and then screen printed that so that

6   the full URL of that image would display.

7            And that image indicates its URL comes from

8   Live Web dot archive dot org.  And then, if you read to

9   the right, where it has the time information, which the

10  Wayback Machine provides in the form of a four-digit

11  year, two-digit month, a two-digit day and then a time

12  code in hours, minutes and seconds, here, that code is

13  2002, 011, 623, 0409.

14       **Q.   Do you have any reason to doubt that that**

15  **image was on Foster and Smith's Live Aquaria website in**

16  **2002?**

17            MR. GEITNER:  Objection to form.

18            And, Woody, I don't know if you know the

19  background of it, but Pet Warehouse also had Life

20  Aquaria.

21            MR. POLLACK:  That's fine.

22            MR. GEITNER:  Okay.  And I think this date

23  relates to that.

24            MR. POLLACK:  It may or may not.

25            MR. GEITNER:  If anything.

1           THE WITNESS:  There's one thing that I'm

2    unclear on, and I didn't have the time to get into

3    researching it, after I delivered my report.  But there

4    is the question of whether an image of using the same

5    image name would -- uploaded to the server may or may

6    not be indexed, if the crawler for archive dot org

7    recognizes that the image name is the same.

8           So I can't really answer your question there.

9           Would I have any reason to doubt that the

10   image was there?

11          I made some assumptions, previously, with

12   archive dot org, and I'm not going to put myself in a

13   position of making those assumptions again.

14          But, if the Howards are ready and willing and

15   able to go back through their archive dot org evidence

16   and document these dates of usage for all the alleged

17   infringements, then I would be glad to revise my

18   estimated actual damages, based on their best estimate,

19   using these dates.

20       **Q.   BY MR. POLLACK:  But you didn't -- aside from**

21   **the example you cited in your report, you didn't right**

22   **click on each image of a Wayback Machine version of a**

23   **Foster and Smith website that we have accused of**

24   **infringing?**

25       A.   At my hourly rate, it was going to be far too

1    expensive for me to do that, at that time.

2              And, as soon as I found that I was looking at

3    a 2012 catalog that was claimed by the Howards to be a

4    2008 infringement, I stopped and let my client know.

5              And -- and -- and I would let the Howards

6    determine -- you know, do that research, to determine

7    whether each image was actually crawled.

8              And then I would confirm back with archive dot

9    org as to whether the name of the -- the file name has

10    anything to do with the refreshing of the stored image.

11              And then I would revise my actual damages

12    estimate, as I offered to do in my report, when the

13    Howards come back with clarification.

14              But I believe that the Howards were relying on

15    the dates that were on each archive dot org way-back

16    page, as I have done in the past, before I noticed this

17    issue.

18    **Q.    But you -- the opinion you offer in your**

19    **report is that the bulk of the alleged evidence is**

20    **inaccurate.**

21              **If I were to show you a dozen or more Wayback**

22    **Machine pages, where I've done the same exercise of**

23    **right clicking on the images and -- and the image date**

24    **listed by the Wayback Machine is the date approximately**

25    **of the same time as the gathered page, would that alter**

1    **your opinion as to whether the bulk of the alleged**

2    **evidence is inaccurate?**

3          MR. GEITNER:  Objection to form.

4          THE WITNESS:  I would say if I -- if -- if you

5    were to go through and provide me -- or -- or, if you

6    were the Howards -- excuse me -- were to go through and

7    provide me with the URL's of the images as they were

8    spidered and indexed by archive dot org and, if I were

9    able to confirm with archive dot org, which I intend to

10   do that the -- that this information is a hundred

11   percent accurate and has nothing to do with the file

12   name, then I would revise my opinion certainly.  And I

13   would remove the words "unreliable" and "bulk" and such,

14   but it's not something I can do, sitting at this table

15   today.

16         MR. GEITNER:  And, Woody, I don't want you to

17   get the wrong impression here but -- and just, by way of

18   example, Image B, there is a single 2004 photograph that

19   was crawled over at one point in 2004 that comprised a

20   dozen or so infringement instances on your spreadsheet,

21   which never happened, because that --

22         MR. POLLACK:  What do you mean it never

23   happened?

24         MR. GEITNER:  Because that catalog, the

25   thumb-nail size, the in-context use of the catalog on

1    the catalog order page went away, after the distribution

2    of the catalog went away.  It was replaced by another

3    fish catalog.

4            And so my point is that that --

5            MR. POLLACK:  He's 650 an hour.

6            MR. GEITNER:  -- single --

7            MR. POLLACK:  Let's you and I --

8            MR. GEITNER:  I know but the single --

9            MR. POLLACK:  -- visit this another time.

10           MR. GEITNER:  But, in that single instance,

11   though --

12           MR. POLLACK:  Well, let's --

13           MR. GEITNER:  -- represented, you know, a

14   dozen or so lines on your spreadsheet of infringement

15   uses for website, which just didn't exist.

16           MR. POLLACK:  But we can pick that up another

17   time.

18           MR. GEITNER:  Right.  I understand.

19           MR. POLLACK:  I get that's your argument.

20           MR. GEITNER:  Right.

21           MR. POLLACK:  And I get --

22           MR. GEITNER:  But you're talking about bulk.

23   If you go from --

24           MR. POLLACK:  Let's --

25           MR. GEITNER:  -- 12 down to 1, at best,

1    assuming you set aside the in-context use, then you're

2    talking about a substantial reduction in --

3             MR. POLLACK:  Well, I think --

4             MR. GEITNER:  -- quantities.

5             MR. POLLACK:  -- the bulk is an inappropriate

6    generalization.  At 650 an hour, I'm not going to go

7    through that.

8             MR. GEITNER:  I understand.  I understand.

9             MR. POLLACK:  I think he said enough on that,

10   and you and I can pick up that discussion.  I'm sorry.

11            THE WITNESS:  Just to cap -- just to cap that

12   that off --

13            MR. GEITNER:  Well, here's my point on this.

14   Because I don't want to get in an argument about this

15   staff either.  And I don't think Foster and Smith ever

16   had an issue with paying for what was actually used.

17            At the end of the day, whatever it was that

18   was used, we'd be interested in knowing because --

19            MR. POLLACK:  Right.  And we're -- our hands

20   are tied, because our ability to recreate history is --

21   is damaged because the tools that we have available to

22   us, the Wayback Machine and the information you have and

23   our willing to share is --

24            MR. GEITNER:  I disagree with that either.

25   And I'll --

1        MR. POLLACK:  And unless you want to pick this

2    up --

3        MR. GEITNER:  Yeah.  And I'll explain why I

4    said just that, but I disagree with that.

5        MR. POLLACK:  Okay.  Okay.  I got it.

6        MR. GEITNER:  Okay.

7        THE WITNESS:  I am little confused as to the

8    extent to which I answered the question.  But to cap

9    off, I -- I -- I hope that the Howards will present

10    revised Wayback Machine results with those URL's, with

11    new dates, and -- and -- and -- um, eliminate any

12    instances, in which there is incorrect date, in other

13    words, the date on the page inconsistent with the date

14    that the image was likely used.

15        And then, if authorized by my client or the

16    court, I'd like the opportunity to go back through and

17    recalculate.

18    **Q.    BY MR. POLLACK:  And you could as easily do**

19    **that.  It's a question of expense.  Is it worth**

20    **somebody's money for to you spend the time to do that?**

21    A.    It's -- I don't know that, under the

22    circumstances, that it is Foster and Smith's, um --

23    **Q.    Whose burden it is to --**

24    A.    Burden.

25        If it became their burden, and they asked me

1    to do it, I would gladly do it, as you might expect.

2        If -- you know, as a photographer, if I was in the

3    Howards' shoes, I would do it.  And I am going to look

4    further into this.

5            As I said, it is knew to me this -- this --

6    this issue with the Wayback Machine.  And I need to find

7    out if there are any other issues with their technology.

8            MR. POLLACK:  Okay.  Why don't we take a

9    break.

10           (Recess.)

11       **Q.    BY MR. POLLACK:  In-context usage.  Is it your**

12   **understanding that in-context usage necessarily comes**

13   **with rights to photographic works?**

14       A.    With respect to stock photography licensing,

15   if you look to the two largest companies, in fact, the

16   ones that you have used in your pricing examples for

17   Exhibits 9 and 12, Getty and Corbis, each of those

18   licenses, though they do not separately state that

19   in-context usage, would be allowed.

20           In-context usage of a catalog would be allowed

21   under those licenses; the catalog cover printed as a

22   thumb nail on a website, in order to facilitate

23   distribution of the catalog.  That sort of thing.

24           Otherwise, everything would grind to a hault.

25   For example, if you have a license to allow the usage of

1   a photograph on a book cover, but you, um -- there was

2   some prohibition on the reproduction of the front cover

3   of the book, so it couldn't appear on a Walmart site or

4   Barns and Noble or anything like that, you'd be in a lot

5   of issue -- a lot of trouble.

6          It's where you separately pull the photograph

7   out of the cover designs and -- and put it into an

8   advertisement or put it onto a web page, removed from

9   the context of the cover design, that you end up with a

10  separate use.

11         But to confirm my understanding, I contacted

12  both Getty and Corbis and asked that question of them,

13  in terms of the in-context usage for catalog-cover use.

14         Now, I don't believe that there are

15  allegations of overuse of in-context pictures of a,

16  let's say, the interior of a catalog in this -- in this

17  matter, because the Foster and Smith's website uses a

18  different design for -- for representing photographs.

19         But all of those cover -- catalog-cover usages

20  that were alleged to be infringements, in my opinion,

21  are not infringements.

22      **Q.   They're not infringements, because they are**

23  **in-context usage?**

24      A.   Right.

25      **Q.   And you believe in-context usage to**

1    **necessarily be a licensed usage, when you have a**

2    **license?**

3         A.   When it comes down to stock photography

4    licensing, yes.  And I don't know about the word

5    "necessarily."

6              I know that it is, essentially, the default in

7    the image -- in the stock image licensing business.  I

8    confirmed that with the two largest image licensors;

9    Getty being responsible for over 75 percent of all stock

10   image licensing in the world -- stock licensing

11   revenues, that is, and -- and Corbis being responsible

12   for some lesser percentage.

13             In terms of what a photographer might include,

14   on an assignment license, I can't tell you.  However, as

15   you heard in my example a moment ago, with a -- if I

16   went out and photographed a musician for an album cover,

17   and they wanted to reproduce that album cover in

18   context, that would be allowable.

19             If they took that image off that album cover

20   and put it on their website or put it in an ad, without

21   the type and everything outside of that cover design,

22   then that could be an infringement, if not licensed.

23        Q.   And is that -- is -- is that the nature of

24   **contract?**

25             **Is there a -- is that a limitation on a**

1    **copyright-infringement claim?**

2         A.    I -- I -- I've never seen anything in

3    copyright law that would allow in-context usage.

4              But I would say that the practice of -- in the

5    practice of image licensing that in-context usage is

6    typically allowed.

7              MR. POLLACK:  Let me hand you Exhibit 15,

8    which is another printout from the ASMP tutorial section

9    of their website.

10             And it's a, kind of, boiler plate terms and

11   conditions that they suggest photographers include with

12   their agreements.

13             (Plaintiff's Exhibit 15 was marked for

14        identification by the reporter and is attached

15        hereto.)

16             MR. GEITNER:  You made this -- what? -- 15?

17             MR. POLLACK:  I did, yes.

18             If you look on Page 2, Paragraph 2, and I

19   apologize, the font is small.

20             THE WITNESS:  I have bifocals.

21             MR. POLLACK:  Then it's easier for you, I

22   guess.

23             The, I think, second sentence in that begins

24   "Unless":

25                  "Unless, otherwise specifically provided

1   elsewhere in this document, no image licensed

2   for use on a cover of a publication may be

3   used for promotional or advertising purposes,

4   without the expressed permission of the

5   photographer and the payment of additional

6   fees."

7   Is this a specific contractual clause related

8   to in-context usage?

9   A.   I don't believe that this refers to in-context

10  usage here.

11  If you read this a little bit differently

12  than, I believe, you're understanding it, they're

13  saying, if you license an image for use on the cover of

14  a publication, you can't then take that image off of

15  that cover and use it for promotional or advertising

16  purposes.

17  **Q.   So we're just interpreting the sentence**

18  **differently?**

19  A.   Here you have -- if you read it and take it at

20  the -- quite literally, as it's written, it says:

21  "No" -- I can't write -- can I write on it?

22  **Q.   You're welcome to write on it.**

23  MR. GEITNER:  Well -- well --

24  MR. POLLACK:  He can write on it.

25  MR. GEITNER:  You can write on mine.

1        MR. POLLACK:  He can write on that one.

2        THE WITNESS:  All right.  I don't need to

3   write on it.

4        MR. GEITNER:  That's going to be part of the

5   record.

6        THE WITNESS:  I don't need to write on it.

7        MR. POLLACK:  No, just --

8        THE WITNESS:  No.  We're good.  We're good.

9   Because nobody is gonna see it but me.

10        MR. GEITNER:  But -- but, here, my point is --

11        MR. POLLACK:  If you write on it, it's -- it's

12   an exhibit.  You can --

13        MR. GEITNER:  No.  What I'm saying is, if he

14   writes on this one, I'll attach this one to it.  But, if

15   he writes on top of that line -- he's gonna line through

16   text.

17        THE WITNESS:  I'm gonna save us that trouble

18   and I'm just gonna talk about it.

19        MR. POLLACK:  I've got a printer right there.

20   I'll -- I'll --

21        THE WITNESS:  No.

22        MR. POLLACK:  -- make 15 copies.

23        THE WITNESS:  We're good.

24        MR. GEITNER:  Okay.  All right.  I've got one

25   here.  I was going to ask him to put it on the copy --

1          THE WITNESS:  Okay.

2          MR. GEITNER:  -- and we can may it B or

3     whatever.

4          THE WITNESS:  I'm -- I'm just gonna talk about

5     it cuz --

6          MR. GEITNER:  You know, 14.

7          MR. POLLACK:  I -- I think he doesn't want to

8     write on it anymore.

9          THE WITNESS:  I'm sorry.  I'm done.  I retract

10    my intent to write upon this.

11         MR. GEITNER:  Okay.  All right.

12         THE WITNESS:  Okay.  So --

13         MR. GEITNER:  I didn't mean to scare you away

14    from that.  I just -- you know.

15         THE WITNESS:  So let's go -- let's dig a

16    little deeper here.

17              "Unless otherwise specifically provided

18              elsewhere in this document, no image licensed

19              for use on a cover..."

20         So what they're saying -- they're not saying

21    that the cover may not be reproduced for promotional

22    advertising purposes, they're saying that the image may

23    not be separately reproduced for promotional or

24    advertising purposes.

25              It's a big problem, in the photography

1    industry, where you'll shoot a job for a magazine.

2    It'll appear on the cover, and then the, um -- let's say

3    it's a portrait of an executive for a company.

4            That company will approach that magazine,

5    let's say, Forbes and say, "We'd like to use that

6    image."

7            And it's, um -- it's a -- these reprint rights

8    often happen, where the publication will then license

9    the right to -- license or -- or sell the company copies

10   of the magazine cover, then the magazine copies -- the

11   reprints get distributed at that company.

12           And then somebody at the company says, "Hey,

13   that's a nice image.  Let's scan it, retouch out the

14   type and make use of it," as happened in that Kugan

15   matter, where they retouched out pieces of the cover

16   design, I believe.

17           And so that's what I think they're saying

18   here.  Was you can't -- just because you've licensed it

19   for usage on a magazine cover, doesn't mean that you can

20   pull the image off that cover and use it in advertising

21   and promotional purposes.

22       **Q.   BY MR. POLLACK:  So your understanding of the**

23   **licenses is that the Howards granted to Foster and**

24   **Smith, for cover usage of works permitted Foster and**

25   **Smith, to prepare blow-in cards with copies of those**

1   **covers and distribute as many of those as they wanted,**

2   **as many of those as Foster and Smith wanted, to**

3   **encourage new or existing customers to ask for catalogs.**

4       A.    That's the way -- that's, you know, really

5   the primary way to get catalogs out, to make customers

6   aware of the fact that the catalogs are in existence.

7           It's not like other things, where you've got,

8   let's say, it's an editorial magazine.  You've got five

9   years' worth of magazine, and you've got a bunch of them

10  in the back.

11          And you want to sell those magazines, and

12  you -- and you offer -- offer up these past issues of

13  magazines -- this is covers -- catalog covers for

14  catalogs, containing merchandise that is currently being

15  offered, and it's my understanding that they replaced

16  the catalogs, according to a regular schedule.

17          And so I -- I mean, to answer your question,

18  yes, the in-context would be permitted by standard

19  industry practice.

20          An argument could be made, with respect to

21  copyright law, and the fact that their image is being

22  reproduce and distributed.

23          You also have to understand where the -- the

24  user of the image is -- is gaining their understanding

25  from common practice and dealing with all their vendors

1    over time, where it's standard practice to be able to

2    use in-context images.

3              Now, they -- they could not pull that image

4    off of that cover and put it on a blow-in card.  In

5    other words, that picture, that fish taken out of the

6    cover of the magazine and just use the image itself, and

7    put it on a blow-in card.

8         **Q.   So they can put the cover on a blow-in card,**

9    **but they can't put the fish that's in the cover on the**

10   **blow-in card?**

11        A.   Correct.

12        **Q.   And that's as the nature of the contract**

13   **rights they've obtained?**

14        A.   It's the -- it's the nature of -- I suppose

15   you would say that the understanding of the parties, as

16   to what they could do -- what -- what -- what the

17   permissible is usage under the agreement.

18             The -- because any company can use, typically,

19   any photograph that's licensed to them for the usage  of

20   a -- for catalog usage or bookcover usage or whatever,

21   album-cover usage.  There's no more albums in the world,

22   but just throw that out there to date me.

23             Using the thumb-nail representations of the --

24   of the in con- -- of the image in context on the cover,

25   they're doing that so as to be able to facilitate the

1   distribution of the catalog that they've paid the rights

2   to be able to reproduce the image on.

3       **Q.   But you agree the creation -- or do you agree**

4   **the creation of an in-context use, the icon, is the**

5   **creation of a copy of the original work?**

6           MR. GEITNER:  Objection to form.

7           THE WITNESS:  It's consistent with my

8   understanding of what a copy is.

9           MR. POLLACK:  So that is right provided to the

10  copyright holder, which means the one who made the copy,

11  either had to have permission to do that, or it was an

12  infringement.

13          MR. GEITNER:  Objection to form.

14      **Q.   BY MR. POLLACK:  Do you agree with me so far?**

15      A.   I can't say that the in-context usage is an

16  infringement only because that type of usage is just

17  pervasive.

18          So of the millions upon millions of images

19  that are licensed by even the largest stock photo

20  agencies that in-context usage is provided.

21      **Q.   But that pervasive usage that could be**

22  **pervasive copyright infringement, maybe not worthy of**

23  **enforcement, but pervasive copyright infringement.**

24          MR. GEITNER:  Objection to form.

25          THE WITNESS:  I think I'll let the court make

1    that determination.

2        **Q.   BY MR. POLLACK:  So if a court decides that**

3    **in-context usage is exercising one of the rights**

4    **reserved for a copyright holder, would that alter your**

5    **opinion as to the value of the Howards' actual damages**

6    **in this case?**

7            MR. GEITNER:  Objection to form.

8            THE WITNESS:  Technically, my belief is that

9    the -- Foster and Smith reasonably received an implied

10   license by standard industry practice, to make use of

11   those catalog covers in context, on the web, on their

12   blow-in cards, and in other media, provided they didn't

13   use it outside of that context of that cover design.

14           And that implied license is gonna result in --

15   if, they did, in fact, receive an implied license, and

16   the court agrees with that, then that would not be an

17   infringement.

18       **Q.   Do you understand the legal elements for**

19   **implied license copyright?**

20       A.   I've seen your version of what an implied

21   license is, based on some case law that you've used in

22   one of your arguments.  I forget if it's in MSJ or in

23   your opposition to MSJ.

24           But as one of the criteria you listed, the

25   creation of an image and -- I mean, I don't know if I

1  made a copy of it, but it -- it was one of the criteria

2  that you listed was an absolute requirement in order for

3  there to be an implied license, and I'm not sure that

4  that's correct.

5      **Q.   You disagree with the law you think I've**

6  **cited?**

7      A.   I think that there can be an implied license

8  for a stock photograph, and where creation of the image

9  is not part of the equation.

10     **Q.   You think there can be a legally -- an implied**

11 **license, when you're using that term, are you using the**

12 **legal term implied license?**

13     A.   I'm --

14     **Q.   Let me back up.**

15        **Do you understand that the term implied**

16 **license in copyright law has a specific meaning?**

17     A.   I -- I understand this.  And what I'm talking

18 issue with is your -- you cited case law, where you

19 state that there's a necessary requirement that the

20 image be created with the intent for it to be used under

21 this implied license.

22        And what I'm responding back to you is, you

23 have to consider that there are two kind of licensing,

24 at least.

25        One is licensing of images that are created

1    for a specific purpose, and the other is licensing of

2    images that were previously created and are now being

3    used in -- or licensed for -- for -- for later use.

4            And, in other words, something from an

5    archive, from a -- from a photo library.  And there can

6    be an implied license, to make use of images that are

7    stock images, rather than assignment images.  In which

8    case, creation of the image is not a factor.

9        **Q.   But your -- your disagreement with me is based**

10   **on --**

11       A.   Respectful disagreement.

12       **Q.   Respectful.**

13            **But you're disagreeing with the law that I've**

14   **presented to the court.**

15       A.   You quoted from some case law, from a case,

16   where the fact pattern involved the creation of an

17   image.  And this case does not involve the creation of

18   an image on a commission basis.

19       **Q.   If the law that I cited is correct, or is the**

20   **law that this court decides to follow, does that alter**

21   **your opinion?**

22            MR. GEITNER:  I think you guys are talking

23   across purposes.

24            MR. POLLACK:  Well, let him answer my

25   question.

1          MR. GEITNER:  Sure.

2          THE WITNESS:  You're -- you're -- it's -- it's

3    another apples and oranges situation, where you're

4    quoting law for a situation that involved the creation

5    of a protective work.

6          This case does not involve the creation of a

7    protective work.  And right now we're talking about a

8    right that could reasonably have been presumed to have

9    been transferred to Foster and Smith, under a license

10   granted them, for a catalog cover use.

11         They could reasonably presume that they could

12   reproduce thumb nails because that's how it works in the

13   industry with all stock agencies or most stock agencies

14   and most clients.

15     **Q.   BY MR. POLLACK:  But do you agree that turns**

16   **on a legal conclusion, whether or not that license --**

17   **implied license does come with the work or not?**

18         MR. GEITNER:  Objection to form.

19         THE WITNESS:  If the court were to look at

20   this and say that there were -- there was no implied

21   license, then I would have to agree with the court, and

22   I'm not going to make a legal judgment.

23         I -- I'm the expert, coming to the table

24   with -- to help the court and the parties to understand

25   the conditions under which a licensee or a image user

1    could perceive that they were entitled to the use of the

2    image under the circumstances of normal image licensing

3    work flow.

4         **Q.   Okay.  Let's bring it home.  Exhibit 16.**

5              MR. GEITNER:  When does that mean, "bring it

6    home"?

7              MR. POLLACK:  I'm not going to answer that

8    question.

9              Do you have to write that down?

10             THE REPORTER:  Yeah.

11             MR. POLLACK:  There's a bracket.  Laughter.

12             THE WITNESS:  Right.

13             MR. POLLACK:  And the same time we're looking

14   at Exhibit 16, we'll turn to your report, Page 37.  And

15   we're talking about what you've labeled as "Disgorged

16   Profits" or the copyright --

17             THE WITNESS:  Page 37?

18             MR. POLLACK:  Page 37 of your report, Exhibit

19   16.

20        **Q.   Do you recognize Exhibit 16?**

21        A.   I do.

22        **Q.   What is Exhibit 16?**

23        A.   Exhibit 16 is an accounting of sales of

24   specific products after distribution of catalogs.

25             And so, for example, the March 2008 catalog is

1   distributed and then the sales occur of various

2   products, and it appears that this company, Foster and

3   Smith tracked the sales of their products.

4           I have a manufacturing business, a publishing

5   business, where I manufacture wholesale and retail

6   products and I do the same thing.

7           I look at my advertising.  I look at my unit

8   sales.  I adjust my advertising to maximize my unit

9   sales by tweaking the text and/or other elements, until

10  I achieve maximum sales.

11      **Q.   So -- and what you've done, in your report --**

12  **first of all, have you seen this type of document from**

13  **Foster and Smith for any other time periods or products,**

14  **or is this two-page document the only one you've seen?**

15      A.   I'm going to turn to my materials considered

16  list --

17      **Q.   Please.**

18      A.   I -- just to check.  I have, literally, seven

19  full file boxes of documents.  I know I have the

20  material considered here.

21      **Q.   It's Exhibit B -- I'm sorry -- Tab B to your**

22  **report.**

23          **(Pause in the proceedings.)**

24          THE WITNESS:  Refreshing my memory with my

25  list here, I believe that I obtained this document from

1    an exhibit to the deposition of Mr. Scribner, who I

2    believe, is CTO or held some kind of a CPA position or

3    accounting position relating to Foster and Smith.

4            And I'm not sure how many others I have, but I

5    was interested in this one.  When I saw this, I

6    requested copies of the actual catalog -- catalogs in

7    question for these months, so I could examine just as

8    a -- not a comprehensive analysis, but just as a -- to

9    pick a few reference points, to see what happened with

10   sales, when an image was associated with the product,

11   and when a Howard image was not run in association with

12   the product.

13           MR. POLLACK:  We're going to get back to that

14   in a second, but while you have the materials you

15   considered open, I meant to ask you earlier today, on

16   the last page of that document, the third to last item,

17   you list:  "Is Foster and Smith Internet department art

18   folder images."

19       Q.   What is that?

20       A.   I think that that was a -- provided to me on a

21   USB stick.  I'm not entirely certain.  But I had a USB

22   stick that was quite a number of images delivered to me

23   from Mr. Geitner, I believe, or from one of his

24   associates.

25           And that was the description that it was

1    given.  You know, the contents of the art folder.  And

2    subsequent to that and, within the last couple of weeks,

3    I've received a hard drive that I mentioned earlier in

4    my testimony, that I haven't had the opportunity to

5    fully inspect.

6           I just opened it, looked at the directory.

7    And it has image -- image files.  It has files that are

8    labeled as backups that I -- I'm not sure how to

9    decompress.  But I'll figure that out, if asked to

10   examine this and determines what is on this.

11          But I understand it to be the contents of

12   their server, as of today.

13       **Q.   Do you have an understanding as to how images**

14   **get from inside Foster and Smith to their external web**

15   **pages?**

16       A.   I have -- I -- I think both a general and a

17   specific understanding of that.

18          They have a web server that exists behind a

19   firewall, and they have to follow specific protocol to

20   push images to that web server, and it's actually a

21   little bit difficult to remove images from that server.

22   But a technical person can get in there and do that.  An

23   art person probably not.

24          So it's my understanding that the procedure

25   was for them to go out to the catalog department and

1  access images and bring them across for use in the

2  Internet department and decide what was going to go on

3  which pages.

4      Because the catalogs are inconsistent with the

5  usage of images, and the catalogs are somewhat

6  inconsistent images on the website.

7      They might us different images associated with

8  different products, based on how it looks on the web.

9  But they do pull images from the catalog department over

10  to the web department, push them out to the web server.

11      And then, um, I did notice that, in some

12  instances, on the web, they're using file names, such

13  as, Cover 1, Cover 2, Cover 3, Cover 4.

14      And so, presumably, they can change the covers

15  that appear on their website by uploading new files into

16  the same directory and just naming those file Cover 1,

17  Cover 2, Cover 3, Cover 4 and effectively overriding the

18  files that are there, which will cause the new files,

19  with the same file names, to appear on the website,

20  which still has the same code on it.

21      You know, it's set up to show Cover 1 in the

22  top, right corner.  It's going to be replaced when they

23  upload a new image called "Cover one."

24      **Q.  But if there's an image on their live web**

25  **server, is it your understanding that it means that that**

1   **image was, at some point, referenced in a Foster and**

2   **Smith web page?**

3       A.   That's not clear to me.

4           I do know that there was some testimony about

5   them pushing images out to the web server, but I don't

6   know if they pushed images out there that eventually

7   did not get used on their web sites.

8           You know, web images -- I have some expertise

9   because I have designed web sites, and I -- I'm a

10  project manager for web development, in addition to some

11  of the other hats I wear.

12          And it's not uncommon to have images existing

13  on a web server that are never available to public view.

14  What causes them to be available on a web page is by

15  inclusion of, either the file name in an image link, or

16  some kind of code that causes the image to actually a

17  appear.

18          It could be sitting there on the web server

19  and never appear on the website.

20      **Q.   Okay.  If we can turn back to Pages 37 and the**

21  **Exhibit 16.**

22      A.   (Witness complies.)

23      **Q.   And here you pointed out that, in March 2008,**

24  **a catalog, where one of Howards' images did appear, 88**

25  **of whatever the product was, a tap water filter**

1    replacement cartridge, 88 units were sold.

2            Whereas, in the equivalent month, the year

3    prior, March 2007, without the Howards' image, 84 units

4    were sold.

5            Is that correct?

6        A.    That is correct.

7        Q.    And you take those numbers from Exhibit 16,

8    the intersection of the March 2008 column, with the

9    three pack tab water filter refill row, being the 88,

10   right?

11       A.    I think so.

12       Q.    Isn't it true that four more tap water filter

13   cartridges were sold, when the Howards' image was placed

14   alongside it, than when it wasn't?

15           MR. GEITNER:  Objection to form.

16           THE WITNESS:  That variation of four units

17   made me want to look at some other instances.

18           And comparing across, as you see my third

19   example was January of '07, where there were 121 units

20   sold, where no photograph featured.

21           And so I earlier testified that the image is

22   not the only variable here.  And so this information is

23   not conclusive.  It's actually up to you and your client

24   to determine a causal nexus.

25           But I was looking at spot checking.  Their

1  sales figures relative to the image being used or not

2  used.  And it appeared to have no positive -- no

3  significant positive or negative affect to have the

4  image in there.

5           There are a number of other factors.  For

6  example, if you look at that January number, you know,

7  that's not really a seasonal number per se, because you

8  know, in December, you'd expect sales to increase

9  because people buy things as gifts very often.

10          I like that the March to March comparison year

11  over year.  Other things can affect this as well.  In

12  the meantime, a new product could have come out, a

13  replacement product.

14          There could have been a price change.  I

15  didn't check those things.  I was looking to spot check

16  it, but I would rely on you to establish that causal

17  nexus --

18          MR. POLLACK:  Well --

19          THE WITNESS:  -- and then a forensic

20  accountant, on the side of Foster and Smith, would

21  analyze whatever theories you put forth.

22      **Q.   BY MR. POLLACK:  And you're not a forensic**

23  **accountant?**

24      A.   I'm not a forensic accountant.

25          I'm very familiar with tables like this that I

1    use in my own businesses.  And I'm also very familiar

2    with branding, advertising and marketing concepts.

3        **Q.   But to your seasonal point January or 2007,**

4    **wouldn't it be reasonable for all the people who were**

5    **given aquariums at Christmas to go out and buy filter**

6    **packs that following month, justifying some kind of --**

7    **or at least providing a level of explanation for a more**

8    **dramatic increase in sales?**

9            MR. GEITNER:  Objection to form.

10            THE WITNESS:  If their relatives were cheap

11    enough not to buy them replacement filter packs then,

12    yes.

13            But, to your point, that is entirely possible.

14        **Q.   BY MR. POLLACK:  But looking back at the**

15    **comparison, just the straight up March-to-March**

16    **comparison, it's quote only four more units.  But that's**

17    **4.7 percent.**

18        A.   And what I did was I took a look at the

19    variation across the board.  You know, you can look

20    month to month as well and how much sales jump up and

21    down.

22        **Q.   Right.**

23            **But comparing -- going more broadly,**

24    **comparing -- just my understanding of the chart that**

25    **we're looking at it, if you go down the section of rows**

1    that the three pack water filter was in, it concludes

2    with subtotals and a total for Page 45, which I believe

3    to be the page that that pack was on.

4            And, in March 2008, there were 1,237 products

5    sold from Page 45, whereas, in March 2007, there were

6    only 1,166 products sold off of that page.

7            MR. GEITNER:  What are you looking at?

8            MR. POLLACK:  I'm looking at the March 2007,

9    the total page 45 products.

10           MR. GEITNER:  Yes.

11           MR. POLLACK:  The intersection of that with

12   March 2007 and the corresponding intersection of total

13   Page 45 products of March 2008.

14           THE WITNESS:  So there's a hundred --

15           MR. POLLACK:  Which is 71 more.

16           THE WITNESS:  About a hundred quantity

17   difference, which is about the same percentage, I think,

18   as the --

19           MR. POLLACK:  It's up a little.

20           THE WITNESS:  -- 84 to 88.

21           MR. POLLACK:  Six percent now.

22           THE WITNESS:  But the way that this type of

23   comparison should be done to -- to have a conclusive

24   determination is to put it in front of a focused group,

25   and put the image in there and see what affect it has.

1    And that's something that a lot of plaintiff's in

2    copyright matters do.

3        **Q.   BY MR. POLLACK:   That may be one way to do it.**

4    **You've not done that here; correct?**

5        A.   Correct, yeah.

6            That's not Foster and Smith's responsibility.

7    I just spot check their sales to determine if there was

8    some significant increase in sales, when the image was

9    in and when the image was not there of the same product.

10       **Q.   But is the test even whether there was a**

11   **significant change?**

12       A.   Um, are we talking about --

13           MR. GEITNER:  Objection to form.

14           THE WITNESS:  So -- so is your question,

15   Counselor, indicating that any change is a -- is a --

16   any change would be sufficient to determine that there's

17   a causal nexus between the use of the image?

18           I'm not saying that's the case.  I'm just

19   asking you if that's your question.

20       **Q.   BY MR. POLLACK:  My question is:  Why did you**

21   **conclude two things; one, that there was no significant**

22   **change.  And, two, why your conclusion that there was no**

23   **significant change meant that there was no causal nexus?**

24       A.   I need to look at my testimony.

25       **Q.   Okay.**

1      A.    And make sure that you're characterizing it

2   correctly.

3            (Pause in the proceedings.)

4            THE WITNESS:  So the wording of my report is

5   very specific and carefully worded, using terms like

6   generally supportive and referring to this -- these as

7   examples and samples, and that your assertion that there

8   was a causal nexus is speculative, until you go out

9   there and prove it.

10           It's possible that you will be able to prove a

11  causal nexus, but you're going to have to -- that's up

12  to you.  And then it becomes -- if there is a causal

13  nexus, then you have to look at which portions of the

14  profits were attributable, and that would be up to

15  Foster and Smith, of course.

16       **Q.    BY MR. POLLACK:  Is there a reasonable**

17  **relationship, between revenues received by Foster and**

18  **Smith from catalogs and websites that included the**

19  **Howards' images?**

20           **Is there a reasonable relationship between**

21  **those revenues and the Howards' images?**

22           MR. GEITNER:  Objection to form.

23           THE WITNESS:  When an image of the Howards

24  would be used on the cover of a catalog, I would think

25  that you could draw a line between -- a line of

1    connection, between the usage of that image and getting

2    people to open up that catalog and look at the inside.

3    And, by extension, perhaps, to buy products.

4         There's a whole lot of factors going on there.

5    So I'm not saying that all the profits are attributable.

6    I'm saying cover usage is a different ball game.

7         When it's on the inside, used as almost an

8    afterthought, for decorative purposes, the determination

9    of a causal nexus becomes much more difficult.

10         And I would not say that there was absolutely

11   no possibility of you proving a causal nexus, but I

12   would leave that up to you.

13         MR. GEITNER:  Objection.  I'm sorry.  Never

14   mind.  Strike that I said that.

15         MR. POLLACK:  Off the record for a second.

16              (Discussion off the record.)

17         MR. POLLACK:  We're back on.

18         But the decorative purposes have a reasonable

19   relationship to the look and feel, and the -- this is

20   back to our horse stirrups example from earlier in the

21   day.

22         There's a connection between putting fish

23   pictures with fish products as a way to convey to your

24   customers, in part, we know what we're doing when it

25   come to selling fish products.

1      MR. GEITNER:  Objection to form.

2      THE WITNESS:  The connection between the use

3  of images in that manner and any actual revenues and

4  profits benefiting Foster and Smith can be a difficult

5  line to draw.  And I'm not the person to draw that line.

6      MR. POLLACK:  I have no further questions.

7      MR. GEITNER:  Great.  We'll read then.

8      THE WITNESS:  Do I get 30 days or...

9      MR. POLLACK:  From whenever she gets it to

10  you.

11      MR. GEITNER:  Yeah.

12      MR. POLLACK:  I appreciate your time, Sir.

13      MR. GEITNER:  Are you ordering it?

14      MR. POLLACK:  Yeah.  I will ask for a copy.

15      MR. GEITNER:  Okay.

16      THE REPORTER:  The original and one -- you get

17  the copy (indicating.)  He gets the original.

18      MR. POLLACK:  That's fine.

19      MR. GEITNER:  Well, I'm not ordering it.

20      THE REPORTER:  He would get the original to --

21      MR. GEITNER:  To review.

22      THE REPORTER:  Right, and it goes back to who?

23      MR. GEITNER:  Well, if I order it -- are you

24  ordering it, I guess, is what I'm trying to figure out?

25  If you're not ordering it -- I'm not sure that I need

1    to.

2              MR. POLLACK:  Oh, I would like a copy of it.

3              MR. GEITNER:  If I order it.  You see, what

4    I'm saying?  Are you ordering --

5              MR. POLLACK:  You just want to save the cost

6    of the --

7              MR. GEITNER:  No, no.  I generally have to --

8              THE REPORTER:  You want this on the record?

9              MR. POLLACK:  No.

10             MR. GEITNER:  No.

11   (The deposition proceedings were concluded at 5:33 P.M.)

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

Page 235

WITNESS'S CERTIFICATE

1
2
3
4          I am the witness in the foregoing deposition.
5   I have read the foregoing deposition, and having made
6   such changes and corrections as I desire, I certify that
7   the same is true of my own knowledge, except as to
8   matters which are therein stated upon my information or
9   belief, and as to those matters, I believe it to be
10  true.
11          I declare under penalty of perjury under the
12  laws of the State of California that the foregoing is
13  true and correct.
14
15          Executed on _____,
16  at _____, California.
17
18
19
20
21          _____
22                  PROFESSOR JEFFREY SEDLIK
23
24
25

1                    CERTIFICATION

2                         OF
              CERTIFIED SHORTHAND REPORTER
3

4         I, the undersigned, a Certified Shorthand

5    Reporter, of the State of California, do hereby certify:

6         That the foregoing proceedings were taken

7    before me at the time and place herein set forth;

8         That any witnesses in the foregoing

9    proceedings, prior to testifying, were placed under

10   oath;

11        That a verbatim record of the proceedings was

12   made by me, using machine shorthand, which was

13   thereafter transcribed under my direction;

14        Further, that the foregoing is an accurate

15   transcription thereof.

16        I further certify that I am, neither

17   financially interested in the action, nor a relative or

18   employee of any attorney of any of the parties.

19

20        IN WITNESS WHEREOF, I have this date

     subscribed my name _____.
21

22        Dated: _____

23        Certificate Number _____

24

25